**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| NEW MEXICO HEALTH CONNECTIONS, a New Mexico Non-Profit Corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) |
| CENTERS FOR MEDICARE AND MEDICAID SERVICES, | ) ) ) ) |
| SYLVIA MATHEWS BURWELL Secretary of the United States Department of Health and Human Services, in her official capacity, | ) ) ) ) ) |
| And | ) ) |
| ANDREW M. SLAVITT Acting Administrator for the Centers for Medicare and Medicaid Services, in his official capacity, | ) ) ) ) ) |
| Defendants. | ) ) ) ) ) ) ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I.   Introduction

1.   In 2010, Congress enacted the Patient Protection and Affordable Care Act ("ACA"), Pub. Law No. 111-148, 42 U.S.C. § 18001 *et seq.*, to expand access to health care coverage in the United States by making it *affordable* and *accessible*, regardless of an individual's health history.

2.   One critical aspect of making health care more affordable is to foster competition in the health insurance market, which has historically been lacking in many communities across the country.  To facilitate this competition, the ACA created the Consumer Operated and Oriented Plan ("CO-OP") program, which provided start-up funding to new non-profit health insurers committed to the development of innovative health insurance models that would invigorate competition, drive costs down, and increase the quality of health care delivered to consumers in the individual and small group markets.  *See* ACA, Pub. L. No. 111-148, § 1322(a)(1)-(2) (codified at 42 U.S.C. § 18042(a)(1)-(2)); HHS et al., *Loan Funding Opportunity Number: OO-COO-11-001* (Dec. 9, 2011), at 7, 10, available at https://apply07.grants.gov/apply/opportunities/instructions/oppOO-COO-11-001-cfda93.545-instructions.pdf.

3.   New Mexico Health Connections ("NMHC") is a non-profit health insurer that was established under the CO-OP program.

4.   NMHC has been enrolling New Mexicans in its affordable, innovative insurance plans since October 2013, offering coverage to individuals (particularly those previously uninsured), small businesses, and large businesses.

5.   NMHC has grown rapidly over the past three years, and now serves 44,500 members, as consumers sign up for its affordable plans that focus on care coordination and medical management – an innovative model that creates value both for the consumer and the

insurance carrier by using better and smarter delivery of health care services to improve health

and drive down costs.

6.     NMHC focuses relentlessly on making health care both better coordinated

and less expensive.  It engages in highly successful outreach efforts, such as ensuring that its

members are complying with their prescription drug regimens to maintain their health status.

This is particularly important for patients with chronic conditions who are at risk of serious

disease progression.  As disease progression is controlled, consumers are not only healthier but

can avoid costly hospitalizations and specialized procedures.  Fewer hospitalizations and

specialized procedures result in cost savings to NMHC, which NMHC passes on in the form of

lower premiums.

7.     NMHC also promotes and provides early and proactive care coordination,

which has led to lower hospitalization rates (nearly 20 fewer admissions per 1000 members than

New Mexico's average) and hospital readmission rates (as low as 6.2 percent, bettering the best

performing national benchmarks).  These impressive figures improve not only consumer health,

but also drive down health care costs.

8.     Although NMHC has been quite successful, expanding coverage to those

consumers who need it most while keeping premiums down, its business success has been

threatened by the Department of Health and Human Services ("HHS") and the Centers for

Medicare and Medicaid Services ("CMS"), which have implemented the "Risk Adjustment"

program of the ACA in a manner that brutally penalizes new, innovative, low-cost insurance

companies and flouts Congress's intent in enacting the ACA.

9.     With the influx of new insureds and the ACA's prohibition against

denying coverage or setting premiums based on an individual's health history, Congress

recognized that there was likely to be some uncertainty in the market after the ACA went into

effect.  To address this uncertainty and maintain stability in the health insurance market,

Congress enacted a trio of risk stabilizing measures often referred to as the "3 Rs": the

Reinsurance, Risk Corridor, and Risk Adjustment programs.  Risk Adjustment, which is the

focus of this action, is the only permanent program and was created to mitigate patient selection

bias by compensating insurers in the individual and small group markets whose enrollees prove

to be sicker and, therefore, costlier.  *See* CMS, *Reinsurance, Risk Corridors, and Risk*

*Adjustment Final Rule* (Mar. 2012), at 3, available at https://www.cms.gov/cciio/resources/files/

downloads/3rs-final-rule.pdf (Congress intended that these three programs would be

implemented concurrently and harmoniously "to provide certainty and protect against adverse

selection in the market while stabilizing premiums in the individual and small group

markets…").

       10.     The theory of Risk Adjustment is that plans should not fail or succeed

solely because they attract sicker or healthier enrollees, but rather should compete based on

price, efficiency, and service quality.  *See* CMS, *March 31, 2016, HHS-Operated Risk*

*Adjustment Methodology Meeting:  Discussion Paper* (Mar. 24, 2016), at 1-2, available at

https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/RA-

March-31-White-Paper-032416.pdf;  CMS, *Reinsurance, Risk Corridors, and Risk Adjustment*

*Final Rule* (Mar. 2012), at 3, 13, available at https://www.cms.gov/cciio/resources/files/

downloads/3rs-final-rule.pdf.

       11.     NMHC understood and built its business model on these principles.  As

stated on its website, NMHC's approach to health insurance is *exactly* what was intended by the

ACA:  "This is a free market.  If we can offer a plan that is on par with or better than existing

plans, with similar or better benefits, many New Mexicans will have an obvious reason for joining our Consumer Operated and Oriented Plan and experiencing the benefits of a consumer-friendly organization."

12.     Unfortunately, HHS and CMS have not carried out the intent of Congress or the express mandates of the ACA when developing the Risk Adjustment methodology. Rather than stabilize the marketplace, they have destabilized it.  Rather than create competition, they are crushing the small, innovative new entrants.  Rather than driving down prices for consumers, they are encouraging issuers to raise rates higher and higher and are punishing carriers like NMHC who are pursuing a low-price strategy to benefit their enrollees.

13.     The government's actions have cost NMHC and its members millions of dollars and pose a substantial threat to NMHC's continued success in achieving the affordability and accessibility goals of the ACA.

14.     For benefit year 2014, NMHC was assessed a Risk Adjustment charge of $6,666,798.00, representing 21.5% of its premiums.  NMHC's Risk Adjustment penalty was paid over to New Mexico's long-time, dominant carrier, Blue Cross Blue Shield of New Mexico ("BCBSNM"), which received total Risk Adjustment payments of $7,471,700.44.

15.     As if the sting from 2014 was not bad enough, NMHC learned on June 30, 2016, that its Risk Adjustment charge for benefit year 2015 is a whopping $14,569,495.74, which amounts to 14.7% of its premiums.  Again, this money will be paid out as a subsidy to BCBSNM, which will collect a total of $18,263,691.23 from the Risk Adjustment program for 2015.

16.     In the health insurance industry, well-managed, successful companies hope for a margin of between 2%-5% per year.  Paying out 14-22% of premiums in one year can

wipe out a carrier's margins for years to come, imposing a huge burden on NMHC and its members.

17.     BCBSNM hardly needs this money.  These payments represent a tiny fraction of BCBSNM's annual premiums.  BCBSNM is a subsidiary of the Chicago, Illinois-based health insurance conglomerate Health Care Services Corporation ("HCSC"), which according to credit rating agency A.M. Best, had nearly $10 billion in total capital and surplus as of the end of 2014.  This is not an institution in need of a few extra million dollars to remain afloat.

18.     NMHC, the small issuer that has perfectly aligned with the goals and mandates of the ACA by developing a competitive, innovative, low cost business model, is thus perversely subsidizing the behemoth BCBSNM.  This regulatory dystopia is the equivalent of forcing the local baker who sells cupcakes to neighborhood coffee shops to pay between 14% and 22% of his revenue to Nabisco.

19.     What accounts for this reverse Robin Hood dynamic that defies the intent of ACA?  It is the collective effect of several severe flaws in CMS's Risk Adjustment formula, with one key culprit being the formula's use of the statewide average premium to set the amount of payments and assessments for plans.  The flaws in CMS's formula penalize NMHC for offering low premium, high quality plans and reward its competitors, like the market-dominating BCBSNM, for keeping their prices high – an absurd distortion of Congress's clear intent to create an affordable, competitive insurance marketplace.

20.     The Risk Adjustment program, as set out in the text of the statute that Congress enacted, is intended to assess and compare insurers' relative "actuarial risk."  CMS's formula calculates a relative health risk score for the insurer's covered population, multiplies that

by the statewide average premium, and then multiplies that result by billable member months.  In New Mexico, as in other states, the statewide average premium is largely driven by large, established, high cost insurers like BCBSNM, who have dominated their local insurance markets for decades.

   21. The statewide average premium is substantially higher than NMHC's premiums, not because its population enters the market healthier, but rather due to NMHC proactively managing and coordinating the care delivered to its members, with particular attention to managing chronic diseases and behavioral health issues.  This results in stabilizing conditions, improving health, and thereby reducing costs.  Fundamental to its approach and business model, NMHC proactively identifies, stratifies and aggressively manages the clinical and financial risk of its members, differentiating itself from those carriers that historically act principally as financial organizations with perfunctory medical management "bolt-ons." NMHC's results have been achieved because of its fundamental understanding of how most effectively to intervene in the chronic care spectrum, proactively addressing health care conditions.  Some of these activities include:

- Outreach to 100% of members in the post-hospital discharge timeframe;

- Outreach to members who fail to fill their critically important chronic care medications at two and ten days after failure to refill;

- An extraordinary focus on behavioral health, which reduces concurrent chronic disease costs by a factor of 2.0x – 3.0x;

- Creation of benefits that include $0 copayments for behavioral health visits and primary care visits;

- $0 copayments for generic medications for nine common chronic conditions, including behavioral health related conditions;

- A home telemonitoring program for the most fragile, high-risk members with uplinks of biometric data for close monitoring by nursing staff, well before an emergency room visit or hospital admission becomes necessary; and

▪ A well-resourced prior authorization process that is more likely to result in a physician peer-to-peer conversation to optimize a patient's care plan rather than the usual, transactional denial letter from an anonymous health insurance plan medical director.

22.     These clinical initiatives cut costs by keeping people healthier and containing disease progression.  Those cost savings are passed on to NMHC's members in the form of lower premiums than BCBSNM charges.  But it is precisely these cost savings driven by innovative, better care management that CMS's Risk Adjustment formula penalizes by calculating payment assessments through the statewide average premium, a metric driven by BCBSNM's higher prices.

23.     This was not what Congress intended or authorized in the ACA.  The Risk Adjustment program as mandated by Congress is intended to adjust for actuarial risk, and nothing else, in order to prevent insurance carriers from being penalized or rewarded solely because they happen to attract greater or fewer sick enrollees.  Risk Adjustment is not intended to mitigate other cost factors, such as different care management models, or to penalize innovative, efficient business models that drive down premium costs.  CMS has usurped the authority of both Congress and state insurance regulators and decided that it does not want insurance companies competing by driving down premiums through new models of managing consumers' health care.  CMS has instead chosen to force NMHC to cross subsidize larger, entrenched competitors that continue to pile high costs on to an ever more beleaguered public as they continue to rely on inadequate or inefficient models of managing health care delivery.  Indeed, the Risk Adjustment methodology rewards and incentivizes issuers to price at or above the statewide average premium to benefit from CMS's Risk Adjustment formula, making a mockery of the "Affordable" in the "Affordable Care Act."

24.     Moreover, as detailed throughout this Complaint, there are a host of other arbitrary and perverse features to CMS's Risk Adjustment formula, each of which is problematic on its own and devastating in combination to the small, non-profit health plans that have entered the market since passage of the ACA.

25.     CMS and HHS are well aware of these problems as they have been repeatedly raised by various insurers (including NMHC) and others in the health care industry. For example, in November 2015, CHOICES, a multi-state coalition of health care plans, submitted to Defendant Sylvia Burwell, in her capacity as Secretary of the Department of Health and Human Services, a white paper written with the technical assistance of Richard S. Foster, Chief Actuary of CMS from 1995 through 2012.  *See* CHOICES, et. al., *Technical Issues with ACA Risk Adjustment and Risk Corridor Programs, and Financial Impact on New, Fast-Growing, and Efficient Health Plans* (Nov. 4, 2015), available at http://nashco.org/wp-content/uploads/2015/11/CHOICES-White-Paper-on-Risk-Adjustment-Issues.pdf.  That paper detailed numerous problems with the ACA's Risk Adjustment and Risk Corridor programs and offered this foreboding prediction:  unless changes are made to the Risk Adjustment and risk corridor programs, the viability of "efficient, public-focused health insurance plans will be severely jeopardized."  *Id.* at 1.

26.     That prediction was all too accurate.  Several new, quickly growing, innovative health insurance companies across the country have been forced into insolvency because of exorbitant Risk Adjustment assessments that have at times exceeded 20% of premium revenue.  Most recently, Oregon Health CO-OP, HealthyCT, and Land of Lincoln, all announced that they must shutter their doors due to their 2015 Risk Adjustment assessments, which were just issued on June 30, 2016.  Their insureds must now scramble for different coverage and their

providers are left wondering if they will get paid for pending claims.  These markets now offer

less choice to consumers, rather than the vibrant competition envisioned by ACA.

27.     Evergreen Health Cooperative, Inc., an insurer in Maryland, is teetering on

the brink of receivership as the result of its 2015 Risk Adjustment assessment.

28.     Even when insurers can stay in the market, the extreme and arbitrary cost

swings caused by the Risk Adjustment program are leading to a wave of requests across the

country for double-digit percentage increases in individual and small group premiums.  *See*

Antonia Ferrier, *Obamacare: Premium Increases Aplenty,* INSURANCENEWSNET (May 16, 2016),

available at http://insurancenewsnet.com/oarticle/obamacare-premium-increases-aplenty.  New

Mexico communities are particularly severe victims of this dynamic.  Based on NMHC's review

of the most recent rate filings in New Mexico, all health plans, reacting to the unpredictability of

the Risk Adjustment Program, are estimating that they will incur a payment transfer under the

2017 Risk Adjustment program:

| Carrier | Avg. Premium PMPM | Expected RA Transfer/Receivable PMPM |
|---|---|---|
| NMHC | $417.12 | -$42.85 |
| BCBS | $525.86 | -$38.38 |
| Molina | $321.29 | -$17.05 |
| Presbyterian | $405.65 | -$1.55 |
| Christus | $273.01 | -$0.13 |

29.     This is despite the fact that, by design, the Risk Adjustment formula will

never assess charges against every carrier in a market, but rather splits the market into winners

and losers whose payments and charges, according to CMS, will net to zero.  The only

explanation why every carrier assumes that it will pay an Risk Adjustment assessment is that

CMS's formula is so unpredictable and so dangerous to a carrier's financial health that

conservative, prudent managers feel they have no choice but to assume the worst.

-10-

30.     These assumptions of extra costs by every carrier have harsh real world consequences for consumers in New Mexico.  Unpredictability in the Risk Adjustment program is one of the major factors contributing to the large rate increases for individual insurance products in 2017, as illustrated below.

| Carrier | Rate Increase |
| --- | --- |
| BCBS | 93% |
| NMHC | 33% |
| Molina | 24% |
| Presbyterian | 21% |
| Christus | 13% |

31.     Under CMS's Risk Adjustment program, middle-class Americans seeking affordable health insurance coverage lose:  they have fewer options to choose from as carriers are forced to shutter and the remaining options they have are skyrocketing in price.

32.     In fact, in New Mexico, Presbyterian Health Plan has formally announced its intention to exit the individual insurance exchange.  BCBSNM has not yet announced if it will remain on the exchange – even though it has been the great beneficiary of the broken Risk Adjustment system.  Numerous health plans, both local, *e.g.*, Presbyterian Health Plan and BCBSNM, and national, *e.g.*, United Health Care, Humana, and Assurant, have withdrawn or are considering withdrawing from the individual market exchanges.  And continued application of the Risk Adjustment formula could potentially force NMHC to close within the next few years.  The upshot is that CMS's Risk Adjustment program could leave New Mexico with one or no exchange offerings and deprive New Mexicans of the opportunity to obtain affordable health insurance – the very opposite of Congress's intent in enacting the ACA.  This situation has already occurred in Alaska where the state government is paying a subsidy to keep carriers from

withdrawing their products from the individual market exchange.  It is highly unlikely the State

of New Mexico could support such corporate welfare payments.

33.     State insurance regulators from across the country have asked CMS and

HHS to fix the Risk Adjustment program.

34.     Maryland Insurance Commissioner Redmer has made multiple proposals

to CMS to mitigate the volatile impact of the Risk Adjustment program, including a proposed

order that would cap Risk Adjustment payments.  *See Review of Obamacare Consumer Operated*

*and Oriented Plans (CO-OPs):  Hearing Before the H. Oversight & Govt. Reform Comm.,* 114th

Cong. (Feb. 25, 2016) (statement of Al Redmer, Jr.), available at https://oversight.house.gov/wp-

content/uploads/2016/02/2016-02-25-Written-Testimony-Redmer-MIA.pdf.

35.     Connecticut Insurance Commissioner Wade has met with CMS along with

multiple other Commissioners to request changes, and even met personally with Secretary

Burwell.  *See* Conn. Ins. Dept., *Insurance Department Places HealthyCT Under Order of*

*Supervision* (July 5, 2016), available at

http://www.ct.gov/cid/cwp/view.asp?a=1269&Q=582452.

36.     New York's Superintendent of Financial Services wrote to HHS

articulating her concern with the Risk Adjustment program's disparate impact on new, smaller

insurance issuers, and requesting "immediate changes" to obviate these disparities and ensure the

solvency of New York issuers.

37.     Illinois' Acting Director Dowling went so far as to order an insurer in her

state not to make Risk Adjustment payments.  *See* ILL. DEPT. OF INS., AGREED CORRECTIVE

ORDER: NO. 2016-1 (June 27, 2016), available at

http://insurance.illinois.gov/newsrls/2016/06/coop_06302016.pdf.

38.     These are the people recognized by CMS as the "primary regulators of their insurance markets," and whose very job is to ensure the stability of the health insurance market and protect consumers.  *See* Amendments to Special Enrollment Periods and the Consumer Operated and Oriented Plan Program, 81 Fed. Reg. 29,146, 29,152 (May 11, 2016). These state insurance commissioners are the true subject-matter experts, and their resounding condemnation should have shaken the complacent federal bureaucracy in Washington, D.C.

39.     Despite the numerous warning signs, the pleas for help, and the mounting casualties, HHS and CMS have failed to correct the Risk Adjustment program.  They have publicly admitted its flaws, but have offered no relief (not even simple stop gap measures), essentially turning a cold shoulder to these small and new non-profit companies trying to effect real, meaningful change in the health insurance market under the ACA and to the many thousands of new insureds who have found coverage that suits them.

40.     NMHC now brings this action for declaratory and injunctive relief to put a stop to this system that is supposed to stabilize the market, but instead has already caused tremendous destabilization and wreaked havoc for thousands of consumers trying to find an affordable health insurance plan.  If not stopped, HHS and CMS, through their unlawful, arbitrary and capricious Risk Adjustment program, will cause further turmoil and will undermine competition, consumer choice, and access to affordable health care.  The public has suffered more than enough from these runaway regulatory abuses, and it is time for this court to step in and end them.

## II.     Jurisdiction and Venue

41.     This Court has subject matter jurisdiction over the Plaintiff's claims under Article III of the United States Constitution and 28 U.S.C. § 1331.  Judicial review is authorized by the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* which permits "[a] person suffering

legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . to judicial review thereof."  5 U.S.C. § 702.

      42.    Venue is proper in this district under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## III.    The Parties

      43.    Plaintiff New Mexico Health Connections is a New Mexico nonprofit corporation based in Albuquerque, NM, with its principal place of business located at 2440 Louisiana Blvd. NE, Suite 601, Albuquerque, NM 87110.  NMHC offers health insurance coverage in New Mexico's individual and small group markets, which are subject to Risk Adjustment.

      44.    Defendant HHS is the federal agency responsible for overseeing federal administration of the ACA.

      45.    Defendant CMS is the agency within HHS immediately responsible for overseeing federal administration of the ACA, including the Risk Adjustment program.

      46.    Defendant Sylvia Mathews Burwell is the Secretary of HHS and is responsible for the overall administration of HHS.  She is sued in her official capacity.

      47.    Defendant Andrew M. Slavitt is the Acting Administrator of CMS and is responsible for overseeing CMS.  He is sued in his official capacity.

      48.    Defendants are collectively referred to as "the Government."  Defendants' address is 200 Independence Avenue, SW, Washington, DC 20201.

**IV.     Factual Background**

**THE AFFORDABLE CARE ACT PREMIUM STABILIZATION PROGRAMS**

**A.     The Affordable Care Act**

49.     Enacted in 2010, the ACA brought major health care reform to the United States.  As noted *supra*, one major goal of the ACA was to foster competition in the insurance market because, as Defendant Burwell has explained, competition improves health care from both a cost and quality perspective: "[w]hen there is competition, that creates downward price pressure, and it also creates upward quality pressure."  Zachary Tracer, *Top U.S. Health Official Highlights Need for Insurer Competition,* BLOOMBERG (July 15, 2016), available at http://www.bloomberg.com/news/articles/2016-07-15/top-u-s-health-official-highlights-need-for-insurer-competition.

50.     While cost and quality (improved through competition in the market) are important ACA goals, another critical component of the ACA is to ensure the availability of care to all Americans, regardless of their medical history or health status.  Prior to the implementation of the ACA, insurers were free to deny coverage or raise premium rates based on individual factors such as medical history or preexisting conditions.  The ACA changed this landscape through its "guaranteed issue" and "community rating" provisions, which prohibited insurance issuers from denying coverage or increasing rates based on an individual's health status.

51.     While providing a crucial step in expanding access to health care coverage, these provisions were problematic for health insurance issuers as they made it difficult to accurately predict health care costs, which could result in large financial losses and premium volatility.  Issuers had no way of assessing health care costs of this new class of previously uninsured Americans, and were unable to adjust premiums to account for unpredictable costs that may accompany these new members.  Due to these inherent financial risks and in order to

provide stability and certainty for health insurance issuers (and to encourage participation on the newly created individual health insurance exchanges), the ACA established three premium stabilization programs: the Reinsurance, Risk Corridor and Risk Adjustment programs.

52.     These inter-related programs, colloquially referred to as the "Three Rs", were designed to mitigate the difficulties and uncertainties during the ACA's rollout "to assist insurers through the transition period, and to create a stable, competitive and fair market for health insurance," particularly during the first few years of full ACA implementation.  CMS, *The Three Rs: An Overview* (Oct. 1, 2015), available at https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2015-Fact-sheets-items/2015-10-01.html.  Congress recognized that this uncertainty could lead insurers to increase premiums and cause instability in the market, and the Three Rs were designed to alleviate these potential problems and minimize an insurer's potential losses due to market participation under the ACA's new rules.

53.     Just one of the "Three Rs" is at issue in this Complaint: Risk Adjustment.

**B.     Risk Adjustment Program**

54.     The Risk Adjustment program is the only permanent "R" program; the other two are temporary programs that will sunset after 2016.  The Risk Adjustment program, which aims to protect consumer access to coverage options by "reducing the incentive for insurance companies to seek only to insure healthy individuals," distributes funds to and makes assessments against insurers based on the actuarial risk (*i.e.*, the relative health or sickness) of their enrollees.  *Id.*  Theoretically, insurance issuers with healthier populations will make payments to CMS and issuers with sicker populations will receive payments from CMS.  The program aims to "level the playing field" between insurers to prevent carriers from making or losing money solely because they draw healthier or sicker enrollees.

55.     States may offer their own risk adjustment program or allow the federal government to administer their program for them.  New Mexico opted to allow the federal government to administer its Risk Adjustment program.

56.     Specifically, the text of the ACA statute provides that:

> each State shall assess a charge on health plans and health insurance issuers [in the individual or small group market within the state] . . . if the actuarial risk of the enrollees of such plans or coverage for a year is less than the average actuarial risk of all enrollees in all plans or coverage in such State for such year that are not self-insured group health plans (which are subject to the provisions of the Employee Retirement Income Security Act of 1974). . . .

> each State shall provide a payment to health plans and health insurance issuers [in the individual or small group market within the state] . . . if the actuarial risk of the enrollees of such plans or coverage for a year is greater than the average actuarial risk of all enrollees in all plans and coverage in such State for such year that are not self-insured group health plans (which are subject to the provisions of the Employee Retirement Income Security Act of 1974).  ACA, Pub. L. No. 111-148, § 1343 (codified at 42 U.S.C. § 18063).

57.     At the most basic level, Risk Adjustment assessments and payments are based on "individual member risk scores" and aggregated to a plan's membership base.  Members' risk scores are intended to reflect their anticipated health costs based on their age, gender, and medical diagnoses.  An individual with more complex medical needs (and, presumably higher health costs) should be ascribed a higher risk score.  A membership base's risk score is then compared with the average risk score within the relevant state and market.  The government then calculates Risk Adjustment payments and assessments based on these relative risk scores.

58.     Unfortunately, the Risk Adjustment program as implemented by CMS and HHS does not assess only the relative health status or actuarial risk of an enrollee.  Rather, it

assesses irrelevant factors, wholly unrelated to actuarial risk, such as differences in premiums, consumer choice of metallic tier, and length of member enrollment, creating a program that flouts Congressional intent, drives up premiums, and chokes off competition.

## NMHC IS FORMED TO PROVIDE AN INNOVATIVE AND AFFORDABLE HEALTH INSURANCE OPTION IN NEW MEXICO

### A.     The ACA CO-OP Program

59.     One major aspect of the ACA's health care overhaul was the establishment of health insurance marketplaces or exchanges, which offered consumers organized platforms to shop for coverage with specified benefit levels.  These exchanges were established to meet the ACA's goal of providing "competitive environments in which consumers can choose from a number of affordable and high quality health plans."  Steven Sheingold, et al., *Competition and Choice in the Health Insurance Marketplaces, 2014-2015: Impact on Premiums,* ASSISTANT SEC'Y FOR PLANNING AND EVALUATION ISSUE BRIEF (July 27, 2015), at 1, available at https://aspe.hhs.gov/sites/default/files/pdf/108466/rpt_MarketplaceCompetition.pdf.

60.     To offer plans on the exchanges, an issuer must certify that the plans are "qualified health plans" ("QHPs"), that is, that they meet certain federally-mandated criteria. The ACA offered tax credits and cost sharing subsidies to help low-income individuals purchase QHPs through the Exchanges.  *See* ACA, Pub. L. No. 111-148, §§ 1401-02 (codified at 26 U.S.C. § 36B, 42 U.S.C. § 18071).

61.     In order to promote competition within the exchanges and to provide consumers with greater choice among QHPs, the ACA created the CO-OP program, which authorized the creation of nonprofit health insurance issuers to offer QHPs primarily to the individual and small group markets on the exchanges.  *See* ACA, Pub. L. No. 111-148, § 1322(a)(1)-(2) (codified at 42 U.S.C. §18042(a)(1)-(2)).  The ACA expressly provided that, in

funding new CO-OP carriers, CMS should give priority to applicants that will utilize integrated care models.  *See* ACA, Pub. L. No. 111-148, § 1322(b)(2)(ii) (codified at 42 U.S.C. § 1322(b)(2)(ii)).

**B.     NMHC Is Formed to Deliver Integrated Care and Drive Down Costs in New Mexico.**

62.     NMHC was initiated by a group of community advocates in 2011 to apply for a CO-OP grant under Section 1322 of the ACA.

63.     On February 19, 2012, NMHC signed a loan agreement ("Loan Agreement") with HHS to fund its initial formation and operation in New Mexico.  *See* Loan Agreement, CMS & NMHC (Feb. 19, 2012).  NMHC began enrolling members in October 2013 for coverage set to go into effect in January 2014.

64.     The Loan Agreement required NMHC to develop viable and sustainable CO-OP offering plans deemed certified by CMS as QHPs to participate on the ACA health insurance exchanges.  *See* HHS et al., Loan Funding Opportunity Number: OO-COO-11-001 (Dec. 9, 2011), at 8, 22, available at https://apply07.grants.gov/apply/opportunities/instructions/oppOO-COO-11-001-cfda93.545-instructions.pdf.

65.     To be deemed certified, NMHC was required to comply with all standards set forth in Section 1311(c) of the ACA, all state specific standards, and any CO-OP regulatory standards.  NMHC was also required to offer at least two-thirds of its plans as QHPs in these markets.  In other words, unlike its larger, entrenched competitors, NMHC is required to offer products on the individual insurance exchanges established by the ACA, and is required to do substantially all of its business in the individual and small group markets (the only markets impacted by the Risk Adjustment program).

66.     From its inception, both the Board of Directors and senior management have focused on offering health insurance plans to individuals and families through the exchange, and to small businesses.

67.     NMHC has always been committed to providing access to quality healthcare to individuals and families regardless of income.  Half of its members qualify for subsidized health insurance coverage.  NMHC fills a void in New Mexico's health insurance options, providing *affordable*, high quality coverage.  Since its inception, NMHC has offered the lowest cost or second lowest cost plan available in each of New Mexico's five rating regions.

68.     NMHC is able to provide these low premium plans thanks to its excellent medical management capabilities, which help members to have the best health status possible for each individual, thus avoiding major unnecessary costs, especially hospitalizations. Affordability and health improvement are core to its mission and business success and are at the forefront of the Board's fiduciary responsibility and managements goals.

69.     The popularity of this approach to health insurance is evident in the significant growth NMHC has achieved in each of its three years of existence – from 14,000 members in 2014 to 33,000 members in 2015 to 44,500 members thus far in 2016.

70.     Members are particularly drawn to NMHC's innovations that promote a focus on improved health status.  The benefits available to each NMHC member include:

       a.      no co-payments for chronic disease generic drugs and behavioral drugs;

       b.      first three visits to primary care and behavioral are free with no co-payment, deductible, or co-insurance;

       c.      personalized outreach to patients to ensure compliance with medication regimens;

> d.      care coordination, including follow-up visits with primary care

providers after a hospitalization;

> e.      assistance of community health workers and social workers when

needed;

> f.      and intense personalized medical management of high risk

individuals.

71.     In keeping with its CO-OP design and consumer focus, NMHC is the only health plan in New Mexico where margins are redirected to the benefit of its members through rate reductions and/or improvement of care and health quality.  It is not under pressure to make extraordinary profits; its focus is solely on its members.

72.     Nevertheless, the positive impact of NMHC is felt beyond its membership pool.  At a recent meeting of the National Association of Insurance Commissioners, the Superintendent of Insurance of New Mexico stated to his colleagues that the presence of the NMHC CO-OP had saved New Mexico health insurance subscribers over half a billion dollars over the last three years by simply being a new competitor in the market and focusing on care management and cost.  As Defendant Burwell has recognized in her public statements, competition works and benefits consumers.

73.     NMHC has, by all measures, been a success.  In a thorough financial and operational review by Deloitte Consulting recently instituted by CMS, the Deloitte team leader stated that NMHC was no longer a fledgling start-up, but now a fully mature health plan given its rapid success (the plan filed a first quarter profit with NAIC in May of 2016), and the deep industry experience of the senior team and staff.

74.     Other national studies have highlighted the value created by NMHC's outstanding approach to care management.  For example, in its 2015 white paper, CHOICES highlighted the value of the NMHC model.  *See* CHOICES, et. al., *Technical Issues with ACA*

*Risk Adjustment and Risk Corridor Programs, and Financial Impact on New, Fast-Growing, and Efficient Health Plans* (Nov. 4, 2015). With respect to medical management services, CHOICES wrote:

> NMHC operates a "Late to Refill" member outreach program and uses a value-based plan design featuring $0 copayments for generic medications for 9 chronic conditions (e.g., asthma, diabetes, depression). These programs are designed to (i) maximize compliance with prescription drug regimens for all patients, (ii) help ensure that members with known chronic conditions can afford medications that are critical to their treatment, and (iii) help prevent worsening (and more expensive) disease progression. These value-driven insurance design elements have resulted in:
>
> - Generic Dispensing Rate of 87.3% for NMHC compared to an average of 85% for the OptumRx pharmacy benefit manager's 283 commercial clients.
>
> - PMPM [per member per month] prescription drug spending of $53.57 for NMHC versus $67.14 for the OptumRx commercial average (with a comparable risk profile).
>
> - With lower member cost-sharing, medication adherence is higher, with the resultant well-proven improved health and reduction in avoidable cost – yet also reducing associated risk scores. *Id.* at 6.

75. The white paper further noted that, in just a 10 week period, NMHC made 267 outreach attempts to its members to remind them to refill prescriptions and stay on course with their regimen. *Id.* This reflects NMHC's particular focus on "high-priority prescription drugs" that are used to treat behavioral health disorders, asthma, seizures, heart problems, diabetes, etc. *Id.* at 7.

76. In sum, NMHC has helped its members maintain or even *improve* their health, which, in turn, has lowered costs. This is precisely the type of innovative offering the ACA CO-OP program was designed to support.

77.     But no good deed goes unpunished.  Sadly, that old adage rings very true for NMHC.  NMHC should be heralded as a shining new star in the health insurance market. But, because of the arbitrary, capricious and unlawful Risk Adjustment methodology imposed on NMHC by CMS and HHS, it instead is left questioning whether its business model is sustainable.

78.     2016 financial numbers indicate that NMHC was profitable in the first quarter of 2016 and was close to break even in the second quarter of 2016.  But the flawed Risk Adjustment methodology is causing NMHC to have a current 2016 loss of $10,635,484.

79.     Rather than disburse margins to its members, most of whom are low income earners buying coverage through the individual market exchange, NMHC instead is forced to pay a huge portion of its premium dollars into the deep pockets of one of the two largest insurers in New Mexico – BCBSNM – and significantly raise premiums on its members to mitigate such losses going forward.  This is despite the fact that, in 2015, BCBSNM's Chicago-based parent, HCSC, had $35 billion in revenue and $9.4 billion in reserves.

80.     This upside-down system of reverse Robin Hood, where innovative start-ups must subsidize multi-billion dollar lumbering incumbents, is a direct result of CMS applying the Risk Adjustment program in an arbitrary, capricious, and unlawful manner that flouts the intent of Congress and the express statutory mandate to HHS.  NMHC's success and future are threatened solely because CMS has instituted Risk Adjustment in a way that penalizes low-cost carriers regardless of the relative health or sickness of their population.

81.     The Risk Adjustment program imposed by CMS calculates payment transfers based on factors having nothing to do with actuarial risk, thwarting the intent of Congress and the express mandates of the statute.  HHS and CMS have acted outside the scope

of their statutorily-created authority in their creation of the flawed Risk Adjustment program that

produces such extreme and punitive assessments on small, new and cost efficient carriers.

**CMS PENALIZES NMHC FOR PROVIDING EXCEPTIONAL MANAGED CARE AT
AFFORDABLE PREMIUMS**

**C.     The Risk Adjustment Methodology Does Not Adjust for Actuarial Risk as
Directed By the Statute.**

82.     In Section 1343 of the ACA, Congress set forth the requirements of the

Risk Adjustment program:  CMS must (1) "assess a charge on health plans and health insurance

issuers…if the actuarial risk of the enrollees of such plans or coverage for a year is less than the

average actuarial risk of all enrollees in all plans or coverage in such State for such year…" and

(2) "provide a payment to health plans and health insurance issuers…if the actuarial risk of the

enrollees of such plans or coverage for a year is greater than the average actuarial risk of all

enrollees in all plans and coverage in such State for such year…" ACA, Pub. L. No. 111-148,

§ 1343(a)(1)-(2) (codified at 42 U.S.C. § 18063(a)(1)-(2)).

83.     The express directive and clear purpose of Section 1343 is to adjust

payments and charges only for "actuarial risk" – *i.e.* how sick an enrollee is.

84.     But the Risk Adjustment methodology developed by CMS instead adjusts

for differences in premiums, consumer choice of metallic tier, and length of member enrollment.

CMS thereby sweeps in numerous factors that have nothing to do with actuarial risk.  As a result,

CMS has created a program that dictates which insurers will be winners or losers based on issues

that have nothing to do with the health of their members.

85.     Like any business, health insurance companies have a number of

expenses.  Those include payments to providers for health care services provided to enrollees,

which is affected both by the amount of utilization of services and by negotiated rates (prices)

with providers; employee salaries and associated overhead costs; marketing expenses, etc.

86.     These expenses must be covered by revenue – *i.e.* premiums collected from plan enrollees.

87.     To maintain a viable business, an insurance company must collect more in premiums than it pays out in collective expenses.  The higher an insurer's expenses, whatever their nature might be, the higher it must set its premiums.  In a well-functioning competitive market, carriers will be forced to innovate to cut their costs so they can lower their premiums and attract more members.

88.     Under the ACA, insurers are prohibited from setting discriminatory insurance premiums based on an individual's health status and corresponding risk profile.  ACA, Pub. L. No. 111-148, § 2701 (codified at 42 U.S.C. § 300gg).  Thus, insurers lack control over who they enroll in their plans.  With that lack of control comes risk that a disproportionate number of sicker individuals (*i.e.* individuals with higher actuarial risk) could enroll in certain plans while healthier individuals who require less care could opt to enroll in other plans.  This is the <u>singular</u> issue that CMS is permitted to address through the Risk Adjustment formula.

89.     All of the other factors that drive an insurer's premiums must be left out of the formula.  In other words, the Risk Adjustment formula cannot assess a payment against an insurer because it runs a more efficient business, separate and apart from the health status of its enrolled population.  It cannot penalize an insurer for cutting costs through innovative and proactive medical management.  It cannot penalize an insurer for running a lean enterprise with lower administrative costs.  It cannot penalize an insurer for executing on a mission to provide price-sensitive consumers with lower priced products.  It cannot penalize an insurer for being new, or high growth.  Likewise, the Risk Adjustment formula cannot be used to subsidize insurance companies that have high administrative costs or do not bother investing in improved

medical management of their members.  It cannot be used to reward insurers that cater to consumers that can afford the most expensive metallic tier products.  And it cannot be used to subsidize entrenched insurers that have been in business longer or have decided not to grow on the exchanges.  But that is exactly what the Risk Adjustment formula does.

90.     As developed by CMS in its regulations, Risk Adjustment charges and payments are calculated in a multi-step process that first involves calculating individual risk scores, then calculating plan level risk scores, and finally calculating payments and assessments. *See* CMS, *HHS-Operated Risk Adjustment Methodology Meeting* (Mar. 31, 2016), at 113, available at https://www.regtap.info/uploads/library/RA_ConferenceSlides_033116_5CR_040516.pdf.

91.     The formula developed by CMS is flawed at every step.  As discussed in more detail below, the inputs used to calculate the individual and plan level risk scores are problematic, and play a significant role in the arbitrary Risk Adjustment assessments that have been devastating to small and new insurers.  One of the inputs responsible for NMHC's exorbitant Risk Adjustment assessments is the statewide average premium multiplier – an input that does not measure actuarial risk.

D.     **Use of the Statewide Average Premium Penalizes Low Cost, Efficient Insurers.**

92.     The payment or assessment amount is a plan's premium with risk selection score minus its premium without risk selection score multiplied by the statewide average premium.  *See id.* at 115-17.  That figure is then multiplied by the plan's total billable member months.  *See id.* at 118.

93.     The statewide average premium is, as its name suggests, a calculation of the average premium charged by <u>all insurers</u> across a given state.

94.     Thus, when calculating statewide average premiums, the prices charged by the largest insurers will skew the "average" closer to their actual premium prices, essentially buffering them from the Risk Adjustment based on their plan size and not on their risk score.

95.     Because of its innovative and efficient business model, NMHC's premiums are substantially lower than those of BCBSNM.

96.     For example, in 2015, the statewide average premium was $314.00 per month, and NMHC's individual average premium was $270.00 per month.

97.     The efficiencies built in to NMHC's business model are wiped out by the Risk Adjustment transfer formula's use of the statewide average premium.

98.     Use of this inflated premium factor has nothing to do with actuarial risk, but nevertheless has a direct and harmful effect on NMHC.  If NMHC had used its average premium instead of the artificially skewed statewide average, it would have paid millions of dollars less in Risk Adjustment assessments in 2015.

99.     The Risk Adjustment formula developed and implemented by CMS, at the direction of  the Secretary, is not an actuarial Risk Adjustment formula at all.  Rather it is a premium adjustment formula.   By design, it punishes insurers that keep premiums low and rewards insurers that charge the highest rates.  It does not cleanly account for actuarially-calculated health risk that is figured using statistical analysis of population health experience.  Rather, it erroneously factors in confounding elements such as health plan pricing behaviors and health plan administrative efficiencies.

100.     Indeed, the greater a low cost plan deviates from the statewide average premium, the harder it is hit by the Risk Adjustment formula.  This creates a disincentive to develop low premium plans.  CMS, through its perverse Risk Adjustment formula, has structured

a system where carriers are *penalized* for competing with lower premium prices and are *rewarded* for raising rates. For example, NMHC's variation in the statewide average premium increased from 3% below the individual market average premium to 14% below the market average premium between 2014 and 2015. The adjustment in the percentage in the Risk Adjustment transfer that is attributable to the use of the market average premium then increased from 6% in 2014 to 16% in 2015.

101.    This is the antithesis of the ACA mandate and flies in the face of Secretary Burwell's recent cries for greater competition in the health care insurance market: "When there is competition, that creates downward price pressure, and it also creates upward quality pressure ... We've always thought and talked about why competition is an important part of the overall picture, and that's not just in the marketplace but overall for the nation in terms of our health care." Tracer, *Top U.S. Health Official Highlights Need for Insurer Competition,* BLOOMBERG (July 15, 2016). Burwell was also reported to have praised competition because it fosters innovation and negotiations between providers, hospitals, and insurers: "Competition needs to be at a provider level and needs to be at an insurer level … When there's competition in both settings, that creates an even playing field for both sets of players." *Id.*

102.    Despite HHS's call for increased competition in the health insurance market and the clear purpose of the ACA, the Risk Adjustment methodology developed and implemented by CMS reduces competition and ensures that consumers will suffer ever increasing premiums.

103.    HHS and CMS are well aware of the problems with the Risk Adjustment formula, including use of the statewide average premium. As discussed *infra*, there have been numerous comments submitted regarding the statewide average premium. In addition, CMS has

held public meetings/discussions on the topic of Risk Adjustment. *See* CMS, *March 31, 2016, HHS-Operated Risk Adjustment Methodology Meeting: Discussion Paper* (Mar. 24, 2016).

104. Even Richard S. Foster, former Chief Actuary for CMS, has vocally denounced the Risk Adjustment formula. A November 2015 white paper published by CHOICES relied on technical assistance from Foster to identify how the Risk Adjustment methodology failed to adjust for actuarial risk. *See* CHOICES, et. al., *Technical Issues with ACA Risk Adjustment and Risk Corridor Programs, and Financial Impact on New, Fast-Growing, and Efficient Health Plans* (Nov. 4, 2015). That paper detailed seven specific problems, one of which was "use of the Statewide market average premium in the risk transfer formula." *Id.* at 9. Relying on Foster, CHOICES concluded:

> To the extent that a plan's actual premiums are significantly lower (or higher) than the market average, then its estimated premium difference will be significantly exaggerated. In particular, for efficient, high-performing plans focusing on thorough care management, cost-efficient care, effective provider networks, low administrative costs, and, in some cases, low nonprofit margins, member premiums will generally be well below average in an area, for a given mix of enrollees. If such a plan's premium is, say, 20% below the market average, then the risk transfer formulas' estimate of the plan's premium related to unallowed health factors will be 20% greater than the reality.

> \*\*\*

> Use of a plan's *actual* average premium in the risk transfer formula, rather than the Statewide market average premium would eliminate this significant source of estimation error and result in much fairer transfers among plans. *Id.*

105. The statewide average premium is purportedly used by CMS because "it simplifies the calculations and automatically results in plan payments and charges that sum to zero." *Id*; s*ee also* CCIIO, *Risk Adjustment Implementation Issues* (Sept. 12, 2011) available at https://www.cms.gov/CCIIO/Resources/Files/Downloads/riskadjustment_whitepaper_web.pdf.

Under CMS's methodology, the Risk Adjustment transfers are artificially set to be budget neutral such that the amount of money collected from issuers matches, to the dollar, the amount of money paid out to other issuers.  But, there is no statutory requirement that Risk Adjustment be budget neutral.

106.    CMS's Risk Adjustment methodology thus uses a metric – statewide average premium – unrelated to actuarial risk to achieve an artificial result not directed by the statute.  In developing this methodology, CMS and HHS, have acted in flagrant disregard of their limited authority and the directions expressly given by Congress.

107.    CMS has acknowledged problems with the Risk Adjustment formula, including the use of the statewide average premium.  On March 24 2016, CMS issued a Discussion Paper in advance of its March 31, 2016 HHS-Operated Risk Adjustment Methodology Meeting.  *See* CMS, *March 31, 2016, HHS-Operated Risk Adjustment Methodology Meeting:  Discussion Paper* (Mar. 24, 2016).  In that Discussion Paper, CMS wrote:

> [T]he Statewide average premium is intended to reflect average administrative expenses and average claims costs for issuers in a market and State.  We received comments from the public who believe that the inclusion of administrative costs in the Statewide average premium incorrectly increases risk adjustment transfers based on costs that are unrelated to the risk of the enrollee population.

> \*\*\*

> [W]e understand the concern that including fixed administrative costs in the Statewide average premium may increase risk adjustment transfers for all issuers based on a percentage of costs that are not related to enrollee risk.  *Id.* at 92.

CMS concluded that it is considering the possibility of future adjustments "beyond the 2018 benefit year."  *Id.* at 93.

108.    The March 24, 2016 Discussion Paper also expressly acknowledged the

bias built into the Risk Adjustment methodology against small, efficient insurers like NMHC:

> [A]lthough a number of sources of premium variation – such as
> metal level, age, and geographic cost factors – are explicitly
> addressed in the transfer equation, others – such as network
> differences, plan efficiency, or effective care coordination or
> disease management – are not.  We are exploring a number of
> ways of addressing such plan differences in our methodology,
> including through potentially modifying the transfer equation,
> perhaps by modifying the equation using a plan's own premium…
> *Id.*

109.    Despite acknowledging the problems and witnessing the devastating

consequences of this formula, the response from CMS and HHS has ranged from vague

assurances that they will look into the problem and maybe take some action in 2018 to outright

hostility.  Indeed, the government has actively fought against providing relief to issuers hit with

devastating Risk Adjustment assessments.

110.    The Risk Adjustment formula, as developed and implemented by CMS, is

arbitrary, capricious, and contrary to law.  It flouts Congressional intent and the express mandate

and plain language of the underlying statute.  HHS and CMS have gone beyond the bounds of

their statutory directive, injecting unauthorized factors into the Risk Adjustment methodology.

The Risk Adjustment methodology they have created is forcing insurers to shutter, premiums to

rise, competition to diminish and American consumers to suffer.  It must be invalidated.

**E.    The Risk Adjustment methodology violates the intent and text of the ACA by
penalizing insurers that sell low cost Bronze plans.**

111.    Under the ACA, health insurance policies offered on the public exchanges,

like those offered by NMHC, must adopt certain standardized terms and conditions for differing

types of coverage, which are identified by metallic designations:  Bronze, Silver, Gold and

Platinum.

112.    The plans differ in how costs are shared between issuer and enrollee.  In Bronze plans, the issuer must cover 60% of health care costs, while the issuer covers 70% in Silver, 80% in Gold, and 90% in Platinum.  Bronze plans have the lowest premiums but the highest deductibles.  Platinum plans, by contrast, have the highest premiums and the lowest deductibles.  As a result, consumers that do not anticipate significant health care needs and/or are price-sensitive tend to purchase Bronze or Silver products as opposed to Gold or Platinum products, because of the lower monthly premium expense.

113.    Instead of building the Risk Adjustment formula to transfer funds based on underlying member risk, CMS instead built the Risk Adjustment formula to penalize issuers that sell Bronze products – i.e. issuers who cater to price sensitive consumers.  Once the Risk Adjustment formula is applied, insurance companies *always pay out money on Bronze* products.  This cannot be a function of adjusting solely for actuarial risk of the member population.  It is instead a function of adjusting for the *nature of the insurance plan*, resulting in issuers that sell low cost Bronze plans subsidizing those who sell more expensive Gold and Platinum plans to members with the same actuarial profile.

114.    CMS's own data shows that in 2014, there was no scenario under which an insurer would receive Risk Adjustment transfer payments for a Bronze plan.  Under the Risk Adjustment formula, insurers of all sizes in the small group and individual markets were subject to a Risk Adjustment assessment with respect to their Bronze plans.  *See* CMS, *HHS-Operated Risk Adjustment Methodology Meeting* (Mar. 31, 2016), at 31.



115.    Because insurers must always pay out Risk Adjustment dollars on Bronze products, those products are likely to have a negative margin after Risk Adjustment.  That result is illustrated in NMHC's own claims data.  After Risk Adjustment, NMHC's medical loss ratio for Bronze members is 114.15%, more than any other metallic tier and well in excess of the total amount of premium collected for those members.

| Small Group Metal Level | MLR | MLR After RA Transfer |
|---|---|---|
| Bronze | 6.98% | 114.15% |
| Silver | 80.22% | 93.08% |
| Gold | 72.00% | 83.31% |
| Platinum | 83.77% | 89.84% |
| Grand Total | 78.39% | 88.15% |

116.    CMS's Risk Adjustment methodology once again uses a factor – this time differential weighting by metallic level – wholly unrelated to actuarial risk to achieve an artificial result not directed by the statute.  In developing this methodology, CMS and HHS, have acted in flagrant disregard of their limited authority and the directions expressly given by Congress.

117.    By making a Bronze plan a money-loser no matter how healthy or sick the insured population is, CMS has made it unsustainable for insurers to offer Bronze plan designs – a wild policy overreach well beyond the limited Risk Adjustment program that Congress intended, and to the detriment of many consumers who desire and rely on these low-cost products.  Not surprisingly, plans around the country are starting to drop their on-exchange Bronze products.

118.    Congress surely did not intend, and definitely did not direct, HHS/CMS to penalize mission-driven issuers who expand accessibility to affordable Bronze products and reward issuers that cater to consumers who purchase more expensive products.  Quite the contrary.

119.    CMS's *ultra vires* actions are plainly outside the statutory mandate.  Wiping out Bronze plans is not the result of adjusting for actuarial risk.  It is the result of improperly weighting plans by metallic level, separate and apart from the risk profile of their enrollees.  The Risk Adjustment statute does not contemplate use of this factor in the Risk Adjustment methodology.  It is, therefore, arbitrary, capricious, and unlawful.

**F.     The Risk Adjustment Methodology Fails to Account for Significant Health Care Expenses for Enrollees without an HCC Score.**

120.    As noted above, CMS's Risk Adjustment formula begins by calculating a risk score for each enrollee.  The risk score is intended to reflect the relative health status and, correspondingly, the relative cost of care that person will utilize.  The higher the risk score, the sicker the individual and the greater the anticipated health care costs.  *See* HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,409, 15,419-52 (Mar. 11, 2013) (setting forth the final methodology for calculating Risk Adjustment payments).

121.    The calculation for an individual's risk score begins with a coefficient (*i.e.* an assigned numeric value), which is based only on age and gender.  That coefficient will be increased if the enrollee has been diagnosed with one or more hierarchal condition categories ("HCCs") that is documented during the plan year.  Each HCC has a corresponding coefficient, with higher values intended to represent more serious and costly health conditions.

122.    HCC coefficients are added to the age/gender coefficient to calculate an enrollee's overall risk score.  Additional adjustments may be made for disease interaction and severity.

123.    Enrollees who do not have an HCC are essentially deemed to be perfectly healthy, having only the risk that is reflected in their base coefficient.  The Risk Adjustment methodology presumes these enrollees will not utilize health care services and, thus, will cost insurers little to no money.

124.    But this is just not true.  For example, there are no HCC scores for chronic low back pain, joint replacement surgery, and trauma, among many other conditions that need to be treated and cost money.

125.    There is a wide middle ground between being perfectly healthy and being so chronically ill as to merit an HCC score.  For example, even though a diagnosis of Type 2 diabetes would trigger an HCC score, a severely overweight adult whose laboratory test results indicate a strong potential for developing diabetes in the future would not receive an HCC score.  But such an individual needs clinical intervention immediately in the form of monitoring, nutritional guidance, and medication.  In effect, by not adjusting a risk score until a patient is severely ill, CMS penalizes early and aggressive preventive care and rewards delaying care until a patient is severely ill and lands in a hospital emergency room.

126.    Even healthy enrollees must utilize preventive care services and sometimes get sick and need medical care.  An individual with no HCC could easily have a year where she contracts strep throat or the flu.

127.    The Risk Adjustment methodology thus over-adjusts for this "healthy" population.  Once the Risk Adjustment transfer formula is applied, insurers end up paying more money than they collect in premiums for enrollees who do not have an HCC score.  By way of example, NMHC members with zero HCCs pay NMHC premiums of $48 million.  NMHC spends only $17 million on these members' claims.  Accordingly, the medical loss ratio for these members, that is the percent of their premium that NMHC spends on their claims, is just over 35%.  With the addition of the Risk Adjustment assessment, however, NMHC is required to pay an additional $*39 million* for these members.  Accordingly, after Risk Adjustment, the medical loss ratio for these members jumps to 118%.  NMHC is left paying out far more than it collects in members' premiums.

| 2015 | | | | | | |
|---|---|---|---|---|---|---|
| Individual | Premium | Paid | Reinsurance | RA Transfer | Straight MLR | MLR after RI and RA |
| Members w/ no HCC | 48,021,286.91 | 17,063,261.57 | 116,261.52 | (39,626,463.30) | 36% | 118% |
| Members w/ HCCs | 14,884,096.80 | 46,340,025.96 | 5,653,049.39 | 29,717,668.76 | 311% | 74% |
| | | | | | | |
| Small Group | Premium | Paid | Reinsurance | RA Transfer | Straight MLR | MLR after RI and RA |
| Members w/ no HCC | 28,369,668.43 | 8,420,140.04 | - | (26,193,178.29) | 30% | 122% |
| Members w/ HCCs | 7,890,324.96 | 20,224,891.11 | - | 21,976,657.03 | 256% | -22% |

128.    Under the Risk Adjustment formula, individuals with no HCCs are *liabilities* to insurance companies.  In other words, the cost of having them enrolled exceeds the premiums collected.

129.    By contrast, and further exacerbating the problem, the risk scores for individuals with HCCs are overstated; the coefficients for certain HCCs are too high relative to the actual costs associated with the HCC.  *See* Memorandum from Richard S. Foster to

CHOICES Exec. Comm. (July 15, 2016), available at
http://www.choicescoalition.org/documents/HHS%20HCC%20RA%20model%20bias%20adjust
ment%20memorandum.pdf.

130.    Just two weeks ago, on July 15, 2016, Richard Foster submitted a
memorandum to CHOICES on this issue, stating "The current HHS-HCC risk adjustment model
established by CMS is known to understate risk scores for relatively healthy individuals and to
overstate them for those with significant health conditions." *Id.* at 1.

131.    Again, CMS has acknowledged this problem and plans to adjust the model
*starting in plan year 2017. See id.*  This is of little comfort to NMHC and other insurers who are
being arbitrarily and significantly penalized by the Risk Adjustment transfer formula now.

132.    Foster has identified a simple fix to this problem: swapping the risk scores
that were used by CMS with risk scores that more accurately represent the *actual* costs
associated with the HCCs.  These adjustments can be made based on existing data.  Foster's
analysis shows that this relatively easy fix "would eliminate virtually all of the tendency in the
existing risk adjustment model to understate risk sores for healthy individuals and groups and to
overstate risk scores for those with significant health conditions." *Id.* at 2.

G.    **The Risk Adjustment Formula Fails to Capture Accurate Risk Scores for
Partial Year Enrollees.**

133.    Yet another flaw in the Risk Adjustment methodology is that it rewards
issuers who do not attract partial year enrollees, separate and apart from actuarial risk of the
insurer's population.  The methodology entirely fails to adequately account for individuals who
are enrolled for less than a full year, which is commonly referred to as "partial year enrollment."

134.    The risk scores for these individuals often understate their health status
and corresponding cost to the insurer.  This is because a partial year enrollee, who starts with a

baseline risk coefficient based on age and gender, may not receive an HCC diagnosis during the portion of the year in which he/she is enrolled in the health plan. Thus, the issuer lacks full knowledge of the enrollee's health status.

135. This is true even if the enrollee is filling prescriptions or otherwise utilizing health care services related to the un-recorded HCC diagnosis. A common scenario is a diabetic patient who does not receive a diagnosis during his partial year enrollment, but nevertheless is filling prescriptions for insulin. Without the diagnosis, this patient's risk score will not reflect that he has diabetes.

136. The problem with partial year enrollment is purely one of timing – if the enrollee visits a doctor and receives an HCC diagnosis that is properly transmitted to the issuer, the enrollee's risk score will be adjusted to reflect the HCC. However, if the enrollee does not receive the diagnosis from his or her doctor *during his/her enrollment in the plan*, the issuer will have no knowledge of it and the enrollee's risk score will be understated.

137. The current HCC methodology further assumes that health care costs are distributed evenly throughout the benefit year. This is not always the case with acute conditions. For example, delivery costs for a pregnancy are generally the same whether the member is covered for 12 months or 3 months. Yet the Risk Adjustment formula gives more risk weight for each month a member is enrolled in the plan. Members who are enrolled for a short time and have a significant acute event, such as delivery, will not receive adequate credit in the Risk Adjustment formula.

138. Partial year enrollment has a disproportionate impact on new carriers and those with fast growing membership such as NMHC, primarily because new carriers have little or no prior health status information on their newly-enrolled members. Established carriers with

long tenure in their market often have extensive health history on their enrollees, and can easily

identify those with HCCs.  This allows them to perform targeted member outreach and medical

record review to document these HCCs, an option unavailable to new-entrants like NMHC.  The

result is that NMHC shows artificially low HCC scores for its membership compared to a carrier

like BCBSNM, and incurs a very significant penalty under CMS's Risk Adjustment formula.

NMHC is penalized not because it has fewer members with HCCs, but because the Risk

Adjustment program's artificial criteria for establishing those HCCs cannot be satisfied for many

members.

> **H.     The Government's Risk Adjustment Methodology Improperly Excludes
>         Prescription Drug Data.**

139.    Further exacerbating the problems faced by NMHC is the Risk

Adjustment formula's failure to utilize prescription drug data.

140.    Consider, for example, a patient suffering from  Cystic Fibrosis ("CF").

The cost for a year's pharmaceutical treatment of one such member is approximately $328,000,

which generally makes up almost all of the spend if her health is maintained with proactive case

management and she stays on her medications.  A second member with CF, covered by a plan

with poor care coordination and perfunctory care management, chooses to take his medications

only half the time, resulting in disease exacerbation and hospitalization twice during the year,

perhaps even an ICU stay given the associated respiratory compromise associated with CF.  The

second member not only spends less on the medications ($164,000) but also incurs a

hospitalization for a significant infection, perhaps incurring $40,000 in claims, such that his risk

score is now more than 4 times that for the member whom the plan has helped remain

consistently on her medications with the help of case management and perhaps even a favorable

pharmacy benefit structure.  This plan is penalized in the process with a much lower risk score

for this member.  This very real scenario demonstrates the perverse incentives introduced by the Risk Adjustment program's treatment of pharmaceutical spend.

141.    An alternative and, again, very real scenario is for the diabetic member whose total care is so well managed that he need not visit his physician during the not-infrequent partial year enrollment, with the plan getting no risk score credit for diabetes risk via a clinic visit.  Thus, under CMS's methodology, he is perfectly healthy, and his actuarial risk is severely underrated.  Although his insulin prescription plainly indicates that he is a diabetic, it is of no consequence.  The Government's Risk Adjustment methodology does not consider prescription drug data, even though it is readily available and often a reliable source of information regarding an individual's health status.

142.    The Government's failure to consider prescription drug data results in understated risk scores and, ultimately, larger Risk Adjustment assessments for plans like NMHC.

143.    For NMHC, which has new and fast growing membership and uses managed medical care to reduce overutilization of healthcare services, including unnecessary doctor visits or emergency room visits, the failure of the Risk Adjustment methodology to consider prescription drug data is particularly acute.

144.    This issue has been raised ad nauseam with CMS, to no avail.  Though CMS has acknowledged the incomplete picture that results from ignoring prescription drug data and the resulting inaccurate risk score, CMS has promised only to consider the issue further, kicking this can down the very bumpy Risk Adjustment road.

I.     **NMHC Has Repeatedly Raised its Objections to the Risk Adjustment Formula to no Avail.**

145.   NMHC has consistently (and persistently) objected to and informed CMS of *every single* methodological flaw in its Risk Adjustment methodology.

146.   CMS issues the Risk Adjustment methodology every year in its Notice of Benefit and Payment Parameters.  On December 7, 2012, CMS issued its Proposed Rule regarding Notice of Benefit and Payment Parameters and outlining the 2014 Risk Adjustment formula, and issued its Final Rule outlining the 2014 Risk Adjustment formula on March 11, 2013.  HHS Notice of Benefit and Payment Parameters for 2014, 77 Fed. Reg. 73,117 (proposed Dec. 7, 2012); HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,409 (Mar. 11, 2013), *as amended by* Amendments to the HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 65,045 (Oct. 30, 2013).  On December 2, 2013, CMS issued its Proposed Rule regarding Notice of Benefit and Payment Parameters and outlining the 2015 Risk Adjustment formula, and issued its Final Rule outlining the 2015 Risk Adjustment formula on March 11, 2014.  HHS Notice of Benefit and Payment Parameters for 2015, 78 Fed. Reg. 72,321 (proposed Dec. 2, 2013); HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13,743 (Mar. 11, 2014).  On November 26, 2014, CMS issued its Proposed Rule regarding Notice of Benefit and Payment Parameters and outlining the 2016 Risk Adjustment formula, and issued its Final Rule outlining the 2016 Risk Adjustment formula on February 27, 2015.  HHS Notice of Benefit and Payment Parameters for 2016, 79 Fed. Reg. 70,673 (proposed Nov. 26, 2014); HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10,749 (Feb. 27, 2015).  On December 2, 2015, CMS issued its Proposed Rule regarding Notice of Benefit and Payment Parameters and outlining the 2017 Risk Adjustment formula, and issued its Final Rule regarding the 2017 Risk Adjustment formula on March 8, 2016.  HHS Notice of

Benefit and Payment Parameters for 2017, 80 Fed. Reg. 75,487 (proposed Dec. 2, 2015); HHS

Notice of Benefit and Payment Parameters for 2017, 81 Fed. Reg. 12,203 (Mar. 8, 2016).

147.    NMHC submitted comments (which were docketed) to CMS articulating

the numerous flaws in the Risk Adjustment methodology during the open comment period for

each proposed rule after initially receiving its first Risk Adjustment assessment.  In December

2015, NMHC submitted a comment to CMS explaining that the Risk Adjustment formula was

"destabilizing and even eliminating new, small and rapidly growing state based plans…"

NMHC, *NMHC Comments Filed On CMS-9937-P, "Patient Protection and Affordable Care*

*Act; HHS Notice of Benefit and Payment Parameters for 2017"* (Dec. 2015), at 1.  NMHC

specifically called out the failure of the methodology to capture prescription drug data and the

problematic use of the statewide average premium.  *See id.* at 2-3.  In addition to this comment,

NMHC also submitted the CHOICES white paper, which clearly articulated the numerous

flawed aspects of the methodology.

148.    The December 2015 comment and attached white paper specifically

explained the problems created by the use of the statewide average premium.  As explained in

this submission, the use of this premium penalizes efficient low-cost issuers because they offer

less expensive premiums.  The submission further explained that reconstructing the formula

based on a plan's own average premium would ameliorate the problem.

149.    On April 22, 2016, in response to the HHS-Operated Risk Adjustment

Methodology Discussion Paper, released by CMS in March 2016, NMHC provided three pages

of detailed comments in response to possible changes to the Risk Adjustment formula.  *See*

NMHC, *NMHC Comments filed on HHS-Operated Risk Adjustment Methodology Discussion*

*Paper* (Apr. 22, 2016).

-42-

150.     NMHC submitted another comment, dated July 5, 2016, addressing the

Risk Adjustment program.  *See* NMHC, *Comment to Final Rule 45 CFR Parts 155 and 156*

*(CMS-9933)* (July 5, 2016).  In the comment, NMHC explained that state regulators should be

given the authority to change and apply any CMS Risk Adjustment payments at their sole

discretion.  Specifically, NMHC noted that Risk Adjustment is "proving detrimental to new, fast

growing and small QHP issuers."  *Id.* at 1.

151.     Dr. Hickey, the NMHC CEO and Chairman of the board of the National

Alliance of State Health Cooperatives has held several discussions, both in person or on the

phone, and has sent several emails to CMS Interim Administrator Slavitt, CCIIO Director and

Marketplace CEO Kevin Counihan, Marketplace Risk Director Jeffery Grant and several of his

staff, regarding the flaws, weaknesses, and outright harm of the current Risk Adjustment

methodology, formula and underlying principles.  These discussions have spanned over a year

but have led nowhere.  Indeed, rather than fixing the obviously broken Risk Adjustment

program, CMS and HHS have tried to silence the complaints; Dr. Hickey was expressly warned

to stop sending emails and making public comments about the Risk Adjustment program as he

was apparently "irritating" the "higher ups" in CMS/HHS.

## COUNT ONE
### (Violations of Section 1343 of the ACA and the APA, 5 U.S.C. § 706)

152.     NMHC incorporates by reference all preceding paragraphs of this

Complaint.

153.     Section 1343 of the ACA directs the Secretary, in consultation with the

States, to "establish criteria and methods" to effectuate Risk Adjustment by charging health

insurance issuers with "less than the average actuarial risk of all enrollees in all plans or

coverage" in a given state and making payments to health insurance issuers with "greater than average actuarial risk of all enrollees in all plans and coverage" in that state.

154.    The Risk Adjustment methodology developed and implemented by CMS, at the direction of HHS, as set forth in 78 Fed. Reg. 15,409, 78 Fed. Reg. 65,045, 79 Fed. Reg. 13,743, 80 Fed. Reg. 10,749, and 81 Fed. Reg. 12,203, does not effectuate the mandate of § 1343.

155.    The Risk Adjustment methodology developed and implemented by CMS, at the direction of HHS, as set forth in 78 Fed. Reg. 15,409, 78 Fed. Reg. 65,045, 79 Fed. Reg. 13,743, 80 Fed. Reg. 10,749, and 81 Fed. Reg. 12,203 does not effectuate the goal of Congress to stabilize the health insurance marketplace.

156.    The Risk Adjustment methodology developed and implemented by CMS, at the direction of HHS, as set forth in 78 Fed. Reg. 15,409, 78 Fed. Reg. 65,045, 79 Fed. Reg. 13,743, 80 Fed. Reg. 10,749, and 81 Fed. Reg. 12,203 does not effectuate the goals of the ACA to expand access to affordable health care.

157.    Nor does the Risk Adjustment methodology developed and implemented by CMS, at the direction of HHS, effectuate the goals of the ACA's CO-OP program, through which NMHC obtained start-up and solvency funds.  The ACA's CO-OP program was designed to support new market participants who would increase competition, provide innovative health care delivery models, and offer low cost premium options.

158.    The Risk Adjustment methodology does not adjust for actuarial risk, does not promote stability in the markets, and does not promote access to affordable health care. Rather, it severely penalizes NMHC and other small, innovative insurers, for reducing premiums

based on costs unrelated to actuarial risk, for offering Bronze plans to cost-conscious consumers, and by inaccurately measuring actuarial risk.

159.    The Risk Adjustment methodology developed and implemented by CMS, at the direction of HHS, is arbitrary, capricious, and unlawful.  It flouts Congressional intent and the express mandate of the Risk Adjustment statute.  HHS and CMS have gone beyond the bounds of their statutory directive, injecting unauthorized factors into the Risk Adjustment methodology, and failing to create a methodology that effects the directive of Congress. Accordingly, the methodology, as developed and implemented by HHS and CMS violates Section 1343 of the ACA and also violates the APA, 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, NMHC respectfully asks this Court to enter judgment in its favor and against Defendants and to:

1.    Declare that the Risk Adjustment methodology applied to NMHC for years 2014 and 2015 and intended to be applied in 2016 and 2017 is arbitrary, capricious, and contrary to law, in violation of the APA and section 1343 of the ACA;

2.    Declare that the Risk Adjustment methodology must be revised to comply with the express language and intent of Section 1343 of the ACA;

3.    Enjoin further application of the unlawful and improper Risk Adjustment methodology;

4.    Enjoin the Government from imposing on or collecting from NMHC a Risk Adjustment assessment until such time as the methodology has been revised to comply with the express language and intent of Section 1343 of the ACA.

5.    To the extent permitted, award NMHC costs and attorneys' fees; and

      6.     Award NMHC such other relief as this Court may deem necessary and appropriate.

Dated: July 29, 2016                   Respectfully submitted:

                           /s/ *Nancy R. Long*
                           Nancy R. Long
                           LONG, KOMER & ASSOCIATES, PA
                           2200 Brothers Road/PO Box 5098
                           Santa Fe, NM 87502
                           (505) 982-8405
                           nancy@longkomer.com
                           email@longkomer.com
                           vmarco@longkomer.com

                           Barak A. Bassman (*pro hac vice to be filed*)
                           Sara B. Richman (*pro hac vice to be filed*)
                           Leah Greenberg Katz (*pro hac vice to be filed*)
                           PEPPER HAMILTON LLP
                           3000 Two Logan Square
                           Eighteenth and Arch Streets
                           Philadelphia, PA 19103-2799
                           215-981-4000
                           bassmanb@pepperlaw.com
                           richmans@pepperlaw.com
                           katzl@pepperlaw.com

                           Marc D. Machlin (*pro hac vice to be filed*)
                           PEPPER HAMILTON LLP
                           Hamilton Square
                           600 Fourteenth Street, N.W.
                           Washington, D.C. 20005-2004
                           202-220-1200
                           machlinm@pepperlaw.com

                           *Attorneys for Plaintiff*