**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| NEW MEXICO HEALTH CONNECTIONS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:16-cv-00878 JB/WPL |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

<u>**DEFENDANTS' MOTION TO ALTER OR AMEND JUDGMENT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(e)**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 4

STANDARD ...................................................................................................................... 7

ARGUMENT .................................................................................................................... 7

I.    The Court Misapprehended the Parties' Positions on Budget Neutrality, Which Led to a Misapprehension of Controlling Law. ................................................................. 7

      A.    The Court's Holding that HHS's Budget-Neutral Approach Was Arbitrary and Capricious Is Based on a Claim NMHC Never Directly Asserted and Could Not Have Asserted as to the 2014-2017 Rules. ................................................. 7

      B.    The Court Misapprehended HHS's Position on Budget Neutrality, Which Led to an Erroneous Legal Analysis. ........................................................................ 12

      C.    Even if HHS's Budget-Neutral Approach Could Be Deemed Discretionary, It Would Not Be Subject to Judicial Review. ......................................................... 19

II.   The Court's Automatic Vacatur Misinterpreted Controlling Law and Is  Manifestly Unjust. .......................................................................................................................... 21

      A.    Automatic Vacatur Was Not Required. .............................................................. 21

      B.    Vacatur is Manifestly Unjust. ............................................................................ 24

CONCLUSION................................................................................................................... 27

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ................................................... 22, 24, 26

*Am.'s Cmty. Bankers v. FDIC*,
    200 F.3d 822 (D.C. Cir. 2000) ........................................................ 17

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*,
    781 F.3d 1271 (11th Cir. 2015) ................................................... 22, 23

*Brown v. Presbyterian Healthcare Servs.*,
    101 F.3d 1324 (10th Cir. 1996) ........................................................ 7

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
    688 F.3d 989 (9th Cir. 2012) (per curiam) ....................................... 22

*California Wilderness Coal. v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ................................................... 18, 19

*Camp v. Pitts*,
    411 U.S. 138 (1973) ............................................................... 22, 23

*Cent. & S. W. Servs., Inc. v. EPA*,
    220 F.3d 683 (5th Cir. 2000) ......................................................... 23

*Cent. Me. Power Co. v. FERC*,
    252 F.3d 34 (1st Cir. 2001) .......................................................... 22

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ............................................................... 5, 6, 7

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308 (1937) ................................................................. 14

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ................................................................. 23

*City of Colorado Springs v. Solis*,
    589 F.3d 1121–35 (10th Cir. 2009) .................................................. 23

*Dist. Hosp. Partners, L.P. v. Burwell*,
    786 F.3d 46 (D.C. Cir. 2015) ........................................................ 22

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) .............................................................. 8, 9

ii

*Fed. Power Comm'n v. Colorado Interstate Gas Co.*,
348 U.S. 492 (1955) ........................................................................... 10

*Hospice of New Mexico, LLC v. Sebelius*,
691 F. Supp. 2d 1275 (D.N.M. 2010), *aff'd*, 435 F. App'x 749 (10th Cir. 2011) ................. 27

*In re FCC 11-161*,
753 F.3d 1015 (10th Cir. 2014) ........................................................... 8, 14

*Judulang v. Holder*,
565 U.S. 42 (2011) ............................................................................ 9

*King v. Burwell*,
135 S. Ct. 2480 (2015) ....................................................................... 18

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ................................................................ 3, 19, 20

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
638 F.3d 644 (9th Cir. 2011) .............................................................. 27

*Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*,
729 F.3d 1025 (9th Cir. 2013) ....................................................... 19-20

*Minuteman Health, Inc. v. U.S. Dep't of Health & Human Servs.*,
No. CV 16-11570-FDS, 2018 WL 627381 (D. Mass. Jan. 30, 2018) ...................... 10, 11, 13

*Modoc Lassen Indian Hous. Auth. v. United States Dep't of Hous. & Urban Dev.*,
881 F.3d 1181 (10th Cir. 2017) ........................................................... 17

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ......................................................................... 27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................ 9

*Mount Evans Co. v. Madigan*,
14 F.3d 1444 (10th Cir. 1994) ............................................................. 20

*Nat. Res. Def. Council v. EPA*,
808 F.3d 556 (2d Cir. 2015) ................................................................ 22

*Nat'l Ass'n of Ctys. v. Baker*,
842 F.2d 369 (D.C. Cir. 1988) ............................................................ 17

*New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*,
No. CIV 02-0199 JB/LCS, 2004 WL 6409640 (D.N.M. Aug. 31, 2004) ............................ 21

*New Mexico Envtl. Improv. Div. v. Thomas*,
   789 F.2d 825 (10th Cir. 1986) ............................................................ 10

*New York v. United States*,
   505 U.S. 144 (1992) ............................................................................ 14

*North Carolina v. EPA*,
   550 F.3d 1176 (D.C. Cir. 2008) .......................................................... 25

*Northside Sanitary Landfill, Inc. v. Thomas*,
   849 F.2d 1516 (D.C. Cir. 1988) .......................................................... 11

*Muscogee (Creek) Nation Div. of Hous. v. Dep't of Hous. & Urban Dev.*,
   698 F.3d 1276 (10th Cir. 2012) ...........................................................21

*Office of Pers. Mgmt. v. Richmond*,
   496 U.S. 414 (1990) ..................................................................... 14, 18

*Oklahoma v. EPA*,
   723 F.3d 1201 (10th Cir. 2013) .......................................................... 18

*Portland Cement Ass'n v. Ruckelshaus*,
   486 F.2d 375 (D.C. Cir. 1973) ............................................................ 11

*Prairie Cty., Montana v. United States*,
   782 F.3d 685 (Fed. Cir. 2015) ............................................................ 19

*Printz v. United States*,
   521 U.S. 898 (1997) ............................................................................ 14

*Prometheus Radio Project v. FCC*
   824 F.3d 33 (3d Cir. 2016) ................................................................. 23

*Ramah Navajo Chapter v. Salazar*,
   644 F.3d 1054 (10th Cir. 2011), *aff'd*, 567 U.S. 182 (2012) ................ 19

*Rives v. Interstate Commerce Comm'n*,
   934 F.2d 1171 (10th Cir. 1991) ..................................................... 2, 10

*Rodway v. U.S. Dep't of Agric.*,
   514 F.2d 809 (D.C. Cir. 1975) ............................................................ 10

*Serrato v. Clark*,
   486 F.3d 560 (9th Cir. 2007) .............................................................. 20

*Servants of the Paraclete v. Does*,
   204 F.3d 1005 (10th Cir. 2000) ............................................................ 7

iv

*Sierra Club v. Yeutter*,
    911 F.2d 1405 (10th Cir. 1990) ................................................................. 20

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ...................................................................... 3, 14

*State of N.J. v. United States*,
    91 F.3d 463 (3d Cir. 1996) ..................................................................... 20

*United States v. L. A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952) ..................................................................... 2, 10

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
    305 F.3d 1152 (10th Cir. 2002) ............................................................ 24

*WildEarth Guardians v. United States Bureau of Land Mgmt.*,
    870 F.3d 1222 (10th Cir. 2017) ....................................................... 21, 27

*Woods Petroleum Corp. v. Dep't of Interior*,
    47 F.3d 1032 (10th Cir. 1995) ............................................................ 23

*Woods Petroleum Corp. v. U.S. Dep't of Interior*,
    18 F.3d 854 (10th Cir. 1994) .............................................................. 24

*Zuniga-Espinoza v. Holder*
    507 F. App'x 778 (10th Cir. 2013) ................................................. 20-21

**Constitutional Law**

U.S. Const., art. I, § 9, cl. 7 ....................................................................... 3

**Statutes**

5 U.S.C. § 553 ...................................................................... 3, 10, 20
5 U.S.C. § 701 ............................................................................... 3
5 U.S.C. § 702 ...................................................................... 21, 22
5 U.S.C. § 706 ............................................................................ 18
31 U.S.C. § 1341 ................................................................. *passim*
31 U.S.C. § 1350 ........................................................................ 18
42 U.S.C.  § 18062 ...................................................................... 26
42 U.S.C. § 300gg-18 .................................................................. 26
42 U.S.C. § 1395w-115 ............................................................... 15
42 U.S.C. § 1395w-116 ............................................................... 15

42 U.S.C. § 18041 ................................................................................................ 4, 14

42 U.S.C. § 18061 .............................................................................................. 11, 18

42 U.S.C. § 18063 ....................................................................................... 4, 9, 13, 15

Consolidated and Further Continuing Appropriations Act 2015,
    Pub. L. No. 113-235, 128 Stat. 2130 (Dec. 16, 2014) .........................................16

Consolidated Appropriations Act 2016,
    Pub. L. No. 114-113, 129 Stat. 2242 (Dec. 18, 2015) .........................................16

Consolidated Appropriations Act 2017,
    Pub. L. No.  115-31, 131 Stat. 135 (May 5, 2017) .............................................16

Consolidated Appropriations Act 2018,
    Pub. L. No. 115-141 (Mar. 23, 2018) ...............................................................16

## Administrative and Executive Materials

2014 Rule, 78 Fed. Reg. 15,410 (Mar. 11, 2013) ................................................ 12, 16

2015 Benefit Rule, 79 Fed. Reg. 13,744 (Mar. 11, 2014) ....................................... 16

2016 Benefit Rule, 80 Fed. Reg. 10,750 (Feb. 27, 2015) ........................................ 16

2017 Benefit Rule, 81 Fed. Reg. 12,204 (Mar. 8, 2016) ......................................... 16

2018 Benefit Rule, 81 Fed. Reg. 94,058 (Dec. 22, 2016)............................. 2, 13, 16, 18

## Other Authorities

U.S. Gov't Accountability Office, Principles of Federal Appropriations Law at 1-8 (4th ed.
2016), https://www.gao.gov/assets/680/675699.pdf...................................................... 17

Pursuant to Fed. R. Civ. P. 59(e) and for the reasons set forth below, Defendants move to alter or amend the Judgment and associated Memorandum Opinion and Order entered February 28, 2018, ECF Nos. 55, 56.   Defendants respectfully request that the Court reconsider its determination that Defendants' risk adjustment methodology is unlawful as to its use of the statewide average premium for the 2014-2018 benefit years.   In the alternative, Defendants request that the Court remand to the agency without vacatur for further proceedings consistent with its opinion or limit the effects of vacatur to the risk adjustment program operated in the State of New Mexico.   Counsel for Defendants conferred with counsel for Plaintiff in a good-faith request for concurrence and Plaintiff noted its opposition to this Motion.

## **INTRODUCTION**

This Court's Memorandum Opinion and Order held that the Department of Health and Human Services' ("HHS's") risk adjustment methodology under section 1343 of the Affordable Care Act ("ACA") is arbitrary and capricious because HHS did not explain its reasons for designing the program in a budget-neutral manner.   In so holding, the Court ruled on a claim that plaintiff New Mexico Health Connections ("NMHC") never expressly asserted.   Although NMHC argued in its pleadings that budget neutrality was not statutorily mandated and could not therefore justify use of the *statewide average premium* as a cost-scaling factor in the transfer formula, NMHC never offered any reason to believe—and certainly never directly asserted—that HHS's budget neutral approach was itself arbitrary and capricious.   Had the issue been squarely addressed in the parties' briefing, HHS would have had the opportunity to correct several mistaken factual and legal premises on which this Court's opinion rests.   Accordingly, HHS respectfully seeks reconsideration and asks the Court to alter or amend its judgment pursuant to Fed. R. Civ. P. 59(e).

First, under black-letter principles of administrative law, HHS was not required to explain—and NMHC was largely foreclosed from challenging—HHS's budget-neutral approach to the risk adjustment program, because at no point during the 2014-2017 rulemakings did NMHC or any other commenter challenge or question that approach. The Supreme Court and the Tenth Circuit have long held that "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952); *see also Rives v. Interstate Commerce Comm'n*, 934 F.2d 1171, 1176 (10th Cir. 1991) ("Failure of a party to present its contentions properly to the agency precludes [judicial] review."). Moreover, when NMHC and other commenters finally raised their objections to budget neutrality during the 2018 rulemaking (after this case was filed), HHS explained that its budget-neutral approach was dictated by "*the absence of additional funding for the HHS-operated risk adjustment program.*" 2018 Benefit Rule, 81 Fed. Reg. 94,058, 94,101 (Dec. 22, 2016), AR009638 (emphasis added). The Court's opinion overlooked that explanation, even while acknowledging that the absence of additional appropriations would be a sound reason for budget neutrality. This oversight alone warrants reconsideration.

Second, the Court misapprehended HHS's position on budget neutrality, which led to clear errors of controlling law. HHS has never stated, as the Court held, that budget neutrality is compelled by the text of section 1343 alone. Rather, budget neutrality is a necessary consequence of Congress's failure to appropriate additional funds for risk-adjustment payments. As the text of section 1343 makes plain, Congress designed the risk adjustment program to be implemented by states if they choose to do so. Nothing in the text of section 1343 requires states to spend their

own funds for risk-adjustment payments or allows HHS to impose such a requirement.  And under settled Supreme Court precedent, Congress must clearly set out the conditions on state participation in a federal program.  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  Furthermore, to the extent that HHS administers the risk-adjustment program on behalf of states, the Appropriations Clause, U.S. Const., art. I, § 9, cl. 7, and the Anti-Deficiency Act, 31 U.S.C. § 1341, prohibit HHS officials from making or authorizing payments or obligations in excess of appropriations.  Thus, HHS's budget-neutral approach was not a discretionary policy choice but a straightforward application of binding appropriations law.

Third, even if HHS had possessed the requisite budget authority to implement the program in a manner that was not budget neutral (which it did not), any decision about whether to exercise that authority would not have been subject to judicial review.  The Supreme Court held in *Lincoln v. Vigil*, 508 U.S. 182 (1993) that, absent a statutory mandate, an agency's budgetary decisions are committed to agency discretion as a matter of law and therefore exempted from judicial review under 5 U.S.C. § 701(a)(2).  The Court further held that such decisions are "general statements of policy" and need not comply with the procedural requirements of 5 U.S.C. § 553.  Thus, under *Lincoln* and controlling Tenth Circuit case law, the agency was not required to explain its decision on budget neutrality and the Court lacked jurisdiction to review it.

Finally, even if the Court's decision could be squared with these dispositive legal authorities, the Court erred by assuming that vacatur was mandatory and declining to weigh the equities before entering such an extraordinarily disruptive remedy.  The Tenth Circuit has made clear that a court has the discretion to remand without vacatur based on equitable considerations, and courts have consistently held that when an agency's only error is an inadequate explanation,

3

the proper course is to remand for additional explanation without vacating the agency's action. That remedy is particularly warranted here because, as explained in the attached declaration of Jeffrey Wu, Associate Deputy Director for Policy Coordination of the HHS Center that administers the ACA risk adjustment program, Ex. A, vacatur creates significant uncertainty, financial hardship, and undue burden for hundreds of health insurance issuers and millions of enrollees nationwide. Even if the Court declines to remand without vacatur, it should limit the relief it orders to the operation of the risk adjustment program in New Mexico, so that its relief does not sweep more broadly than that needed to address NMHC's claims.

For all of these reasons, HHS respectfully submits that reconsideration is warranted.

## <u>BACKGROUND</u>

In recognition of the Court's familiarity with the issues, Defendants set forth only a short discussion of the factual and procedural background.  At issue in this lawsuit is the "risk adjustment" methodology promulgated by HHS pursuant to section 1343 of the ACA, 42 U.S.C. § 18063.  Section 1343 directs HHS to develop "criteria and methods" for states to "assess a charge on" or "provide a payment to" specified health plans and health insurance issuers, depending on whether "the actuarial risk of the enrollees of such plans or coverage for a year" is less than or greater than "the average actuarial risk of all enrollees in all plans or coverage in such State for such year." 42 U.S.C. § 18063.  HHS is directed to operate the risk adjustment in a state that fails to do so. 42 U.S.C. § 18041(c)(1).  HHS has developed its risk adjustment methodology in separate rulemakings for each year that the ACA's insurance market reforms have been in effect, from 2014 to the present.

NMHC's amended complaint, ECF No. 21, asserted only a single count broadly alleging that the risk adjustment methodology promulgated by HHS for benefit years 2014-2018 "does not effectuate the mandate of § 1343" or broader objectives of the ACA and therefore is "arbitrary, capricious, and unlawful."  *See* Am. Compl. ¶¶ 188-93.  Nevertheless, and based on other allegations in the amended complaint, the parties proceeded along the assumption that NMHC asserted six separate claims for each year at issue: (1) that HHS's use of the statewide average premium as a cost-scaling factor in the transfer formula is contrary to law under "step 1" of *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); (2) that HHS's use of the statewide average premium is arbitrary and capricious and unreasonable under *Chevron* "step 2"; (3) that HHS's original risk adjustment models were arbitrary and capricious due to a slight "estimation bias"; (4) that HHS's initial treatment of partial year enrollees was arbitrary and capricious; (5) that HHS's initial decision not to consider pharmacy data as an indicator of risk was arbitrary and capricious; and (6) that HHS's treatment of bronze plans is arbitrary and capricious.  The parties have consistently adhered to an understanding of NMHC's claims based on these six theories.  *See generally* Pl.'s Mot. for Summ. J., ECF No. 33 ("Pl.'s MSJ"); Defs.' Opp'n and Cross-Mot. for Summ. J., ECF No. 35 ("Defs.' MSJ"); Pl.'s Reply and Opp'n, ECF No. 40; and Defs.' Reply, ECF No. 41.  NMHC has never directly challenged, either in its amended complaint or in its summary judgment briefing, the substance of HHS's separate decision to design the program in a budget-neutral, self-funding manner.  Instead, NMHC has argued only that budget neutrality is not statutorily mandated by the ACA and, thus, that HHS's decision to structure the program in this way does not justify use of the statewide average premium.

The parties filed cross-motions for summary judgment. *See* ECF Nos. 33, 35, 40, 41.   In addition to challenging the legal basis for NMHC's claims, HHS also requested that, if the Court concluded that any error had been committed, the Court exercise its equitable power not to vacate the risk adjustment methodology due to the disruption such a remedy was likely to impose on hundreds of health insurance issuers nationwide.  *See* Defs.' MSJ at 43-44.

The Court issued a Memorandum Opinion and Order ("Mem. Op." or "opinion"), ECF No. 55, granting-in-part and denying-in-part the parties' cross-motions.  The Court rejected NMHC's first theory outlined above, that use of the statewide average premium is contrary to law, and also rejected the third through sixth theories, that other aspects of the methodology are arbitrary and capricious.  *Id.* at 60-63, 72-82.  The Court held, however, that HHS's use of the statewide average premium was arbitrary and capricious because the agency's rationale for selecting that approach was influenced by its separate decision to design the program in a budget-neutral manner, which, the Court held, HHS did not adequately explain.  The Court acknowledged that "there may be excellent policy reasons for making the risk adjustment plan budget neutral," such as inadequate "funding to make up the shortfall between the risk adjustment charges and credits" or a decision to allocate "discretionary funds to other programs that more desperately need that funding."  Mem. Op. at 68.  However, the Court concluded that HHS "never articulate[d] any public policy decision to operate risk adjustment in a budget neutral way," and therefore, "cannot now appeal to budget neutrality's public policy benefits to justify its decision."  Mem. Op. at 68-69.

Based on this conclusion, the Court held that it was "vacat[ing] the agency action as to the statewide average premium rules and 'remand[ing] the case to the agency for further

proceedings.'"  *Id.* at 71 (citations omitted).  The Court did not weigh the equities of vacatur or otherwise address HHS's request for remand without vacatur.

## STANDARD

Under Federal Rule of Civil Procedure 59(e), a party may move a district court to alter or amend a judgment within 28 days of its issuance.  "[I]n determining whether to grant or deny a Rule 59(e) motion to alter or amend the judgment, the district court is vested with considerable discretion."  *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1332 (10th Cir. 1996) (citation omitted).  Reconsideration "is appropriate where the court has misapprehended the facts, a party's position, or the controlling law" or where necessary to "prevent manifest injustice."  *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

## ARGUMENT

**I.      The Court Misapprehended the Parties' Positions on Budget Neutrality, Which Led to a Misapprehension of Controlling Law.**

**A.      The Court's Holding that HHS's Budget-Neutral Approach Was Arbitrary and Capricious Is Based on a Claim NMHC Never Directly Asserted and Could Not Have Asserted as to the 2014-2017 Rules.**

As noted, the Court declared invalid the agency's use of the statewide average premium because it concluded that HHS's decision to design the program in a budget-neutral manner was arbitrary and capricious.  However, NMHC has never—either in this case or during the rulemaking process before the agency—directly challenged that determination as arbitrary and capricious.  Instead, NMHC merely argued, as part of its attack on the statewide average premium, that HHS's budget-neutral approach was not *required* by the text of section 1343, standing alone.  *See* Am. Compl. ¶¶ 117-18 (arguing that HHS's budget neutrality rationale did not support use of the statewide average premium because "there is no statutory *requirement* that Risk Adjustment be

7

budget neutral" (emphasis added)); *id.* ¶ 128 ("HHS and CMS have improperly imposed this limitation on the program *without any statutory directive* to do so." (emphasis added)); *id.* ¶ 130 ("Lack of funding from Congress does not equate to a *requirement* that Risk Adjustment be budget neutral." (emphasis added)); Pl.'s MSJ at 21-22 ("there is no statutory *requirement* that risk adjustment be budget neutral." (emphasis added)).

The mere absence of a statutory directive does not render agency action arbitrary and capricious. Rather, "[a]gency action is arbitrary and capricious *only if* the agency: has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *In re FCC 11-161*, 753 F.3d 1015, 1132 (10th Cir. 2014) (emphasis added) (citation omitted). To this day, NMHC has not identified a single reason to believe that HHS's budgetary approach would fail this standard, much less expressly claimed that it does. *See* Am. Compl. ¶¶ 104-32 (challenging only the statewide average premium); *id.* ¶¶ 186-93 (failing to assert challenge to the budget neutrality determination). The Court appears to have implicitly recognized as much at the summary judgment hearing when it observed that, "budget neutrality is at least reasonable. It may not be the best reading of the statute, but [it] seems . . . at least reasonable." Ex. B, Summ. J. Hr'g Tr. at 28:3-8.

Nor were NMHC's budget neutrality arguments transformed into an independent substantive attack on HHS's budgetary approach simply because NMHC asserted, in passing, that "[i]n fact, HHS has never explained why it believes the program must be budget neutral" and cited *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016); *Judulang v. Holder*, 565 U.S.

42, 55 (2011); and *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Pl.'s MSJ at 22.  First, this argument was sandwiched within a paragraph contending only that "there is no statutory *requirement* that risk adjustment be budget neutral" and directly followed by a second paragraph contending that "[t]here is no language in Section 1343 of the ACA . . . *requiring* budget neutrality." *Id.* (citing 42 U.S.C. § 18063) (emphasis added). Again, merely asserting that the text of a statute does not require a certain approach is not the same as contending the approach is irrational or unreasonable.  Furthermore, the cases on which NMHC relied, *Encino Motorcars* and *State Farm*, hold only that an agency must provide sufficient explanation for a court to evaluate a policy that is *itself* challenged as arbitrary and capricious, here, the statewide average premium.  *See Encino Motorcars, LLC*, 136 S. Ct. at 2125-26 (addressing a change in an agency's prior policy challenged as arbitrary and capricious); *State Farm*, 463 U.S. at 43 (same).  They do not hold that an agency must also have explained a distinct policy that is not itself challenged as unlawful, and was never challenged during the rulemaking process, simply because that policy is a factor in the decision under review.  Similarly, while *Judulang v. Holder* stands for the proposition that agency decisions should be based on "non-arbitrary, relevant factors," 565 U.S. at 55, NMHC has never argued that budgetary considerations are "arbitrary" or "irrelevant."

Indeed, NMHC was foreclosed from challenging the reasonableness of the budget neutrality determination with respect to the 2014-2017 Benefit Rules because, although HHS outlined its budget-neutral approach as early as July 15, 2011, and repeatedly thereafter in soliciting comment on the risk adjustment methodology, *see, e.g.*, AR000010, 000136, 000258, 000650, 000659-61, 000933, at no point during the next five years did NMHC or any other

commenter question or comment on that approach.  *See Minuteman Health, Inc. v. U.S. Dep't of Health & Human Servs.*, No. CV 16-11570-FDS, 2018 WL 627381, at *21 (D. Mass. Jan. 30, 2018) ("To the extent that plaintiff complains that HHS did not adequately explain its decision to run the program in a budget-neutral way, the claim must likewise fail. There is no evidence that there was any significant comment on the topic that HHS was required to address in 2014."); *see also, e.g.*, *L.A. Tucker Truck Lines, Inc.*, 344 U.S. at 37 ("Simple fairness to those who are engaged in the tasks of administration . . . requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred *but has erred against objection made at the time appropriate under its practice*." (emphasis added)); *Fed. Power Comm'n v. Colorado Interstate Gas Co.*, 348 U.S. 492, 500 (1955) ("'A party cannot willfully fail to exhaust his administrative remedies and then, after the agency action has become operative, either secure a suspension of the agency action by a belated appeal to the agency, or resort to court . . . .'" (citation omitted)); *Rives*, 934 F.2d at 1176 ("Failure of a party to present its contentions properly to the agency precludes [judicial] review."); *New Mexico Envtl. Improv. Div. v. Thomas*, 789 F.2d 825, 835 (10th Cir. 1986) (rejecting APA challenge where "[n]either [plaintiff] nor anyone else advanced any dissatisfaction to the [agency] through comments . . . in the record").

Moreover, the "general statement" explaining a rule's "basis and purpose" required by the APA, 5 U.S.C. § 553(c), "is not intended to be an abstract explanation addressed to imaginary complaints.  Rather, its purpose is, at least in part, to respond in a reasoned manner *to the comments received*."  *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 817 (D.C. Cir. 1975) (emphasis added); *see also Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d 1516, 1519-21 (D.C. Cir. 1988) (finding agency action not arbitrary and capricious because plaintiff never "presented its objections

10

to the agency in a way which could reasonably have permitted the agency to examine those contentions" and noting that "'the dialogue between administrative agencies and the public is a two-way street'" (citation omitted)); *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (D.C. Cir. 1973) ("comments must . . . show why the mistake was of possible significance" before "*any lack of agency . . . consideration becomes of concern*" (emphasis added)).  Because neither NMHC nor any other commenter challenged HHS's budget-neutral approach during the 2014-2017 rulemakings, HHS was not required to explain itself and NMHC was foreclosed from asserting such a challenge in this case.  Furthermore, when NMHC did finally raise the budget neutrality issue to the agency during the 2018 rulemaking (after it filed this lawsuit), it largely argued only that budget neutrality is not statutorily mandated, not that it is irrational.  *See* NMHC000847 ("[T]here is no *requirement* in Section 1343 that Risk Adjustment be budget neutral; no *requirement* that payments collected from one set of issuers be used to make full and complete payments to another set of issuers."  (emphasis added)).

In sum, the Court's holding is based on a claim that NMHC did not clearly assert in this case and that NMHC was foreclosed from asserting as to the 2014 to 2017 Rules—that HHS's budget-neutral approach was independently arbitrary and capricious for lack of a satisfactory explanation for the basis of that approach.[1]  Even as to the 2018 Rule, Defendants respectfully

---

[1]  The district court in Massachusetts, which encountered nearly identical pleadings and summary judgment briefing in a case raising virtually identical legal issues, remarked that "[e]ven plaintiff does not argue that the statute forbids budget-neutrality—at most it argues that the statute's silence, when read in conjunction with 42 U.S.C. § 18061(b)(1)(B) . . . 'suggests' that the risk-adjustment program should be operated differently."  *Minuteman Health, Inc.*, 2018 WL 627381, at *20.  A mere "at best" "suggest[ion]" that a program "should be operated differently" is a far cry from clearly pleading that HHS's budget-neutral approach is arbitrary and capricious and on what grounds.

submit that they should not be prejudiced by the lack of clarity in NMHC's theories, and that the Court should reconsider its analysis based on the controlling principles of law outlined below.

### B.   The Court Misapprehended HHS's Position on Budget Neutrality, Which Led to an Erroneous Legal Analysis.

The Court also misapprehended HHS's position regarding the budget neutrality of the program, which led to a misapprehension of governing law.  The Court stated that "HHS assumed, erroneously, that the ACA requires risk adjustment to be budget neutral."  Mem. Op. at 54; *see also id.* at 64 ("HHS assumed that the ACA requires budget neutrality"); *id.* at 66 ("HHS assumes budget neutrality as a given because it believes, erroneously, that the ACA requires it[.]"); *id.* at 67 ("That HHS erroneously reads the ACA's risk adjustment provisions to require [budget neutrality] infects its analysis[.]"); *id.* at 68 ("the ACA does not require risk adjustment to be budget neutral").  This characterization led the Court to analyze only the text of the ACA, rather than equally binding principles of constitutional and appropriations law, in evaluating HHS's decision to implement the program in a budget-neutral manner.  *See id.* at 62-63.

Yet HHS has never contended that the text of section 1343 alone requires the program to be budget neutral; rather, it has explained that the program was "*designed* to be a budget-neutral revenue redistribution among issuers."  2014 Rule, 78 Fed. Reg. 15,410, 15,441 (Mar. 11, 2013), AR000258 (emphasis added); *see also, e.g.*, AR000010, AR000680, AR003751 (referring to program's budget-neutral "design").   In response to comments received during the 2018 rulemaking, HHS clarified that budget neutrality was compelled by Congress's failure to appropriate additional funds for risk-adjustment payments.  *See* 2018 Benefit Rule, 81 Fed. Reg. at 94,101, AR009638 ("*In the absence of additional funding for the HHS-operated risk adjustment program*, we continue to calculate risk adjustment transfers in a budget neutral manner[.]"

(emphasis added)); *see also* Am. Compl. ¶ 129 (citing same); Pl.'s MSJ at 22 (same).  Yet the Court's opinion appears to have overlooked this explanation, even while explicitly recognizing that a lack of "funding to make up the shortfall between the risk adjustment charges and credits" would be an "excellent policy reason[] for making the risk adjustment plan budget neutral."  Mem. Op. at 68; *see also id.* at 69 n.13 (stating that "subsequent final rules" after the 2014 Benefit Rule did not "elaborate further on [HHS's] budget-neutrality rationale").[2]

The Court's misapprehension of HHS's position led it to overlook binding principles of constitutional and appropriations law that mandated budget neutrality in light of Congress's failure to appropriate additional funds.  First, Congress designed the risk adjustment program to be implemented by states.  *See* 42 U.S.C. § 18063(a).  Yet nothing in the text of section 1343 requires states to spend their own funds for risk-adjustment payments or allows HHS to impose such a requirement.  *See Minuteman Health, Inc.*, 2018 WL 627381, at *21 ("Congress could not, under the Constitution, require the states to use their own money to fund a federal program.  It therefore stands to reason that absent any appropriation, Congress expected the states to run budget-neutral risk-adjustment programs, and for HHS to set its federal regulations to allow it to certify such programs." (citing *Printz v. United States*, 521 U.S. 898, 929-30 (1997); *New York v. United States*, 505 U.S. 144, 175-76 (1992)); *see also South Dakota*, 483 U.S. at 207 (holding that Congress must clearly set out the conditions of state participation in a federal program).  Thus, while section 1343 may have provided leeway for states to spend additional funding on the program if they voluntarily

---

[2] In this case as well, counsel for HHS clarified that although the text of section 1343 alone does not require budget neutrality, "in light of the absence of [additional] appropriations for risk adjustment," the "only reasonable interpretation" is that "risk adjustment is a budget neutral program."  Ex. B, Summ. J. Hrg. Tr. 79:19-22.

chose to do so, HHS could not have *required* additional funding within the methodology.  As the *Minuteman* court properly held, although HHS did not expressly state this rationale, it flows directly from section 1343's design as a program administered by states and therefore required no explanation.  *See In re FCC 11-161*, 753 F.3d at 1115 (holding that courts "can rely on 'implicitly adopted rationales as long as they represent the fair and considered judgment of the agency, rather than a post hoc rationalization'" (citation omitted)).

Second, fundamental appropriations law principles dictated that, insofar as HHS was operating the program on behalf of states (as HHS ultimately did pursuant to 42 U.S.C. § 18041(c)), the agency could not adopt a methodology that required payments in excess of collections.  As the Supreme Court has long recognized, "the straightforward and explicit command of the Appropriations Clause[] . . . means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (citing *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).  In furtherance of this straightforward and explicit command, Congress has enacted the Anti-Deficiency Act, 31 U.S.C. § 1341, which prohibits agency officials from making or authorizing "an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation" or an "obligation for the payment of money before an appropriation is made unless authorized by law."  *Id.* § 1341(a)(1)(A), (B).  Although the statutory provisions for many other ACA programs appropriated or authorized amounts to be appropriated from the Treasury, or provided budget authority in advance of appropriations,[3] the ACA neither

---

[3] For examples of ACA provisions appropriating funds, *see* ACA §§ 1101(g)(1), 1311(a)(1), 1322(g), 1323(c).  For examples of ACA provisions authorizing the appropriation of funds, *see* ACA §§ 1002, 2705(f), 2706(e), 3013(c), 3015, 3504(b), 3505(a)(5), 3505(b), 3506, 3509(a)(1),

authorized nor appropriated additional funding for risk adjustment payments beyond the amount of charges paid in, nor authorized HHS to obligate itself for risk adjustment payments in excess of charges collected.  *See* 42 U.S.C. § 18063.  Indeed, unlike the Medicare Part D statute, which expressly authorizes the appropriation of funds and provides budget authority in advance of appropriations to make Part D risk-adjusted payments, the ACA's risk adjustment statute makes no reference to additional appropriations whatsoever.  *Compare* 42 U.S.C. § 18063 (failing to specify source of funding other than risk adjustment charges), *with* 42 U.S.C. § 1395w-116(c)(3) (authorizing appropriations for Medicare Part D risk adjusted payments); *id.* § 1395w-115(a) (establishing "budget authority in advance of appropriations Acts" for risk adjusted payments under Medicare Part D).  Because Congress omitted from the ACA the budgetary language that it used in the preexisting Medicare Part D statute to appropriate independent funding or create budget authority in advance of an appropriation, HHS could not—absent another source of appropriations—have designed the risk adjustment program in a way that required payments in excess of collections consistent with binding appropriations law.  Thus, as a practical matter, Congress gave HHS no discretion to implement a program that was not budget-neutral.

NMHC has argued that HHS could have used a "lump sum" appropriation contained in the annual appropriation for the Centers for Medicare & Medicaid Services ("CMS") "Program Management" account to fund additional risk adjustment payments.  *See* Pl.'s MSJ at 24 ("[P]resumably, HHS has remained free to fund the risk adjustment program from its general

---

3509(b), 3509(e), 3509(f), 3509(g), 3511, 4003(a), 4003(b), 4004(j), 4101(b), 4102(a), 4102(c), 4102(d)(1)(C), 4102(d)(4), 4201(f), 4202(a)(5), 4204(b), 4206, 4302(a), 4304, 4305(a), 4305(c), 5101(h), 5102(e), 5103(a)(3), 5203, 5204, 5206(b), 5207, 5208(b), 5210, 5301, 5302, 5303, 5304, 5305(a), 5306(a), 5307(a), 5309(b).

program appropriation." (citing HHS – Risk Corridors Program, U.S. Gov't Accountability Office ("GAO"), B-325630, at 3-4 (Sept. 30, 2014), ECF No. 33-3 (discussing the CMS Program Management appropriation)).   NMHC is mistaken.   First, as discussed above, section 1343 is designed to be implemented by the states.   The lump sum is an appropriation to CMS, which has no authority to transfer such funds to state governments.   Second, as the underlying budget requests reflect, the Program Management lump sum is for *program management expenses*, such as administrative costs for various CMS programs such as Medicaid, Medicare, the Children's Health Insurance Program, and the ACA's insurance market reforms—not for the program payments themselves, which would vastly exceed the amount of the lump sum.   *See* Ex. C (CMS budget requests).[4]   Third, the lump sum appropriation for each year was enacted *after* the applicable Benefit Rule authorizing payments for that year.[5]   Thus, the later-enacted lump sum could not have authorized HHS to deviate from the budget-neutral design of the ACA in those Benefit Rules.   *See*

---

[4] The program payments are separately funded, a distinction reflected by language in the Program Management appropriation making the lump sum available for carrying out various CMS responsibilities "except as otherwise provided."   *See* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. G, title II, 128 Stat. 2130, 2477 (Dec. 16, 2014).   Just as Congress "otherwise provided" for Medicaid and Medicare payments through separate appropriations, Congress "otherwise provided" for risk adjustment payments through statutory text that mentions "charge[s]" as the only source of funding for "payment[s]."

[5] *Compare* 2014 Benefit Rule, 78 Fed. Reg. 15,410 (Mar. 11, 2013) *with* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. G, title II, 128 Stat. 2130, 2477 (Dec. 16, 2014); 2015 Benefit Rule, 79 Fed. Reg. 13,744, 13,753 (Mar. 11, 2014) *with* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, tit. II, 129 Stat. 2242, 2624 (Dec. 18, 2015); 2016 Benefit Rule, 80 Fed. Reg. 10,750, 10,759 (Feb. 27, 2015) *with* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. H, title II, 131 Stat. 135 (May 5, 2017); 2017 Benefit Rule, 81 Fed. Reg. 12,204 (Mar. 8, 2016) *with* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. H, tit. II (Mar. 23, 2018).   The 2018 Benefit Rule was promulgated on December 22, 2016, 81 Fed. Reg. 94,058, but Congress has not yet enacted a lump sum appropriation for fiscal year 2019.

GAO, Principles of Federal Appropriations Law at 1-8 (4th ed. 2016) ("Agencies may not spend, or commit themselves to spend, in advance of . . . appropriations.").[6]

The Court's misapprehension of HHS's position on budget neutrality led the Court to look only at section 1343 in its analysis, rather than equally binding principles of constitutional federalism and appropriations law.  But while the text of section 1343, read in isolation, may not require budget neutrality in all situations (and HHS has never suggested that it does), absent a state's voluntary decision to spend additional funds on the risk adjustment program or budget authority for HHS to obligate additional Treasury funds for that purpose, HHS was constrained to devise a methodology that was budget neutral.  *See, e.g.*, *Modoc Lassen Indian Hous. Auth. v. United States Dep't of Hous. & Urban Dev.*, 881 F.3d 1181, 1205 (10th Cir. 2017) (Matheson, J., concurring in part and dissenting in part) (observing that "HUD can pay . . . funds to the Tribes only to the extent Congress has authorized HUD to do so" because "the Appropriations Clause assures 'that public funds will be spent according to the letter of the difficult judgments reached by Congress . . . and not . . .  the individual pleas of litigants" (citation omitted)); *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 830 (D.C. Cir. 2000) (holding that the agency "had no statutory, regulatory, or other . . . authority to distribute funds" to a claimant "[o]utside the appropriations process"); *Nat'l Ass'n of Ctys. v. Baker*, 842 F.2d 369, 380-81 (D.C. Cir. 1988) (upholding agency action based on "the only plausible interpretation" of appropriations laws and noting that "[t]he problem in the district court's reasoning and the position urged by the [plaintiffs] is that it assumes the existence of appropriated funds"); *cf. Richmond*, 496 U.S. at 430 ("it would be most anomalous for a judicial order to require a Government official . . . to make an extrastatutory payment of

---

[6] Available at https://www.gao.gov/assets/680/675699.pdf.

federal funds. It is a federal crime, punishable by fine and imprisonment, for any Government

officer or employee to knowingly spend money in excess of that appropriated by Congress." (citing

31 U.S.C. §§ 1341, 1350)).  Accordingly, the Court clearly erred in holding that HHS's budget-

neutral approach—even if it were properly challenged by NMHC here—was a discretionary policy

choice subject to notice and comment rulemaking, *see* Mem. Op. at 64-68, as opposed to a

straightforward application of binding appropriations law.[7]

The Court compounded this error by overlooking HHS's explanation during the 2018

rulemaking, the first time the issue was raised by commenters, that its budget-neutral approach

was dictated by "*the absence of additional funding for the HHS-operated risk adjustment

program*."  2018 Benefit Rule, 81 Fed. Reg. at 94,101, AR009638 (emphasis added).  Because the

Court acknowledged that such a lack of "funding to make up the shortfall" would be an "excellent"

reason for operating the program in a budget-neutral manner, Mem. Op. at 68, this oversight

independently warrants reconsideration because HHS did not err as to the 2018 rulemaking even

under the Court's reasoning.[8]

---

[7] Due to these principles, comparisons to the text of the reinsurance statute, 42 U.S.C. § 18061, which differs significantly in its mechanics from section 18063 (and in fact, is budget positive, not budget neutral, *see* 42 U.S.C. § 18061(b)(3)(B)(iv)), are not particularly helpful.  That is especially true given the Supreme Court's recognition that the ACA "contains more than a few examples of inartful drafting." *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015).

[8]  In light of the foregoing, the Court also committed clear error by not considering the harmless error doctrine.  *See* 5 U.S.C. § 706 (stating that courts "shall" take account of "the rule of prejudicial error").  An agency's error is harmless when it "'clearly had no bearing on . . . the substance of [the] decision reached.'"  *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090 (9th Cir. 2011); *see also Oklahoma v. EPA,* 723 F.3d 1201, 1212 n.6 (10th Cir. 2013) (agency's inadequate basis and purpose statement "is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors" (citation omitted)).  Here, given the constitutional and budgetary constraints limiting HHS's

**C.      Even if HHS's Budget-Neutral Approach Could Be Deemed Discretionary, It Would Not Be Subject to Judicial Review.**

Even if HHS had the authority to design the risk adjustment program in a non-budget neutral manner, its decision not to exercise that authority would be committed to agency discretion as a matter of law and thus exempted from judicial review under controlling Supreme Court and Tenth Circuit precedent.  In *Lincoln*, the Supreme Court explained that:

> The allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion. After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way . . . .  [A]n agency's allocation of funds from a lump-sum appropriation requires a complicated balancing of a number of factors which are peculiarly within its expertise: whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all . . . .  To that extent, the decision to allocate funds is committed to agency discretion by law.

508 U.S. at 192-94 (citations omitted).  *See also Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1068 (10th Cir. 2011) ("'as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives,' federal law 'gives the courts no leave to intrude.'" (citing *Lincoln*, 508 U.S. at 193)), *aff'd*, 567 U.S. 182 (2012)[9]; *Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025, 1038 (9th Cir. 2013) ("courts may not use the APA to review an

---

discretion, the agency's failure to explain its approach "clearly had no bearing on . . . the substance of [the] decision reached," *California Wilderness Coal.*, 631 F.3d at 1090, and thus was harmless.

[9] In *Ramah Navajo*, the Tenth Circuit held that the inadequacy of a lump sum appropriation to cover all of an agency's contractual obligations does not prevent an individual contractor from enforcing its contract rights in the Court of Federal Claims and collecting from the Judgment Fund. 644 F.3d at 1066.  This limited doctrine applies only to enforceable contract rights and does not negate the limitations of the Anti-Deficiency Act. *See, e.g.*, *Prairie Cty., Montana v. United States*, 782 F.3d 685, 689-90 (Fed. Cir. 2015).  Thus, it has no application here.

agency's decision to allocate funds absent some statutory constraint on the agency's discretion." (citing *Lincoln*, 508 U.S. at 190-94)); *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1449 (10th Cir. 1994) (where Congress "did not command the agency to spend monies and certainly imposed no duty to" do so, agency's decision was not subject to judicial review (citing *Sierra Club v. Yeutter*, 911 F.2d 1405, 1413 (10th Cir. 1990)); *State of N.J. v. United States*, 91 F.3d 463, 471 (3d Cir. 1996) ("the decision as to whether to appropriate any of th[e] funds [in a lump sum appropriation] for [a particular] purpose is one 'committed to agency discretion' and therefore unreviewable under the APA").  Thus, even if HHS had been permitted to obligate the CMS lump sum appropriation on risk adjustment payments, its decision not to exercise that authority would not have been subject to judicial review.

Nor would such a decision have been subject to the procedural requirements of section 553 of the APA.  The *Lincoln* Court held that an agency's decisions about how to allocate unrestricted discretionary funds among competing purposes constitute "general statements of policy" that are exempted from the requirements of section 553.  *Lincoln*, 508 U.S. at 197; *see also Serrato v. Clark*, 486 F.3d 560, 569-70 (9th Cir. 2007) (holding section 553 inapplicable to discretionary policy change attributable to budgetary considerations).  Accordingly, even if HHS could have deviated from a budget neutral approach, it would not have been required to conduct notice and comment rulemaking on its decision not to do so, nor would it have been required to explain that decision pursuant to 5 U.S.C. § 553(c).

Finally, because such budgetary decisions are committed to agency discretion as a matter of law, this Court lacked jurisdiction to review any allegation that HHS's budget-neutral approach was arbitrary and capricious.  *See, e.g.*, *Zuniga-Espinoza v. Holder*, 507 F. App'x 778, 780 (10th

Cir. 2013) ("decisions committed to the agency's discretion [are] beyond our jurisdiction to review." (citation omitted)); *Muscogee (Creek) Nation Div. of Hous. v. Dep't of Hous. & Urban Dev.*, 698 F.3d 1276, 1282 (10th Cir. 2012) (affirming dismissal "for lack of jurisdiction because HUD's authority to approve investment activities is committed to agency discretion as a matter of law"). For these reasons, the Court lacked jurisdiction to vacate HHS's risk adjustment methodology on the ground that HHS did not adequately explain its decision on budget neutrality.

## II.     The Court's Automatic Vacatur Misinterpreted Controlling Law and Is Manifestly Unjust.

### A.     Automatic Vacatur Was Not Required.

Based on its conclusion that HHS had not explained its budget neutral approach, the Court "set[] aside and vacate[d] the agency action as to the statewide average premium rules and remand[ed] the case to the agency for further proceedings." Mem. Op. at 71. The Court did not address HHS's request for remand without vacatur or explain why it was denying that request.

To the extent the Court concluded that vacatur was mandatory under the APA, that conclusion misapprehends controlling law.[10] The APA provides that "nothing herein . . . affects . . . the power or duty of the court to . . . *deny relief on any appropriate . . . equitable ground*." 5 U.S.C. § 702 (emphasis added). The Tenth Circuit recently confirmed that a court may decline to vacate agency action even if it finds that action arbitrary and capricious. *WildEarth Guardians v. United States Bureau of Land Mgmt.*, 870 F.3d 1222, 1239-40 (10th Cir. 2017). Numerous other

---

[10] HHS recognizes this Court's holding in *New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, No. CIV 02-0199 JB/LCS, 2004 WL 6409640 (D.N.M. Aug. 31, 2004) that the "APA and Supreme Court and Tenth Circuit precedent *require* vacatur pending a remand." *Id.* at *8 (emphasis added). However, HHS respectfully submits that this holding warrants reconsideration in light of the more recent authorities cited here and the APA's express recognition of a court's power to deny relief on any appropriate "equitable ground." 5 U.S.C. § 702.

circuits are in accord with this view.  *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015) ("'[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures.'" (citation omitted)); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015) ("In deciding whether an agency's action should be remanded without vacatur, a court must balance the equities."); *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (per curiam); *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) ("A reviewing court that perceives flaws in an agency's explanation is not required automatically to set aside the inadequately explained order."); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) ("The decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" (citation omitted)).

Indeed, remand without vacatur appears to be the presumptive remedy when an agency's only error is a failure to provide a sufficient explanation to permit judicial review.  In *Camp v. Pitts*, 411 U.S. 138 (1973), the Supreme Court held that "[i]f . . . there was such failure to explain administrative action as to frustrate effective judicial review, the remedy" is "*to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary*."  *Id.* at 142-43 (emphasis added).  Applying this holding, every court of appeals to consider the issue has held that remand without vacatur is appropriate when the only defect in an agency's decision is inadequate explanation.  *See, e.g.*, *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) (noting that "bedrock principles of administrative law preclude us from declaring definitively that the Secretary's decision was

arbitrary and capricious without first affording her an opportunity to articulate, if possible, a better explanation" and following that "well-worn path" to remand without vacatur (citation omitted)); *Black Warrior Riverkeeper, Inc.*, 781 F.3d at 1289-91 ("In circumstances like these, where it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process, the remedy of remand without vacatur is surely appropriate."); *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) ("EPA may well be able to justify its decision to refuse to promulgate a national variance for the electric utilities and it would be disruptive to vacate a rule that applies to other members of the regulated community."); *cf. Prometheus Radio Project v. FCC*, 824 F.3d 33, 52 (3d Cir. 2016) ("Vacatur typically is inappropriate where it is 'conceivable' that the [agency] can, if given the opportunity, create a supportable rule." (citation omitted)).

In reliance on *Camp,* the Tenth Circuit has likewise stated that "[w]hen the agency has failed to explain adequately the rationale underlying its action, and 'further explanation is necessary to a proper assessment of the agency's decision,' the court should ordinarily remand for further proceedings." *Woods Petroleum Corp. v. Dep't of Interior*, 47 F.3d 1032, 1041 (10th Cir. 1995) (citing *Camp*, 411 U.S. at 143); *see also City of Colorado Springs v. Solis*, 589 F.3d 1121, 1134–35 (10th Cir. 2009) (holding that "even if . . . the administrative record w[as] inadequate for judicial review, in these circumstances such inadequacy would not justify reversing [the agency action] . . . [because] where an agency decision and administrative record is insufficient for judicial review, a court may require the agency to explain its decision" without vacatur (citing *Camp*, 411 U.S. at 142-43); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002) ("If . . . the reviewing court simply cannot evaluate the challenged agency action on the basis of the record

before it, the proper course, except in rare circumstances, is to remand to the agency for *additional investigation or explanation*." (emphasis added) (citations omitted)); *Woods Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859 (10th Cir. 1994) (contrasting between simple remand for additional explanation where "the only deficiency in the Secretary's actions [is] an inadequate analysis and discussion of all relevant factors" and vacatur with instructions where agency's actions were substantively flawed).  In light of this robust authority, HHS respectfully submits that, even if the Court declines to reconsider its holding based on the principles of law set forth above, vacatur is not required.

### B. Vacatur is Manifestly Unjust.

To determine whether vacatur is appropriate, courts generally should evaluate "'the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal*, 988 F.2d at 150-51 (citation omitted).  Applying this standard, vacatur of the 2014-2018 Rules' use of the statewide average premium is not only inappropriate, it is manifestly unjust.

First, any deficiencies in the 2014-2018 Rules were minor.  No commenter raised any objection regarding budget neutrality until the 2018 rulemaking, at which time HHS responded to those comments by explaining that its approach was driven by a lack of additional appropriations. Moreover, the Court noted that there could be "excellent" reasons for adopting a budget-neutral approach, including a lack of appropriations (as well as many of the other reasons set forth in HHS's briefing in this case).  Mem. Op. at 68.  Thus, the Court's holding raises little question that the agency "chose correctly." *Allied-Signal*, 988 F.2d at 150.  Indeed, further agency procedure

24

on this issue is unnecessary because there is no funding for risk adjustment payments other than amounts collected, and no amount of additional rulemaking will alter that fact.

On the other hand, the consequences of the Court's vacatur—an "interim change that may itself be changed," *id.* at 150-51—are tremendously disruptive, not only for insurance companies nationwide, but also for policyholders and state insurance markets generally.  As the attached Declaration of Jeffrey Wu explains, Ex. A, HHS's inability to use the statewide average premium for the time being means that HHS cannot presently calculate, collect, or pay risk adjustment transfers for the 2017 and 2018 benefit years and therefore issuers that factored the expectation of those payments into their budgeting and rate setting will not timely receive billions of dollars of expected payments.  Wu Decl. ¶ 13.  *See North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) ("it is appropriate to remand without vacatur in particular occasions where vacatur 'would at least temporarily defeat'" the protections the statute was enacted to provide).  For benefit years in which payments and charges have already been administered (2014-2016), vacatur raises numerous questions about the legal status of those payments and charges during the interim time period in which—in the absence of a complete risk adjustment methodology for 2014-2018—HHS engages in the administrative proceedings necessitated by the Court's decision.  Wu Decl. ¶ 14.

The disruptive effects of vacatur also extend beyond the risk adjustment program.  The risk corridors calculations required under 42 U.S.C. § 18062 and the Medical Loss Ratio ("MLR") calculations required under 42 U.S.C. § 300gg-18 both incorporate risk adjustment transfers.  Wu Decl. ¶¶ 18, 20.  Therefore, they cannot be performed absent a complete risk adjustment methodology, and they must be revised to the extent the risk adjustment calculation changes.  As a result, vacatur could require hundreds of issuers to recalculate their risk corridors payments and

25

charges for all three years, which would then need to be recalculated again after HHS engages in the additional administrative proceedings necessitated by the Court's judgment.  *Id.* ¶ 19. Similarly, both risk corridors and risk adjustment amounts are factored into the calculations that establish MLR rebates for enrollees.  *See* 42 U.S.C. §300gg-18(a)-(b).  Thus, after engaging in the necessary recalculation of their risk corridors transfers, the hundreds of issuers subject to this requirement may have to revise their MLR reports, affecting millions of dollars in MLR rebates and potentially resulting in some issuers owing new and unexpected rebates to enrollees for prior years.  Wu Decl. ¶ 21.  Those new liabilities are not only unanticipated, they would be difficult and burdensome to calculate and disburse given that some may apply to enrollees that have moved on to other plans.  *Id.*  Furthermore, such calculations would need to be revised a second time after HHS completes any additional rulemaking necessitated by the Court's judgment, imposing a second round of burdensome administrative revisions on health plans and raising questions about the status of the rebates that flow from such reporting.  *Id.*  Finally, all of this uncertainty and disruption coincides with health insurance issuers' annual process for rate setting and plan design for the 2019 benefit year, and could influence those decisions in the form of increased premiums, thus harming the millions of individuals seeking health insurance coverage nationwide.  *Id.* ¶ 22.

Given the minor nature of the deficiency found by the Court, the incredibly "disruptive consequences of an interim change [to the risk adjustment program] which may itself be changed," *see Allied-Signal*, 988 F.2d at 150-51, the high probability that HHS will be able to justify its approach on remand because no other approach would be constitutionally permissible, and the weight of authority holding that remand without vacatur is the proper remedy in such circumstances, HHS respectfully requests that, if the Court elects not to reconsider its essential

holding in light of the authority set forth in this motion, it reconsider its remedial order and instead remand to the agency without vacatur. In the alternative, HHS requests that, in light of the equitable considerations presented here, the Court limit its remedy to the risk adjustment program operated in the State of New Mexico, rather than extending it to the risk adjustment program nationwide. *See WildEarth Guardians*, 870 F.3d at 1240 (observing that instead of a complete vacatur district court "might fashion some narrower form of injunctive relief based on equitable [considerations]"); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) (noting that courts should generally consider "a less drastic remedy" if available, including "partial . . . vacatur"). This narrower form of relief would address NMHC's claimed injuries without prejudicing the rights and obligations of insurers in other states. *See Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664-65 (9th Cir. 2011); *Hospice of New Mexico, LLC v. Sebelius*, 691 F. Supp. 2d 1275, 1294 (D.N.M. 2010), *aff'd*, 435 F. App'x 749 (10th Cir. 2011).

## <u>CONCLUSION</u>

For all of the foregoing reasons, HHS respectfully requests that its Motion be granted and that the Court alter or amend its judgment pursuant to Federal Rule of Civil Procedure 59(e).

Dated: March 28, 2018                    Respectfully submitted,

                                         CHAD A. READLER
                                         Acting Assistant Attorney General

                                         JOEL McELVAIN
                                         Assistant Branch Director

                                         */s/ James Powers*
                                         JAMES R. POWERS (TX Bar No. 24092989)
                                         SERENA M. ORLOFF
                                         Trial Attorneys
                                         U.S. Department of Justice,
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Ave., N.W.
                                         Washington, D.C. 20530
                                         Telephone: (202) 353-0543
                                         james.r.powers@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of March, 2018, I caused the foregoing document to be served on counsel for Plaintiff by filing with the Court's electronic case filing system.


*/s/ James Powers*
James R. Powers