# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

NEW MEXICO HEALTH CONNECTIONS,
a New Mexico Non-Profit Corporation,

      Plaintiff,

vs.                                           No. CIV 16-0878 JB\JHR

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
CENTERS FOR MEDICARE AND
MEDICAID SERVICES; SYLVIA MATHEWS
BURWELL, Secretary of the United States
Department of Health and Human Services, in
her official capacity and ANDREW M.
SLAVITT, Acting Administrator for the Centers
for Medicare and Medicaid Services, in his
official capacity,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59(e), filed March 28, 2018 (Doc. 57)("Motion"); (ii) the Plaintiff's Motion to Strike the Declaration of Jeffrey Wu or in the Alternative Grant Plaintiff Leave to Take Discovery, filed April 23, 2018 (Doc. 61)("Motion to Strike"), and Plaintiff's Memorandum of Law in Support of its Motion to Strike the Declaration of Jeffrey Wu or in the Alternative, Grant Plaintiff Leave to Take Discovery, filed April 23, 2018 (Doc. 62)("Strike Mem."); and (iii) the Motion of America's Health Insurance Plans and Blue Cross Blue Shield Association for Leave to File Statement on New Developments in Support of Rule 59(e) Motion as Amici Curiae, filed July 19, 2018 (Doc. 80)("Motion for Leave"). The Court held a hearing on the Motion and the Motion to Strike on June 21, 2018. The primary issues are: (i) whether the Court should reconsider its determination in the Memorandum

Opinion and Order, 312 F. Supp. 3d 1164, filed February 28, 2018 (Doc. 55)("MOO"), that Defendant United States Department of Health and Human Services' ("HHS")[1] risk adjustment formula is arbitrary and capricious, because, HHS contends, it had no obligation to explain its decision to operate the program in a budget-neutral manner, it never stated budget neutrality was compelled by statute, and its decision not to use any budget authority to operate the program was unreviewable; (ii) whether the Court should reconsider its decision to vacate HHS' risk adjustment formula and instead remand without vacatur because, as HHS contends, the Court has equitable discretion to remand without vacatur or to limit the vacatur to New Mexico; (iii) whether the Court may consider the remarks in the Declaration of Jeffrey Wu (executed March 3, 2018), filed March 28, 2018 (Doc. 57-1)("Wu Decl."), because, as Plaintiff New Mexico Health Connections ("Health Connections") contends, it is improper evidence under rule 59 of the Federal Rules of Civil Procedure and the Administrative Procedure Act; and (iv) whether the Court should grant America's Health Insurance Plans ("AHIP") and Blue Cross Blue Shield Association ("Blue Cross") leave to file a joint statement as amici curiae, because, as Health Connections contends, the request is untimely, irrelevant, and moot.

While the Court carefully reconsiders its MOO, the Court stands by both its determination that HHS' risk adjustment formula is arbitrary and capricious, and that vacating the formula and remanding to HHS for further consideration is the appropriate remedy. The Court also concludes that it is appropriate to consider recent developments and the consequences of its decision in this case and, thus, may consider the remarks in the Wu Decl. and the statement

---

[1]HHS is not the only Defendant in this case, but Plaintiff New Mexico Health Connections challenges the agency's actions, so the Court will, for simplicity's sake, refer to HHS only.

that AHIP and Blue Cross wish to file as amici curiae. Accordingly, the Court denies the Motion and the Motion to Strike, and grants the Motion for Leave.

## FACTUAL BACKGROUND

Congress enacted The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010)(codified at 42 U.S.C. §§ 300gg-1 to -19, 18001-18022)("ACA") "to expand coverage in the individual health insurance market." King v. Burwell, 135 S. Ct. 2480, 2485 (2015)(Roberts, C.J.). To affect that goal, the ACA: (i) bars insurers from considering pre-existing medical conditions when deciding whether to sell insurance and when determining prices; (ii) requires individuals to make an individual shared responsibility payment to the Internal Revenue Service unless they maintain health-insurance coverage; and (iii) gives certain individuals tax credits to make health insurance more affordable for them. See King v. Burwell, 135 S. Ct. at 2485; 26 U.S.C. § 5000A (describing the individual shared responsibility payment requirement).

The ACA expands healthcare access, but it also increases health-insurance-industry risk. That the ACA requires insurers to cover all individuals, healthy or otherwise, means an insurer could end up providing coverage to a particularly sickly group of customers. See 42 U.S.C. § 300gg-1(a) ("[E]ach health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the State that applies for such coverage."). The ACA prohibits those same insurers from responding to the increased cost of providing healthcare coverage to sicker individuals by charging those individuals higher prices. See 42 U.S.C. § 300gg(a) (prohibiting price discrimination based on factors other than geography, age, tobacco use, and whether coverage extends to an individual or to a family). Taken together, those two ACA requirements "threaten to impose massive new

costs on insurers, who are required to accept unhealthy individuals but prohibited from charging them rates necessary to pay for their coverage." Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 548 (2012).

The ACA contemplates three kinds of programs -- two temporary and one permanent -- to ameliorate that problem. See 42 U.S.C. §§ 18061-63. First, under transitional reinsurance programs, which operated only from 2014 to 2016, insurers make payments to "an applicable reinsurance entity," typically HHS, and reinsurance entities use those funds to provide "reinsurance payments" to insurers "that cover high risk individuals in the individual market." 42 U.S.C. § 18061(b)(1). According to HHS, "The reinsurance program will reduce the uncertainty of insurance risk in the individual market by partially offsetting issuers' risk associated with high-cost enrollees." HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410, 15,411 (dated March 11, 2013)(A.R.000228)("2014 Final Rule"). "Each State is eligible to establish a reinsurance program," but "HHS will establish a reinsurance program for each State that does not elect to establish its own reinsurance program." 45 C.F.R. § 153.210(a), (c).

Second, under the temporary risk corridor program, which also operated only from 2014 to 2016, sufficiently profitable insurers must make payments to HHS while HHS must make payments to sufficiently unprofitable insurers. See 42 U.S.C. § 18062. Those payments, HHS predicts, "will protect against uncertainty in rate setting for qualified health plans by limiting the extent of issuers' financial losses and gains." 2014 Final Rule, 78 Fed. Reg. at 15,411 (A.R.000228).

Third, under permanent risk adjustment programs, "each State shall assess a charge" on insurers "if the actuarial risk of [their] enrollees . . . for a year is less than the average actuarial

risk of all enrollees in all plans or coverage in such State for such year." 42 U.S.C. § 18063(a)(1). Likewise, "each State shall provide a payment" to insurers "if the actuarial risk of [their] enrollees . . . is greater than the average actuarial risk of all enrollees in all plans and coverage in such State for such year." 42 U.S.C. § 18063(a)(2). Risk adjustment programs are "intended to provide increased payments to health insurance issuers that attract higher-risk populations, such as those with chronic conditions, and reduce the incentives for issuers to avoid higher-risk enrollees." 2014 Final Rule, 78 Fed. Reg. at 15,411 (A.R.000228).

While the ACA refers to "States" assessing charges and providing payments in risk adjustment programs, 42 U.S.C. § 18063(a), it also tells HHS to "issue regulations setting standards for meeting" the ACA's requirements "with respect to . . . the establishment of the reinsurance and risk adjustment programs." 42 U.S.C. § 18041(a). When a state establishes a risk adjustment program, it must use "the Federal standards" or "a State law or regulation that the [HHS] Secretary determines implements the standards within the State." 42 U.S.C. § 18041(b). If a state does not establish a risk adjustment program or if a state establishes a risk adjustment program but does not take "the actions the [HHS] Secretary determines necessary to implement" federal risk adjustment standards, then "the [HHS] Secretary shall take such actions as are necessary to implement" those standards. 42 U.S.C. § 18041(c).

HHS regulations implementing that open-ended mandate in 42 U.S.C. § 18041(c) declare that the agency will operate risk adjustment programs for "[a]ny State that does not elect to operate an Exchange, or that HHS has not approved to operate an Exchange," 45 C.F.R. § 153.310(a)(2); for "[a]ny State that elects to operate an Exchange but does not elect to administer risk adjustment," 45 C.F.R. § 153.310(a)(3); and for, "[b]eginning in 2015, any State that is approved to operate an Exchange and elects to operate risk adjustment but has not been

approved by HHS to operate risk adjustment," 45 C.F.R. § 153.310(a)(4). Only Massachusetts, however, elected to operate its own risk adjustment program, see HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10,750, 10,759 (dated February 27, 2015)(A.R.005691)("2016 Final Rule"), and that program did not last long, see HHS Notice of Benefit and Payment Parameters for 2017, 81 Fed. Reg. 12,204, 12,230 (dated March 8, 2016)(A.R.007774)("2017 Final Rule")("We are not recertifying the alternate State methodology for use in Massachusetts for 2017 risk adjustment. Massachusetts and HHS will begin the transition that will allow HHS to operate risk adjustment in Massachusetts in 2017."). The bottom line is that HHS now operates New Mexico's -- and forty-nine other states' -- risk adjustment program. See 2017 Final Rule, 81 Fed. Reg. at 12,230 (A.R.007774)("HHS will operate risk adjustment in all States for the 2017 benefit year.").

Each year, HHS publishes the methodology it uses to calculate the risk adjustment payments that insurers make to HHS or receive from HHS. See 45 C.F.R. § 153.320(c) ("HHS will specify in the annual HHS notice of benefit and payment parameters for the applicable year the Federally certified risk adjustment methodology that will apply in States that do not operate a risk adjustment program."). That annual publication must describe: (i) how HHS calculates individual risk scores, see 45 C.F.R. § 153.320(b)(1), which are "relative measure[s] of predicted health care costs" for particular individuals, 45 C.F.R. § 153.20; (ii) how HHS determines a plan's average actuarial risk from individual risk scores, see 45 C.F.R. §§ 153.20, .320(b)(2); and (iii) how HHS uses a plan's average actuarial risk to determine the plan's risk adjustment payments and charges, see 45 CFR §§ 153.20, .320(b)(3).

HHS' risk adjustment methodology[2] "predict[s] plan liability for an enrollee based on that person's age, sex, and diagnoses (risk factors), producing a[n individual] risk score." 2014 Final Rule, 78 Fed. Reg. at 15,419 (A.R.000236). HHS calculates a health plan's average risk score by averaging its enrollees' individual risk scores; each individual risk score is weighted by the number of months that the relevant individual was enrolled in the health plan. See 2014 Final Rule, 78 Fed. Reg. at 15,432(A.R.000249). HHS multiplies the "State average premium" by several plan-cost factors -- "relative measures that compare how [a] plan[] differ[s] from the market average with respect to cost factors" -- including the plan average risk score to produce its first plan-premium estimate. 2014 Final Rule, 78 Fed. Reg. at 15,431 (A.R.000248). See 2014 Final Rule, 78 Fed. Reg. at 15,430-31 (A.R.000247-48)(describing the plan-cost factors: plan average risk score, actuarial value, permissible rating variation, geographic cost differences, and induced demand). "Multiplying the plan average risk score by the State average premium shows how a plan's premium would differ from the State average premium based on the risk selection experienced by the plan." 2014 Final Rule, 78 Fed. Reg. at 15,430 (A.R.000247). HHS then produces a second plan-premium estimate by multiplying the state average premium by plan-cost factors other than the plan average risk score. See 2014 Final Rule, 78 Fed. Reg. at 15,430 (A.R.000247). HHS' payment transfer formula takes the first plan-premium estimate and subtracts the second, which "provides a per member per month (PMPM) transfer amount for a

---

[2]The Court refers to HHS' published risk adjustment methodology in general terms even though HHS has five different published risk adjustment methodologies at issue, one for each year from 2014 to 2018, because, while those methodologies differ in detail, they have the same basic structure. See, e.g., 2017 Final Rule, 81 Fed. Reg. at 12,230 (A.R.007774)("Although we did not propose to change the payment transfer formula from what was finalized in the 2014 Payment Notice . . . we believe it is useful to republish the formula in its entirety, since, as noted above, we are recalibrating the HHS risk adjustment model."). Where the differences between HHS' five payment methodologies are important, the Court will be more specific.

plan." 2014 Final Rule, 78 Fed. Reg. at 15,431 (A.R.000248). Finally, HHS multiplies a plan's per member, per month transfer amount by its number of "billable member months . . . to calculate the plan's total risk adjustment payment." 2014 Final Rule, 78 Fed. Reg. at 15,431 (A.R.000248).

Health Connections is a Consumer Operated and Oriented Plan ("CO-OP")[3] insurer that has operated in New Mexico since 2014, and thus falls under the programs established under the ACA. See Declaration of Martin Hickey, MD ¶ 27, at 5 (dated October 5, 2016)(NMHC000867)("Hickey Decl."). Health Connections signed a loan agreement with HHS to fund Health Connections' initial formation and its New Mexico operations. See Hickey Decl. ¶ 27, at 5 (NMHC000867). Health Connections began enrolling members in October 2013, and providing coverage in January 2014. See Hickey Decl. ¶ 27, at 5 (NMHC000867). Health Connections has grown from 14,000 members in 2014, to 44,500 members in 2016. See Hickey Decl. ¶ 33, at 6 (NMHC000868).

Health Connections offers -- and has offered since its inception -- the lowest or second-lowest cost health insurance plan in New Mexico. See Hickey Decl. ¶ 31, at 6 (NMHC000868). It has offered such affordable plans even while serving unhealthy enrollees -- such as many who suffer from Hepatitis C, since New Mexico has the highest prevalence of it in the nation. See Patient Protection and Affordable Care Act Comments to HHS Notice of Benefit and Payment Parameters for 2018 at 19-20 (dated October 6, 2016)(NMHC0000853-54)("2018 Comments").

---

[3]ACA established the CO-OP program to provide loans and grants to new nonprofit health-insurance issuers, which fosters competition in the individual health-insurance market. See 42 U.S.C. § 18042. See also Memorandum of Law in Support of New Mexico Health Connections' Motion for Summary Judgment ¶ 19, at 10, filed April 13, 2017 (Doc. 33)("Plaintiff Mem.")("Congress created the CO-OP program to enhance competition."). To receive these loans or grants, however, insurers must offer their health-insurance plans on the Exchanges. See 45 C.F.R. § 156.515(c). See also Plaintiff Mem. ¶ 21, at 10.

"At a meeting of the National Association of Insurance Commissioners, the Superintendent of Insurance of New Mexico stated" that Health Connections' entry into the health-insurance marketplace increased competition and saved New Mexicans "over half a billion dollars over the last three years." Hickey Decl. ¶ 36, at 7 (NMHC000869).

While many health-insurance companies aim for a profit margin between 2% and 5% of their premiums, <u>see</u> Hickey Decl. ¶ 19, at 4 (NMHC000866), for 2014, many small health-insurance companies were required to pay over 10% of their premiums as risk adjustment charges, <u>see</u> Letter from CHOICES to Centers for Medicare & Medicaid Services, United States Department of Health and Human Services (dated April 22, 2016)(NMHC001018). For that year, HHS assessed Health Connections a $6,666,798.00 risk adjustment charge, which is equal to 21.5% of Health Connections' 2014 premiums. <u>See</u> Hickey Decl. ¶ 17, at 3 (NMHC000865). For 2015, HHS assessed Health Connections a $14,569,495.74 risk adjustment charge, which is equal to 14.7% of Health Connections' 2015 premiums. <u>See</u> Hickey Decl. ¶ 18, at 4 (NMHC000866).

Risk adjustment charges have, thus, forced several CO-OP program participants to close their doors. <u>See</u> 2018 Comments at 3 (NMHC000837); U.S. House of Representatives Committee on Energy and Commerce, <u>Implementing Obamacare: A Review of CMS' Management of the Failed CO-OP Program</u> at 19-22 (dated September 13, 2016)(NMHC000910-13); CHOICES, <u>Technical Issues with ACA Risk Adjustment and Risk Corridor Programs, and Financial Impact on New, Fast-Growing, and Efficient Health Plans</u> at 11-13 (NMHC001000-02); Connecticut Insurance Department, <u>Insurance Department Places HealthyCT Under Order of Supervision</u> (dated September 26, 2016)(NMHC001351-52). Several state insurance commissioners have expressed concern about the risk adjustment program. For

example, Maryland's Insurance Commissioner testified to Congress:

> Over the past few years, new innovative health insurance plans have been created that are providing enhanced competition and patient care. And it is working. For year-end 2014, CareFirst had a 91% market share of the individual market in Maryland. Today, it is 57%, due in part to a more competitive marketplace. These carriers have the potential to continue but their ability to do so is severely jeopardized by the adverse and perhaps fatal financial impact caused by the technical shortcoming of the current risk adjustment and risk corridor programs. . . .

> The risk adjustment formula is of concern to state regulators because it has proven to place newer carriers at a distinct disadvantage. For example, the risk adjustment formula quantifies an enrollee's health status based on age, sex and diagnoses recorded during the course of the year. New carriers have very limited information on the health status or previous claims history of the applicants. Therefore, the carrier's population may appear healthier than it actually is if some diagnoses are not captured which may result in improper risk adjustment payments.

See Written Testimony for: Mr. Al Redmer, Jr., Commissioner, Maryland Insurance Administration (NMHC001331). The New York Superintendent of Financial Services had similar concerns:

> DFS [(New York State Department of Financial Services)] is concerned that the risk adjustment program has created inappropriately disparate impacts among health insurance issuers in New York and unintended consequences.

> Specifically, it is DFS's understanding that, based on the data accumulated by [Centers for Medicare & Medicaid Services ("CMS")] for the upcoming report on June 30, 2016, new and smaller issuers generally are considered to have had relatively healthy members than their larger and more established competitors. CMS's anticipated determination appears to be unduly impacted by the dates of diagnoses or recording of diagnoses of members' medical conditions rather than actual relative health of the members. This disparity may be because the new and smaller health insurers have not been in operation long enough to have amassed the long term data and records management systems that have helped to allow the large, established health insurers to convince CMS that their members are relatively unhealthy and, concomitantly, will allow them to receive large payments from the risk adjustment program.

Letter from Maria T. Vullo, Superintendent of Financial Services of the State of New York, to Sylvia M. Burwell, Sec'y of HHS, and Andrew Slavitt, Acting Adm'r for CMS at 1-2 (dated June 28, 2016)(NMHC001335-36).

## PROCEDURAL BACKGROUND

Health Connections filed its initial complaint on July 29, 2016, <u>see</u> Complaint for Declaratory and Injunctive Relief at 1, filed July 29, 2016 (Doc. 1), and it filed an amended complaint approximately six months later, <u>see</u> Amended Complaint for Declaratory and Injunctive Relief at 1, filed January 12, 2017 (Doc. 21)("Complaint"). The Complaint invokes the judicial review provisions that the Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946)("APA") contains. <u>See</u> Complaint ¶ 193, at 55 (citing 5 U.S.C. § 706). <u>See</u> <u>also</u> 5 U.S.C. § 706(2) (requiring a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Both Health Connections and HHS moved the Court for summary judgment and filed memoranda in support of those motions. <u>See</u> Plaintiff's Motion for Summary Judgment, filed April 13, 2017 (Doc. 32); Defendants' Cross-Motion for Summary Judgment, filed June 1, 2017 (Doc. 34); Memorandum of Law in Support of New Mexico Health Connections' Motion for Summary Judgment, filed April 13, 2017 (Doc. 33)("MSJ"); Defendants' Memorandum in Support of its Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, filed June 1, 2017 (Doc. 35)("Cross MSJ"). Because the Complaint seeks judicial review of agency action, however, the MSJ and Cross MSJ are properly characterized as appellate briefs.

> Reviews of agency action in the district courts must be processed *as appeals.* In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure. Motions to affirm and motions for

summary judgment are conceptually incompatible with the very nature and purpose of an appeal.

Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994)(emphasis in original).  See Fed. R. App. P. 28 (providing rules for appellate briefs).

In the MSJ, Health Connections argues -- among other things[4] -- that HHS' decision to base risk adjustment payments on statewide average premiums and not on each insurer's own average premium is both contrary to law, and arbitrary and capricious.  See MSJ at 16.  It is contrary to law, according to Health Connections, because "use of the statewide average premium is an unlawful departure from Congress's mandate that risk adjustment assessments be based solely upon actuarial risk."  MSJ at 17.  HHS' use of statewide average premiums is arbitrary and capricious, according to Health Connections, because "HHS never coherently confronted the requirements of the ACA, and never offered any justification for developing a methodology driven by factors unrelated to actuarial risk."  MSJ at 22.

In the briefing leading up to the Court's MOO, no third-party filed a motion for leave to file an amicus brief or filed an amicus brief.  Indeed, in the United States District Court for the District of Massachusetts, when the Honorable F. Dennis Saylor IV decided Minuteman Health, Inc. v. United States Department of Health and Human Services, 291 F. Supp. 3d 174 (D. Mass. 2018), on January 30, 2018,[5] no one filed a motion for leave to file an amicus brief or filed an amicus brief.

_____

[4]In its MOO, the Court summarized and analyzed Health Connections' MSJ arguments.  See MOO at 14-22, 312 F. Supp. 3d at 1177-82 (setting out those arguments); MOO at 59-82, 312 F. Supp. 3d at 1207-18 (analyzing those arguments).  The Court now presents only the details that relate to the Motion and the Motion to Strike.

[5]Judge Saylor presided over a similar challenge to HHS' risk adjustment program under the APA that a different nonprofit health-insurance provider brought, holding that HHS "acted

within the bounds of its authority" and thus granting HHS' motion for summary judgment. 291 F. Supp. 3d at 179. Minuteman Health, Inc., the insurance provider challenging HHS' regulations in the case, also challenged the agency's decision to use the statewide average premium in its formula for being contrary to law, and arbitrary and capricious. See 291 F. Supp. 3d at 198. Judge Saylor determined that the statute does not prohibit nor require HHS' decision to use the statewide average premium in the risk adjustment formula, and thus the decision was not contrary to law. See 291 F. Supp. 3d at 199. Judge Saylor then determined if this decision was "reasonable (under *Chevron*) and not arbitrary and capricious (under the APA)." 291 F. Supp. 3d at 199. In determining reasonableness, Judge Saylor noted that the administrative record shows "HHS's decision to use the statewide average premium was the result of excessive debate." 291 F. Supp. 3d at 199. Judge Saylor stated:

> Ultimately, HHS chose to use the statewide average premium, subject to certain cost-factor adjustments. It did so because it concluded that such an approach would result in balanced transfers, was a "straightforward and predictable benchmark," and would best compensate plans for liability differences due to risk selection, as opposed to other cost factors. Those articulated reasons have a clearly rational connection to HHS's choice. Thus, the record demonstrates that the proposal to use a plan's own premium was actively considered and rejected on rational grounds.

291 F. Supp. 3d at 201 (quoting 2014 Proposed Rule, 77 Fed. Reg. at 73,139 (A.R.000134)).

Judge Saylor then tackled the question "whether HHS's decision to attempt to operate the risk-adjustment program in a budget-neutral way was unreasonable or arbitrary," concluding, "[i]t was not." 291 F. Supp. 3d at 201. Judge Saylor considered HHS' goal in operating the program -- "to spread risk of insuring unhealthy enrollees among all insurers and eliminate incentives for plans to engage in risk selection" -- and the modeling in the White Paper, infra, showing "that use of a plan's own premium would disproportionately ran the risk of a shortfall, where there was no money to shore up plans that took on less-healthy patients." 291 F. Supp. 3d at 201 (citing Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 77 Fed. Reg. 17,220, 17,230 (dated March 23, 2012)(A.R.000068); 2014 Final Rule, 78 Fed. Reg. at 15,411 (A.R.000228); White Paper, infra, at 35 (A.R.000681)). Judge Saylor noted that, according to HHS' modeling, "reducing payments or increasing charges would disproportionately penalize high-and low-risk plans . . . and splitting the shortfall would still fail to cover the payments due to plans with less-healthy members, and therefore still encourage plans to risk-select." 291 F. Supp. 3d at 202 (citing White Paper, infra, at 36-38 (A.R.000682-84)). In response to Minuteman Health's argument that "general appropriations could be used to fund any shortfall," Judge Saylor wrote:

> [A] showing that there are other ways a budget-neutral program *might* have been achieved is not a showing that what HHS actually *did* was unreasonable or arbitrary. The risk-adjustment statute may be reasonably read as intending to level the playing field by spreading the risk among insurers, not by having the government subsidize the costs of insuring less-healthy people . . . .

1.    **The MOO.**

In its MOO, the Court determines that HHS' decision to use statewide average premiums is not contrary to law, but it is arbitrary and capricious.  See MOO at 59-60, 312 F. Supp. 3d at 1205.  The Court concludes that HHS' decision is not contrary to law, because the ACA does not require HHS to base its risk adjustment methodology solely on actuarial risk.  See MOO at 61, 312 F. Supp. 3d at 1206.

> That the ACA commands "[t]he Secretary, in consultation with States, [to] establish criteria and methods to be used in carrying out the risk adjustment activities" indicates that the ACA does not oblige HHS to use actuarial risk as the sole actuarial risk criterion.  42 U.S.C. § 18063(b).  Telling HHS to establish risk adjustment criteria would make no sense otherwise.  The ACA's language stating

---

291 F. Supp. 3d at 202 (emphasis in original).  Judge Saylor also noted that, because Congress intended the states to run the risk adjustment program, "absent an appropriation, Congress expected the states to run budget-neutral risk-adjustment programs, and for HHS to set its federal regulations to allow it to certify such programs."  291 F. Supp. 3d at 202 (citing 45 C.F.R. § 153.310).  Further, Judge Saylor decided that "[i]t was not unreasonable or arbitrary for HHS to attempt to design the program to pay for itself."  291 F. Supp. 3d at 202.  Finally, Judge Saylor did not find merit in Minuteman Health's claim that HHS inadequately explained its decision to run the program in a budget-neutral manner, because "[t]here is no evidence that there was any significant comment on the topic that HHS was required to address in 2014," and, "in the 2011 white paper, HHS considered the effects of non-budget neutral methodologies and rationally chose to operate a budget-neutral program."  291 F. Supp. 3d at 202.

Minuteman Health also challenged HHS' transfer formula on three other points: (i) for "systemically underestimat[ing] the costs of insuring members who are not diagnosed with a condition associated with an HCC [(hierarchical condition category)]"; (ii) for "miss[ing] enrollees who are eligible for HHC classification" by failing to use prescription-drug data, until 2018, and failing to account for partial year enrollees who were undiagnosed, until 2017; and (iii) for making "lower-cost bronze plans economically unviable."  291 F. Supp. 3d at 197.  Judge Saylor rejected these three challenges as well, finding these decisions and resulting "regulations were not arbitrary and capricious," and granting HHS' motion for summary judgment.  291 F. Supp. 3d at 214.

With regards to comments brought requiring HHS to address budget neutrality, this Court agrees with Judge Saylor that there was "no significant comment on the topic that HHS was required to address in 2014."  291 F. Supp. 3d at 202.  The Court notes, however, that, as Judge Saylor wrote, "in the 2011 white paper, HHS considered the effects of non-budget neutral methodologies."  291 F. Supp. 3d at 202.  HHS' raising the issue on its own, as discussed infra Section I.A., is why the Court concludes that issue exhaustion does not waive the challenge on this point and why the Court concludes that HHS inadequately explained its decision.

- 14 -

that health plans and health insurance issuers must make a risk adjustment payment if their enrollees have below-average actuarial risk, see 42 U.S.C. § 18063(a)(1), while health plans and health insurance issuers must receive a risk adjustment payment if their enrollees have above-average actuarial risk, see 42 U.S.C. § 18063(a)(2), does not mean that criteria other than actuarial risk cannot be used when determining the magnitude of those payments. . . . The statute does not say anything about how to calculate the charge; it says only "each state shall assess a charge. . . ." 42 U.S.C. § 18063(a)(1). From the text, the charge assessed could be any amount.

MOO at 61-62, 312 F. Supp. 3d at 1206 (alterations in original).

The Court also concludes, however, that HHS' decision was arbitrary and capricious, because the agency did not give adequate reasons for its decision to use statewide average premiums and not each insurer's own average premium when calculating risk adjustment payments. See MOO at 64, 312 F. Supp. 3d at 1208. Under HHS' reading of the ACA, its risk adjustment methodology must be budget neutral, i.e., the risk adjustment payments that HHS receives from insurers with healthier-than-average customers must be equal to the risk adjustment payments that HHS makes to insurers with sicker-than-average customers. See MOO at 25, 312 F. Supp. 3d at 1184 (citing Cross MSJ at 22-23). The Court declines to adopt that reading of the ACA -- notwithstanding the deference it owes to an administrative agency that reasonably interprets an ambiguous statute that is within the agency's remit -- because the ACA's provisions regarding risk adjustment are unambiguous insofar as they do not require budget neutrality. See MOO at 60-61, 312 F. Supp. 3d at 1206 (citing Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984)("Chevron")). See also Transcript of Motion Proceedings at 49:12-13 (taken January 22, 2018)(Powers), filed February 1, 2018 (Doc. 49)(conceding that "the statute does not require budget neutrality"). The Court then explains that HHS' erroneous reading of the ACA infects the agency's analysis of the available alternatives, because HHS considered only alternatives that were budget neutral. See MOO at

67-68, 312 F. Supp. 3d at 1209-10.  Finally, the Court acknowledges that the ACA does not forbid HHS to design its risk adjustment methodology to be budget neutral and that "there may be excellent policy reasons for making the risk adjustment plan budget neutral," but those facts do not alter the Court's analysis:

> The problem with invoking those policy rationales here, however, is that HHS never articulates any public policy decision to operate risk adjustment in a budget neutral way; HHS' only decision is to comply with a supposed statutory requirement.  That HHS, in designing its risk adjustment methodology, never considered whether budget neutrality was sound public policy means that HHS cannot now appeal to budget neutrality's public policy benefits to justify its decision.  That HHS can reasonably conclude that budget neutrality is a worthy public policy goal does not permit the Court, in reviewing HHS' decisionmaking, to act as though HHS actually considered the issue and reached that conclusion.

MOO at 68-69, 312 F. Supp. 3d at 1210 (citations omitted).  The Court, accordingly, sets aside and vacates "the agency action as to the statewide average premium rules," and remands the case for further proceedings.  MOO at 71, 312 F. Supp. 3d at 1211-12.

There was very little published as to the Court's ruling.  See, e.g., Marie C. Baca, Favorable NM Health Connections Ruling Has National Implications, LAS CRUCES SUN NEWS (March 2, 2018, 1:07 PM), https://www.lcsun-news.com/story/news/local/new-mexico/2018/03/02/favorable-nm-health-connections-ruling-has-national-implications/390119002/; John Kennedy, HHS Must Reconsider Formula for ACA Payments, LAW360 (March 1, 2018, 9:02 PM), https://www.law360.com/articles/1017456/hhs-must-reconsider-formula-for-aca-payments; Shelby Livingston, New Mexico Co-op Scores Partial Victory in ACA Risk-Adjustment Case, MOD. HEALTHCARE (March 2, 2018), http://www.modernhealthcare.com/article/20180302/NEWS/180309960; Paige Minemyer, FIERCEHEALTHCARE (March 2, 2018, 10:47 AM), https://www.fiercehealthcare.com/payer/new-mexico-health-connections-risk-adjustment-hhs-affordable-care-act; Federal District Court Vacates Part of CMS's ACA Risk

Adjustment Methodology, Covington & Burling LLP (March 6, 2018), https://www.cov.com/en/news-and-insights/insights/2018/03/federal-district-court-vacates-part-of-cmss-aca-risk-adjustment-methodology; Judge: HHS Mistakenly Envisioned ACA Risk-Adjustment Program as Budget Neutral, Lexis Legal News (March 2, 2018, 2:46 PM), https://www.lexislegalnews.com/articles/24727/judge-hhs-mistakenly-envisioned-aca-risk-adjustment-program-as-budget-neutral; U.S. District Court Rules in Favor of New Mexico Health Connections in Risk Adjustment Case, Grant County Beat (March 1, 2018), http://www.grantcountybeat.com/news/non-local-news-releases/42569-u-s-district-court-rules-in-favor-of-new-mexico-health-connections-in-risk-adjustment-case. No third party attempted to file an amicus brief or filed an amicus brief.

2.      **The Motion.**

HHS argues that the Court should reconsider its determination that HHS' decision to use statewide average premiums in its risk adjustment transfer formula "is arbitrary and capricious because HHS did not explain its reasons for designing the program in a budget-neutral manner." Motion at 1. HHS gives three reasons why, in its view, reconsideration is appropriate. First, HHS argues that, "under black-letter principles of administrative law, HHS was not required to explain -- and NMHC was largely foreclosed from challenging -- HHS's budget-neutral approach to the risk adjustment program, because at no point during the 2014-2017 rulemakings did NMHC or any other commenter challenge or question that approach." Motion at 2. See Motion at 11 ("Furthermore, when NMHC did finally raise the budget neutrality issue to the agency during the 2018 rulemaking (after it filed this lawsuit), it largely argued only that budget neutrality is not statutorily mandated, not that it is irrational."). HHS asserts that, when commenters finally objected to the budget-neutral approach during the 2018 rulemaking, it

adequately addressed the objections by explaining that "the absence of additional funding for the HHS-operated risk adjustment program" requires budget neutrality. Motion at 2 (internal quotations and emphasis omitted)(quoting HHS Notice of Benefit and Payment Parameters for 2018, 81 Fed. Reg. 94, 058, 94, 101 (dated Dec. 22, 2016)(A.R.009638)("2018 Final Rule")).

Second, HHS asserts that, even though the ACA does not explicitly require risk adjustment to be budget neutral, HHS' budgetary restraints mean that, as a practical matter, budget neutrality is the agency's only option. See Motion at 2-3. HHS avers that risk adjustment charges are the only funding source from which the agency can make risk adjustment payments, because Congress has not made a risk-adjustment-specific appropriation or permitted HHS to use its program management appropriation to fund risk adjustment. See Motion at 15-16, 15 n.4.[6] See also Motion at 14-15 ("[T]he ACA neither authorized nor appropriated additional funding for risk adjustment payments beyond the amount of charges paid in, nor authorized HHS to obligate itself for risk adjustment payments in excess of charges collected."). It follows, according to HHS, that "the Court clearly erred in holding that HHS's budget-neutral

---

[6]HHS articulates several reasons why its program management appropriation is not available to fund risk adjustment:

> First, as discussed above, [the risk adjustment program] is designed to be implemented by the states. The lump sum is an appropriation to CMS, which has no authority to transfer such funds to state governments. Second, as the underlying budget requests reflect, the Program Management lump sum is for *program management expenses*, such as administrative costs for various CMS programs such as Medicaid, Medicare, the Children's Health Insurance Program, and the ACA's insurance market reforms -- not for the program payments themselves, which would vastly exceed the amount of the lump sum. Third, the lump sum appropriation for each year was enacted *after* the applicable Benefit Rule authorizing payments for that year. Thus, the later-enacted lump sum could not have authorized HHS to deviate from the budget-neutral design of the ACA in those Benefit Rules.

Motion at 16 (emphasis in original)(citations and footnotes omitted).

approach . . . was a discretionary policy choice subject to notice and comment rulemaking as opposed to a straightforward application of binding appropriations law." Motion at 18 (citation omitted). Third, HHS contends that, "[e]ven if HHS had the authority to design the risk adjustment program in a non-budget neutral manner, its decision not to exercise that authority would be committed to agency discretion as a matter of law and thus exempted from judicial review." Motion at 19.

HHS then argues that -- if the Court stands by its determination that HHS acted arbitrarily and capriciously -- the Court should reconsider the remedy it imposed. See Motion at 3-4. HHS faults the Court for "assuming that vacatur was mandatory and declining to weigh the equities before entering such an extraordinarily disruptive remedy." Motion at 3. According to HHS, "The Tenth Circuit has made clear that a court has the discretion to remand without vacatur based on equitable considerations, and courts have consistently held that when an agency's only error is inadequate explanation, the proper course is to remand for additional explanation without vacating the agency's action." Motion at 3-4. See Motion at 21 ("The Tenth Circuit recently confirmed that a court may decline to vacate agency action even if it finds that action arbitrary and capricious." (citing WildEarth Guardians v. U.S. Bureau of Land Mgmt., 870 F.3d 1222, 1239-40 (10th Cir. 2017))); Motion at 22 ("[R]emand without vacatur is appropriate when the only defect in an agency's decision is inadequate explanation." (citing Dist. Hosp. Partners, L.P. v. Burwell, 786 F.3d 46, 60 (D.C. Cir. 2015)(Henderson, J.); Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1289-91 (11th Cir. 2015); Cent. & S. W. Servs., Inc. v. U.S. EPA, 220 F.3d 683, 692 (5th Cir. 2000))). HHS asserts that "vacatur creates significant uncertainty, financial hardship, and undue burden for hundreds of health insurance issuers and millions of enrollees nationwide." Motion at 4. In the alternative, HHS suggests that, "if the

Court declines to remand without vacatur, it should limit the relief it orders to the operation of the risk adjustment program in New Mexico, so that its relief does not sweep more broadly than that needed to address NMHC's claims." Motion at 4.

### 3.    The Wu Decl.

HHS filed the Wu Decl. as an attachment to the Motion. <u>See</u> Wu Decl. ¶ 1, at 1. Wu is the Associate Deputy Director for Policy Coordination at the Center for Consumer Information and Insurance Oversight, an HHS component. <u>See</u> Wu Decl. ¶ 2, at 1. Wu describes the risk adjustment program as a permanent program under ACA meant "to mitigate the potential impact of adverse selection, stabilize the price of health insurance in the individual and small group markets, and ensure that premiums are not based on the health status of enrollees." Wu Decl. ¶ 6, at 2. He states that the risk adjustment program, like the temporary reinsurance and risk corridors programs, "are each funded entirely from amounts that insurance entities pay into them. Congress did not enact separate appropriations for these provisions." Wu Decl. ¶ 7, at 2. According to Wu, the Court's vacatur of the 2014-2018 rules will impose administrative burdens on health insurance companies and create uncertainty for them. <u>See</u> Wu Decl. ¶¶ 6-22, at 2-6.

### 4.    The Response.

Health Connections' response explains why, in its view, the Court should not grant the Motion. <u>See</u> Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Alter or Amend Judgment Pursuant to Rule 59(e) at 1, filed April 23, 2018 (Doc. 63)("Response"). Health Connections begins by responding to HHS' argument that Health Connections waived its challenge to "HHS's use of the statewide average premium in the risk adjustment transfer formula as opposed to an issuer's own premium." Response at 5. Health Connections contends

that HHS' focus on whether it or other commenters challenged HHS' budget-neutral approach to risk adjustment is misplaced:

> HHS's argument is premised on an artificial distinction between the agency action challenged -- the use of the statewide average premium instead of an issuer's own premium -- and the agency's justification for that action. However, the action engaged in by the agency, challenged by NMHC, and addressed by this Court was the decision to use the statewide average premium instead of a plan's own premium. The agency's justification for its choice -- budget neutrality -- is not in and of itself an agency action subject to separate challenge under the APA.

Response at 6. According to Health Connections, HHS "confuses the agency action being challenged with the proffered justification for the action." Response at 7. Health Connections asserts: "There can be no dispute that NMHC and other commenters challenged the agency's decision to use the statewide average premium instead of an issuer's own premium in both the 2017 and 2018 rulemaking periods." Response at 7 (listing examples). Health Connections also asserts that the fact "that commenters may not have squarely addressed the issue during the 2014-2016 rulemakings is immaterial[,] because the agency considered the issues on its own initiative." Response at 8. See Response at 8 ("If an agency considered the issue *sua sponte*, the Court will not invoke the waiver rule because the agency had the opportunity to consider the issue and apply its expertise." (citations omitted)). Health Connections further asserts that "parties are not required to challenge 'key assumptions' used to justify the agency's rule" or obvious problems underlying their claim. Response at 8 (quoting Nat. Res. Def. Council v. EPA, 755 F.3d 1010, 1023 (D.C. Cir. 2014)). Finally, Health Connections argues that "the Court may excuse waiver in 'exceptional circumstances.'" Response at 8 (quoting Portland Gen. Elec. Co. v. Bonneville Power Admin., 501 F.3d 1009, 1024 (9th Cir. 2007)).

Health Connections then addresses HHS' argument that budgetary constraints prevent it from adopting a risk adjustment formula that is not budget neutral. See Response at 9-10.

Health Connections argues that HHS can use its program management appropriation to fund the risk adjustment program if HHS adopts a budget-negative formula.  See Response at 14-15.  Health Connections contends that HHS' assertion that the agency's program management appropriation cannot fund the risk adjustment program is "entitled to no deference," because it is a post-hoc litigation position that "contradicts the [Government Accountability Office ("GAO")], which is the actual expert agency in the field of government appropriations, whose views are entitled to deference."  Response at 14-15 (citing Motion at 16).  Health Connections adds that its argument regarding HHS' program management appropriation is not a challenge to HHS' "decision not to allocate funds" for risk adjustment; instead, that argument regarding fund availability is part of a challenge to "the agency's action in adopting a formula using the statewide average premium instead of each issuer's own premium."  Response at 16.

Finally, Health Connections contends that the Court should vacate HHS' risk adjustment formula and remand for further consideration, because that is "the standard remedy when a Court finds regulatory action to violate the APA."  Response at 16 (citing Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs, 486 F.3d 638, 654 (9th Cir. 2007), rev'd on other grounds, 557 U.S. 261 (2009); St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard, 85 F. Supp. 3d 197, 208 (D.D.C. 2015)(Chutkan, J.)).  Health Connections continues by arguing that equitable considerations do not indicate that vacatur is an inappropriate remedy in this case:

> The bulk of Mr. Wu's argument [on HHS' behalf] is that vacatur upsets settled expectations and reliance interests in the previously issued risk adjustment regulations.  But this harm is self-inflicted: the Court has not prohibited HHS from continuing the same risk adjustment formula, but only required it to justify its policy choices in compliance with the APA.  Mr. Wu nowhere explains why HHS has not simply commenced a new rulemaking to address the errors found by the Court.  The only conclusion is either that the agency does not consider risk adjustment important enough to act upon, in which case the cry of disruption rings hollow, or the agency cannot address the Court's critique, in which case the

remedy is wholly appropriate to address a serious deficiency.

   In addition, the reliance interests are overstated. The administrative record contains substantial evidence that carriers are unable to predict risk adjustment transfers and thus cannot rely upon them. . . . NMHC's 2018 comments pointed out that every carrier in New Mexico built into its 2017 premium the assumption that it would make a risk adjustment payment -- a mathematical impossibility under the risk adjustment formula which always has a balance of payments in and out within a state. These rate-setting assumptions can only be explained by the carriers' inability to predict how the formula will work and a desire to have a cushion if the outcome were adverse.

Response at 19-20 (citing Hickey Decl. ¶¶ 52-55, at 11-12 (NMHC000873-74)). Health

Connections concludes by commenting: "[T]here is no reason to limit the vacatur to New

Mexico. The regulations apply nationwide. Courts regularly vacate and enjoin enforcement of

nationwide regulations even when challenged by an individual plaintiff." Response at 24 (citing

Earth Island Inst. v. Ruthenbeck, 459 F.3d 954, 966 (9th Cir. 2006), rev'd on other grounds, 555

U.S. 488, 500 (2009)).

   **5.**  **The Reply.**

   HHS filed a reply. See Defendants' Reply in Support of Their Motion to Alter or Amend

the Judgment, filed May 17, 2018 (Doc. 68)("Reply"). In the Reply, HHS renews its argument

that Health Connections "cannot challenge HHS's budget neutral approach to the risk adjustment

program in the 2014-2017 Rules because neither it nor any other commenter objected to that

approach with respect to those Rules," and that it adequately responded when the budget-neutral

approach was challenged during the 2018 rulemaking. Reply at 2. HHS avers that no exception

to the exhaustion requirement applies in this case. See Reply at 3-4.

   HHS also renews its argument that, "because of black-letter constraints on the authority

of agency officials to obligate federal funds absent or in advance of an appropriation," the

agency had to "devise a risk adjustment program that could be funded with amounts the agency

then knew would be available to make risk adjustment payments," i.e., risk adjustment charges. Reply at 5. HHS contends that, at least in its risk adjustment rule for 2018, it "explained that its budget-neutral approach to the risk adjustment program is necessitated by a lack of funding." Reply at 6. HHS also contends that the Wu Decl. confirms that "the absence of additional funding for the risk adjustment program" requires the agency to "balance payments and charges across plans." Reply at 6 (internal quotations omitted)(quoting Wu Decl. ¶ 9, at 3).

HHS then recites the reasons why, in the agency's view, it could not have used its program management appropriation to design risk adjustment in a way that was not budget neutral:

> [HHS] could not have relied on those funds because they (a) had not yet been appropriated when HHS was finalizing the rules at issue, (b) are for "responsibilities of CMS," not the responsibilities of the state governments for whom HHS acts under 42 U.S.C. § 18063, and (c) are designated for administrative and operational expenses of CMS, not program payments.

Reply at 8 (quoting Motion at 16). It also notes that the GAO decision Health Connections cites to "addressed a different program and an entirely different legal question"; it did not analyze "whether HHS itself could *create* a payment formula requiring expenditures exceeding amounts available in existing appropriations." Reply at 8-9 (emphasis in original)(citing Dep't of Health & Human Services-Risk Corridors Program, B-325630, 2014 WL 4825237 (Comp. Gen. Sept. 30, 2014)("GAO Report")). HHS then underscores its belief that, even if it could have used its program management appropriation to make the risk adjustment rules, its decision not to allocate funds from the appropriation is within agency discretion and outside the purview of the Court's review under the APA. See Reply at 9-10 (citing Motion at 19-21).

Finally, HHS argues that its "only error is a failure to adequately explain the rationale underlying a decision," so the Court should have followed "the presumptive approach," i.e., to

"remand *without* vacatur." Reply at 10-11 (emphasis in original)(citing Motion at 22-24). HHS also asserts that "the Court did not weigh the equities or otherwise demonstrate that it was exercising that discretion here" in deciding whether to vacate. Reply at 11. It postulates that vacatur is not equitable here, because many issuers "have structured their business plans around the methodology as it currently exists and have specifically asked HHS to prioritize consistency and stability in the applicable methodology," and, even if the "methodology is not perfectly predicable, this does not militate in favor of depriving issuers of important payments they would otherwise receive." Reply at 11-12 (citing 2018 Final Rule, 81 Fed. Reg. at 94,085; Wu Decl. ¶¶ 13-22, at 4-6).

6.     **The Motion to Strike.**

In addition to contesting the Motion's substance, Health Connections argues that the Wu Decl. is "improper extra-record evidence outside of the Court's purview in an Administrative Procedures Act case." Motion to Strike at 1. The APA, Health Connections asserts, limits judicial review to "the administrative record already in existence, not some new record made initially in the reviewing court." Strike Mem. at 5 (internal quotation marks omitted)(quoting Bar MK Ranches v. Yuetter, 994 F.2d 735, 739 (10th Cir. 1993)). Health Connections also argues that the Wu Decl. is "inappropriate under Rule 59 [of the Federal Rules of Civil Procedure] because it improperly expands upon and repackages facts and arguments that were previously available and asserted." Motion to Strike at 1. Health Connections argues: "That HHS opted not to expound upon its arguments against vacatur" at the summary judgment stage "does not grant it license to revive its arguments in more detail with newly submitted evidence at the Rule 59 stage." Strike Mem. at 4 (citing Williams v. HSBC Bank USA, N.A., No. 15-9372, 2016 U.S. Dist. LEXIS 99858, *3 (D. Kan. July 29, 2016)(Robinson, J.), aff'd, 681 F. App'x 693

(10th Cir. 2017)(unpublished)). Accordingly, Health Connections asks the Court to strike the Wu Decl. See Motion to Strike at 1. Alternatively, Health Connections asks the Court for "leave to conduct discovery into the allegations contained in the Wu Declaration." Motion to Strike at 1. Health Connections argues that the Court should "conduct any new fact-finding on the question of remedy" with "a full record." Strike Mem. at 3. A full record, Health Connections avers, requires that it have "the opportunity to conduct discovery into Mr. Wu's statements and examine him under oath so that NMHC has a full and fair opportunity to present opposing arguments." Strike Mem. at 6.

### 7. The Motion to Strike Response.

HHS responds to Health Connections' Motion to Strike. See Defendants' Opposition to Plaintiff's Motion to Strike or for Discovery, filed May 7, 2018 (Doc. 64)("Motion to Strike Response"). HHS asserts that it provided the Wu Decl. "solely to inform the Court's exercise of its equitable discretion in setting a remedy if the Court concludes that the agency erred in its explanation of its use of a budget neutral approach." Motion to Strike Response at 2. HHS contends that the APA's "bar on extra-record evidence concerns judicial review of the merits of agency action, not the evidence a court may consider in determining how to exercise its equitable discretion in fashioning a remedy." Motion to Strike Response at 2. In fact, HHS contends, the Court should consider "the facts as they exist at the time of the judicial order" when fashioning its remedy. Motion to Strike Response at 6. HHS adds that "permit[ing] post-judgment discovery with regard to Mr. Wu's declaration" would be inappropriate, because "NMHC cites no legal authority for why it should be granted such post-judgment discovery, and it has said nothing about what facts it hopes to discover or what role they would play in the Court's evaluation of the remedial issues to which Mr. Wu's declaration was directed." Motion to Strike

Response at 2.  HHS also notes that the "Court has repeatedly held that motions to strike are disfavored and will only be granted where the motion concerns a pleading or a document prohibited by the Court's local rules."  Motion to Strike Response at 3.  The Wu. Decl., HHS avers, "falls into neither category, and the motion to strike should be denied."  Motion to Strike Response at 3.

### 8.    The Motion to Strike Reply.

Health Connections replies to the Motion to Strike Response.  See Plaintiff's Reply Brief in Further Support of Its Motion to Strike the Declaration of Jeffrey Wu or in the Alternative, Grant Plaintiff Leave to Take Discovery, filed May 21, 2018 (Doc. 69)("Motion to Strike Reply").  First, Health Connections asserts that it is not moving to strike under rule 12(f) but, rather, under the Court's "inherent power to control [its] docket[]."  Motion to Strike Reply at 2 (internal quotation marks omitted)(quoting Anthony v. BTR Auto. Sealing Sys., Inc., 339 F.3d 506, 516 (6th Cir. 2003)).  According to Health Connections, courts regularly grant "motions to strike extra-record material in [APA] cases."  Motion to Strike Reply at 4.  Health Connections asserts that "HHS notably fails to articulate any substantive basis for the Court to consider the Wu Declaration as part of its Rule 59 analysis."  Motion to Strike Reply at 5.  Health Connections contends that, notwithstanding HHS' "claims that . . . the Wu Declaration can be considered by the Court because it addresses the remedy and not the merits of the risk adjustment challenge," the Wu Decl. "contains a number of statements purporting to support HHS' theories on budget neutrality -- an issue that is squarely on the merits of both the underlying case and the Rule 59 motion."  Motion to Strike Reply at 7.  Health Connections adds that, "if the Court decides to consider HHS's new evidence outside of [the administrative] record, it should also consider additional new evidence submitted by NMHC in its [Response] that provides a more

fulsome context and rebuts the Wu Declaration." Motion to Strike Reply at 7 n.3. Finally, Health Connections argues that, should the Court consider the Wu Decl., the Court should allow Health Connections to conduct discovery as "to investigate and challenge one-sided, cherry-picked testimony that is being proffered without the opportunity to cross-examine Mr. Wu." Motion to Strike Reply at 9.

9. **The First Notice of Supplemental Authority.**

After the parties completed their briefing regarding the Motion and the Motion to Strike, Health Connections brought a recently decided case to the Court's attention. See Notice of Supplemental Authority at 1, filed June 15, 2018 (Doc. 74)("Notice"). According to Health Connections, in Moda Health Plan, Inc. v. United States, 892 F.3d 1311 (Fed. Cir. 2018)(Prost, C.J.)("Moda"), "HHS argued, like here, that the lack of a specific appropriation necessitated budget neutrality for the risk corridors program," but the United States Court of Appeals for the Federal Circuit rejected that argument, "explaining 'it has long been the law that the government may incur a debt independent of an appropriation.'" Notice at 1 (quoting Moda, 892 F.3d at 1321). Health Connections states: "The Federal Circuit also rejected HHS's arguments (which mirror those made in this case) that the Anti-Deficiency Act and the structure of Medicare Part D's risk stabilization programs supported its budget neutral operation of the risk corridors program." Notice at 1-2. Health Connections concludes by distinguishing the Federal Circuit's conclusion "that certain appropriations riders mandated budget neutrality for the *risk corridors* program," because "these riders were silent as to risk adjustment." Notice at 2 (emphasis in the original).

10. **The Notice Response.**

HHS filed a response to the Notice.  <u>See</u> Defendants' Response to Plaintiff's Notice of Supplemental Authority, filed June 20, 2018 (Doc. 75)("Notice Response").  HHS argues that <u>Moda</u> recognizes that Congress -- and not an administrative agency -- can create a legally enforceable obligation without providing an associated appropriation.  <u>See</u> Notice Response at 1. HHS explains that "the <i>Moda</i> decision relied on 42 U.S.C. § 18062(b), which the court read to establish a set formula of mandatory payments that was not limited by the amount of payments into the program," but the risk adjustment statute "does not dictate a formula for mandatory payments."  Notice Response at 2 (citing 42 U.S.C. § 18063(b)).  It follows, according to HHS, that "the <i>Moda</i> decision concluded that Congress, in certain circumstances, can create an enforceable payment obligation absent an appropriation," but "nothing in <i>Moda</i> supports Plaintiff's suggestion that <i>HHS</i> could have done so via regulation."  Notice at 2 (emphasis in original)(citing <u>Moda</u>, 892 F.3d at 1320-22).

11. **The Hearing.**

The Court held a hearing on June 21, 2018.  <u>See</u> Transcript of Motion Proceedings at 1 (taken June 21, 2018), filed July 3, 2018 (Doc. 77)("Tr.").  At the hearing, HHS began by asserting that it is entitled to reconsideration of the judgment in the MOO under rule 59, because the judgment was "based on misapprehensions of the parties' positions and the controlling law, and that they result in manifest injustice."  Tr. at 5:8-14 (Powers).  HHS then repeated its argument that Health Connections "was foreclosed from challenging the budget neutrality determination for the 2014 to 2017 rules," because "there were no comments to the agency in those rules challenging the decision to structure the program in a budget neutral fashion."  Tr. at 6:23-7:3 (Powers).  According to HHS, "there needs to be some sort of raising of the issue before

the agency out of the simple fairness to the agency to allow them to apply their expertise in the first instance, and to explain themselves further or to change their decision as the case may be." Tr. at 7:11-16 (Powers). HHS conceded, however, that this issue exhaustion requirement is satisfied as long as someone -- and not necessarily "the particular party before the court" -- raises the issue before the agency. Tr. at 7:7-11 (Powers).

The Court then asked for Health Connections' perspective regarding HHS' argument on the issue exhaustion requirement. <u>See</u> Tr. at 9:22-10:2 (Court). Health Connections contended that "the comment rule exists to give the agency an opportunity to address an issue, and exercise its expertise and its reasoned decision making and rule making." Tr. at 10:5-8 (Bassman). Health Connections asserted that this rationale means that, "when an agency actually addresses an issue, and does it itself without needing a comment or product, there is no exhaustion requirement from commenters." Tr. at 10:9-12 (Bassman). <u>See</u> Tr. at 10:22-23 ("There is no requirement for a commenter to ask an agency to engage in analysis it already did."). Health Connections then averred that "the agency action being challenged [is] the decision the agency made in setting the original formula to use the statewide average premium instead of each issuer's own premium," and "[t]hat was a decision that the agency made itself and analyzed." Tr. at 10:13-19 (Bassman). Health Connections contended that there is no issue exhaustion issue, because HHS recognized and addressed the statewide average premium decision, so there was no need for commenters to challenge it from 2014-2016, and that, in 2017 and 2018, commenters had "directly challenged" the decision. Tr. at 15:12-15 (Bassman).

In reply, HHS clarified that "we don't contend there has been waiver with respect to challenging statewide average premium itself." Tr. at 16:8-10 (Powers).

The argument we're making is that there is waiver as to challenging the

budget neutrality determination. Now, we recognize that [Health Connections] contends that it is challenging the statewide average premium. But the Court's decision relied on the fact that there was a failure to explain the budget neutrality determination. And we believe that . . . is necessarily a determination that that decision, that antecedent decision, was arbitrary and capricious, because if the budget neutrality determination was simply a parameter of the program, we believe the agency was entitled to treat that as one of the kind of factors that it would consider in deciding how to proceed. And that would be a sufficient basis to support the use of the statewide average premium.

Tr. at 16:11-25 (Powers). HHS then contended that "the sua sponte exception" does not apply, because "[i]t concerns when the agency has actually addressed the particular challenge that's raised," which HHS asserted "is that the program could have been nonbudget neutral because it could have been backfilled with lump sum appropriations or with resort to the Judgment Fund." Tr. at 17:19-22 (Powers). HHS contended that it "did not address those points, so it has not sua sponte addressed" the issue. Tr. at 17:22-24 (Powers). HHS then averred that when it did address the budget neutrality issue, with the 2018 rule, it did so "sufficiently," in "an application of binding appropriations principles," because the rule "says that, '[i]n the absence of additional appropriations the program will be operated in a budget neutral fashion.'" Tr. at 20:4-9 (quoting 2018 Final Rule, 81 Fed. Reg. at 94,101).

Health Connections rejoined:

[I]n coming up with the original 2014 rule, Your Honor's opinion does an extremely thorough analysis of what the agency said then. And what the agency said then was that it was under the belief that the Risk Adjustment Statute mandated budget neutrality, and that that was Congress' intent in the text of the statute. That was the explanation they gave. There was not an absence of explanation for why they took the position they did. It's laid out in the 2011 white paper. Defendants don't seem to be willing to defend anymore what the agency actually said in its contemporaneous reasoning. But that's the reason that was given.

This is not a case where the agency failed to explain itself. The agency wrote a very thick white paper explaining itself, and then detailed rule making in 2014.

Tr. at 23:3-20 (Bassman).  Health Connections then noted that the justification to which HHS points for budget neutrality in the 2018 rule does not seem to be sufficient, because it raises the question whether "the agent [is] adopting a new position and rationale," Tr. at 25:3 (Bassman), because "the prior position was the statute mandated it," Tr. at 25:12-13 (Court).  Health Connections stated: "If it were changing its rationale, then under the Supreme Court's opinion in Encino Motorcars[, LLC v. Navarro, 136 S. Ct. 2117 (2016)], it was required to acknowledge that there was [a] change in position and give a reasoned explanation for the change in position." Tr. at 25:6-10 (Bassman).  Health Connections continued by addressing HHS' argument that, "to have a nonbudget neutral formula, even though the statute doesn't require a budget neutral formula, there needs to be some separate, new Congressional appropriations bill that says: Thou shalt spend X dollars on risk adjustment."  Tr. at 26:20-24 (Bassman).  Health Connections pointed to Moda as authority showing that the absence of a line-item appropriation for risk adjustment does not require risk adjustment to be budget neutral.  See Tr. at 28:18-23 (Bassman)("[T]he DOJ argued to the Federal Circuit[ that] the Risk Corridor Program had to be budget neutral from the get-go because there was no separate specific line item appropriations bill for it.  And the Federal Circuit said that was hogwash.").  Health Connections then asserted that the CMS' lump sum appropriation was available to fund risk adjustment payments.  See Tr. at 28:24-29:24 (Bassman).

HHS responded that budget neutrality is "mandated by the absence of the authority or appropriations that would have permitted the agency to operate the program in a different fashion," not that it was "commanded by Congress."  Tr. at 32:6-10 (Powers).  HHS then attempted to distinguish Moda:

[In t]he Moda decision by the Federal Circuit, the Court held or concluded that

the Risk Corridor statute sets forth a payment formula that, you know, is mandatory and does create an obligation.

Now, as the plaintiff has raised, the DOJ has disagreed with that conclusion as well. But even if you take that conclusion on its face and move from there, that is something where Congress has loosened the purse strings, so to speak, rather than the agency. And under the appropriations clause of the Constitution and the Antideficiency Act, administrative agencies, executive officials, are limited in their capacity to obligate the government or to authorize spending in advance of statutory authorization to do so. And so the fact that the <u>Moda</u> Court held that there could have been an obligation by product of statute is irrelevant to the question here of whether or not the agency itself could have created such an obligation of its own, you know, exercise of discretion. And I think that that really shows the distinguishing characteristics there, the dispositive distinguishing characteristics to <u>Moda</u>, and why that is largely irrelevant to the Court's consideration here of the issues.

Tr. at 32:15-33:13 (Powers). HHS also argued that CMS' lump sum appropriation was not available to fund risk adjustment payments, because "those lump sum appropriations are for things like salaries, for administrative expenses of the agency." Tr. at 43:6-8 (Powers). Alternatively, HHS asserted that, "even if they were available, and the Court were to conclude they're available, the agency's discretion to tap those funds for any particular program is not reviewable under the APA." Tr. at 43:11-15 (Powers). <u>See</u> Tr. at 55:22-25 (Powers)("[W]hen it comes to the allocation of a lump sum appropriation, the agency is not obligated to explain its decision making in regard to how it will allocate that.").

The Court then turned from the merits to the remedies issue. <u>See</u> Tr. at 57:1-10 (Court). The Court began by stating that its understanding is that "vacatur is the general rule" when a court concludes that a regulation is arbitrary and capricious, Tr. at 57:6 (Court), and HHS agreed that the Court's understanding is correct, <u>see</u> Tr. at 57:11-16 (Powers). The Court then asked HHS why -- in its view -- the general rule does not apply to this case. <u>See</u> Tr. at 57:17-21 (Court). HHS replied:

I think it comes from a weighing of the equities, of evaluating the error identified by the Court, which is a failure to explain the budget neutrality determination, and weighing the disruption that will be caused by vacatur, in light of the potential that that error can be rectified on remand.

And so I think that, you know, when one weighs those equities in that manner, the clear, you know, equitable outcome would be remand without vacatur, here the only area, as I said, is a failure to explain. And there is little doubt, in our view, that the agency can adequately resolve this and adequately explain the decision to treat the program in a budget neutral fashion.

Tr. at 57:22-58:11 (Powers). The Court asked HHS for "the strongest case that you would say that I got . . . this relief issue wrong." Tr. at 59:20-22 (Court). HHS indicated that <u>WildEarth Guardians v. United States Bureau of Land Management</u>, 870 F.3d 1222 (10th Cir. 2017), supports its view "that when an error has been identified . . . equitable considerations may inform the Court's decision about whether or not to simply remand without vacating the challenged agency action." Tr. at 62:18-22 (Powers). As to the equities, HHS averred that, "absent a change to the Court's order or further administrative proceedings," it would not be able to collect charges or to make payments under the 2017 rule, as it planned to do in August through October. Tr. at 65:16-19 (Powers). HHS noted that the Court's order affects "the whole nation" and not just New Mexico. Tr. at 66:8-9 (Powers).

The Court then noted that its order "doesn't really impact the government," yet it appears that "nobody else seems to be too interested in this case." Tr. at 68:8-11 (Court). The order, in the Court's mind, "really impacts . . . the recipients of these risk adjustment payments; that's who would want this to be a remand rather than a vacatur." Tr. at 68:11-14 (Court). The Court then asked: "Why have I not seen, for example, Blue Cross and other large insurance companies that are the typical recipients of these payments coming in and telling me, [']Look, you've just

got to change this part of the relief, because it's just going to be so inequitable to us.[']"  Tr. at 68:19-24 (Court).

In response, HHS reiterated that "it's important to evaluate in reflection of the particular error identified," Tr. at 69:7-9 (Powers), although it agreed that the Court will also have to "consider the equities of the parties that are the recipients or payers of the funds," Tr. at 69:12-15 (Court, Powers).  HHS argued that issuers "are expecting to receive hundreds of millions of dollars or at least millions of dollars in payment to help cover the exorbitant cost of covering higher than average actual risk folks [and] are going to be harmed by delays in receiving these funds, which they have anticipated receiving."  Tr. at 71:2-8 (Powers).  Vacatur of the rules for previous years in which charges and payments have been completed, HHS asserted, also "create[s] some uncertainty about the status of payments and charges already issued for those years."  Tr. at 72:5-9 (Powers).  Remanding without vacatur would, as HHS stated, "help the Department, because it would mean that there was no question that the rules had ever ceased to be effective, but rather that the agency then would undertake administrative process that would be consistent with the Court's opinion."  Tr. at 72:13-17 (Powers).  HHS also argued that its error -- lack of explanation on the budget neutrality decision -- could be fixed with just a remand. See Tr. at 76:1-5 (Powers).

The Court questioned why, if the error is "such a minor defect that . . . it's not worth any sort of remedy," HHS has not corrected it.  Tr. at 77:4-7 (Court).  HHS responded: "[B]ecause we have been pursuing this relief here."  Tr. at 77: 8-9 (Powers).  Health Connections argued against HHS' classification of this case as "a failure to explain case.  This is a case where the explanation given was found to be arbitrary and capricious."  Tr. at 81:18-20 (Bassman).  Health Connections asserted that vacatur is proper here, because HHS provided an explanation for

budget neutrality and that explanation was insufficient under the APA. See Tr. at 82:4-13 (Bassman). Further, that "the Blue Crosses of the world" have not appeared as amici curiae, Health Connections averred, calls into doubt HHS' assertion that vacatur will cause a "great disruption." Tr. at 82:14-83:3 (Bassman). Heath Connections also averred that the big insurance companies receiving the payments do not really care that payments are halted, because they are "very well capitalized." Tr. at 85:1-16 (Bassman). Health Connections then noted that HHS has not identified any insurance company that is "actually upset that . . . risk adjustment is right now on hold." Tr. at 83:10-12 (Bassman). Health Connections also argued the equities weigh in favor of vacatur, because HHS has not acted in the four months since the Court's MOO -- when it would have been easy to issue a notice of proposed rulemaking and review comments, especially in light of the fact that HHS has already "thought through these issues really well, [and] got their answers at the ready." Tr. at 83:13-84:10 (Bassman). See Tr. at 84:7-8 (Bassman)("The disruption is either a self-inflicted wound or an admission of a serious deficiency.").

HHS then moved to argue its alternative request that, because Health Connections "point[s] to the particular situation involving this state, . . . we've also requested that Your Honor narrow the relief to New Mexico to only accord full relief to the plaintiff." Tr. at 70:6-10 (Powers). It asserted that "the Court in exercising its equitable discretion also has discretion to fashion narrower relief than a full vacatur," Tr. at 90:16-18 (Powers), and should do so here so to avoid "having an effect on plans across the county that have nothing to do with the New Mexico marketplace" while still granting Health Connections' relief, Tr. at 90:25-91:2 (Powers). HHS argued that a limited vacatur is consistent with the APA, because "the APA does not disturb courts' equitable discretion to deny equitable relief on any ground." Tr. at 93:6-8 (Powers).

Health Connections noted that HHS' rules are "not New Mexico-specific," Tr. at 94:1 (Bassman), but allowed "that for our particular injuries as one plaintiff, an order about New Mexico, as opposed to an order about the United States, would leave us equally whole and in the same position," Tr. at 94:5-9 (Bassman). Neither party could, however, point to a time where HHS has made a similar argument or any case in which a court has granted a limited vacatur. See Tr. at 91:14-92:18 (Court, Powers); Tr. at 94:14-21 (Court, Bassman).

As to the Motion to Strike, Health Connections argued that the Wu Decl. is "improper under Rule 59, because this is not newly discovered evidence that was not previously available" and, thus, HHS should have presented this evidence in the motion-for-summary-judgment briefing. Tr. at 96: 9-15 (Bassman). Health Connections also requested that, should the Court consider the Wu Decl., it should also consider the "additional affidavits and other materials" it attached to its Response. Tr. at 96:18-24 (Bassman). HHS conceded that it would be fair for the Court to consider the Wu Decl. only on the equity issues, but argued that the declaration is properly considered under rule 59 for the reasons stated in its Motion. See Tr. at 13-23 (Court, Powers). Health Connections then asked the Court for the opportunity to cross-examine Mr. Wu should the Court "engage in fact finding and find based on Mr. Wu's declaration that the defendants have proven some sort of remedy equity facts that entitle them to a change in relief." Tr. at 107:22-108:2 (Bassman). HHS then reiterated its position that "[t]here is no need for discovery." Tr. at 109:18-19 (Powers).

12. **Suspension of Risk Adjustment Transfers.**

On July 7, 2018, sixteen days after the Court's June 21, 2018, hearing, CMS suspended risk adjustment transfers for the 2017 benefits year, "[i]n light of the current status of litigation" in the United States District Court for the District of New Mexico. Center for Consumer

Information & Insurance Oversight, Department of Health and Human Services, <u>Summary</u> <u>Report on Permanent Risk Adjustment Transfers for the 2017 Benefit Year</u> at 2, available at https://downloads.cms.gov/cciio/Summary-Report-Risk-Adjustment-2017.pdf (dated July 9, 2018), filed July 19, 2018 (Doc. 78-2)("2017 Risk Adjustment Summary Report").[7] The New York Times, however, reported that "[t]he Trump administration said Saturday that it was suspending a program that pays billions of dollars to insurers to stabilize health insurance markets under the" ACA. Robert Pear, Health Insurers Warn of Market Turmoil as Trump Suspends Billions in Payments, N.Y. TIMES (July 7, 2018), https://www.nytimes.com/2018/ 07/07/us/politics/trump-risk-adjustment-payments-obamacare.html. "Trump administration officials said they decided to suspend payments under the program because of a ruling in February in Federal District Court in New Mexico. Pear, <u>supra</u>.

"Billions of dollars in risk-adjustment payments and collections are now on hold," and AHIP stated that the Court's "decision will have serious consequences for millions of consumers." Zachary Tracer et al., <u>Trump Health Officials Toss Obamacare Insurers Another</u> <u>Curveball</u>, BLOOMBERG (July 7, 2018), https://www.bloomberg.com/news/articles/2018-07- 07/cms-puts-on-hold-payments-to-insurers-that-cover-sicker-patients. CMS Administrator Seema Verma told the Wall Street Journal: "We are disappointed by the court's recent ruling." Stephanie Armour & Anna Wilde Matthews, Trump Administration Halts Payments Expected by Health Insurers, WALL STREET J. (July 7, 2018, 5:46 PM), https://www.wsj.com/articles/trump-

_____

[7]The Court takes judicial notice of the 2017 Risk Adjustment Summary Report's contents, because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), <u>i.e.</u>, a federal agency's website, <u>see</u> <u>New</u> <u>Mexico ex rel. Richardson v. Bureau of Land Mgmt.</u>, 565 F.3d 683, 702 n.22 (10th Cir. 2009)(Lucero, J.)(taking judicial notice of facts set out on "[t]he websites of two federal agencies").

administration-halts-payments-expected-by-health-insurers-1530992052 (internal quotation marks omitted). The Wall Street Journal notes that the risk adjustment program "plays a major role in the ACA markets" as, in 2016, the "transfers were valued at 11% of total premium dollars in the individual market." Armour & Matthews, supra. It also quoted AHIP as being "very discouraged by the new market disruption" and Blue Cross as stating that "this action will significantly increase 2019 premiums for millions of individuals and small business owners." Armour & Matthews, supra (internal quotation marks omitted). Deep Banerjee, analyst with S&P Global Ratings, stated that, because many insurers had already input estimates of the 2017 payouts into their books, the abrupt suspension of the risk adjustment payments "would be a big hit to their financial position." Armour & Matthews, supra (internal quotation marks omitted)(quoting Deep Banerjee). Tom Snook, actuary with Milliman Inc., notes that rising uncertainty in the market may provide cause for insurers to "argue that they need a bigger profit margin built into their 2019 rates." Armour & Matthews, supra. The New York Times mirrored much of what the Washington Post wrote, and also pointed to HHS officials saying: "[T]hey were caught between two conflicting court rulings," with the New Mexico Court voiding the current formula, and the Massachusetts court upholding it. Pear, supra.

Dr. Martin Hickey, the CEO of Health Connections when it filed the lawsuit, however, welcomes a revised methodology and states "it's always been unpredictable. We need a new formula that has less of a negative impact and encourages more entrance and competition in the marketplace." Marie C. Baca, NM Lawsuit Central to "Obamacare" Change, ALBUQUERQUE J. (July 9, 2018, 10:30 PM), https://www.abqjournal.com/1194625/nm-lawsuit-central-to-obamacare-change.html. Dr. Hickey also says the decision "will allow more companies to get into the insurance market. That will increase competition, and competition will help keep prices

down." Pear, <u>supra</u>. The Albuquerque Journal notes that risk adjustment payments "were one of several factors that led to the demise of many of the" twenty CO-OPs, of the twenty-four which the ACA created, that are now defunct. Baca, <u>supra</u>. On July 9, 2018, the Albuquerque Journal also reached out to "two of New Mexico's large insurance organizations," who replied that "they were still weighing the consequences of the CMS announcement." Baca, <u>supra</u>. One of these organizations is BlueCross BlueShield of New Mexico, which wrote that it is "currently assessing the implications and any potential impacts as a result of this development." Baca, <u>supra</u>. Presbyterian Health Plan, another large insurance company in New Mexico, wrote "we do not believe it will impact our operations extensively." Baca, <u>supra</u>.

In response to HHS' decision to halt the program, Nicholas Bagley, a professor of law at the University of Michigan Law School, notes that

> the government had several options . . . . [I]t could have adopted a rule that addressed the judge's concerns. Second, it could have sought a stay of the judge's order while it prepared an appeal. Finally, the government might have narrowly interpreted the order to apply only to New Mexico Health connections, or any New Mexico insurer, and acted accordingly . . . .[8]

Joseph Ditzler, <u>New Mexico Lawsuit Puts "Obamacare" Provision on Chopping Block</u>, Santa Fe New Mexican (July 14, 2018), http://www.santafenewmexican.com/news/health_and_science/new-mexico-lawsuit-puts-obamacare-provision-on-chopping-block/article_edb2979d-edc7-594e-9e36-72b1a55d81e8.html. "The administration had options at its disposal that would cause less confusion and uncertainty for insurers than halting the program entirely."

---

[8]Professor Bagley suggests that HHS should have ignored the Court's vacatur order and limit the effects of the Court's MOO just to New Mexico. <u>See</u> Ditzler, <u>supra</u>. The Court appreciates that HHS did not do what Professor Bagley suggests. Instead, HHS did what the United States and any party should do when it loses, in an orderly society, and filed a motion to reconsider the remedy and limit the remedy, not just ignore the order and give it a dishonest reading.

Ditzler, supra.  As the Albuquerque Journal notes, HHS "could have just issued a new 'interim' rule," especially because it "already [has] such language handy."  Catherine Rampell, Repealing Obamacare Didn't Work, So Republicans Try Sabotage, ALBUQUERQUE J. (July 13, 2018, 12:02 AM), https://www.abqjournal.com/1195956/repealing-obamacare-didnt-work-so-republicans-try-sabotage.html.  "It is unclear why the administration didn't choose one of its less disruptive options, especially since previous court filings suggested it wanted to keep the program running.  As of Monday morning, administration officials had not responded to my questions about their reasoning or timing."  Rampell, supra.  Professor Bagley also writes that the Court's MOO "wasn't compelling, to put it mildly" and that "the court's decision is weak."[9]  Nicholas Bagley, Taking a Dive on Risk Adjustment, INCIDENTAL ECONOMIST (July 9, 2018, 9:43 AM), https://theincidentaleconomist.com/ wordpress/taking-a-dive-on-risk-adjustment/.  He says:

> The point of risk adjustment isn't to subsidize insurers with especially unhealthy populations.  The point is to adjust risk among insurers.  That's why risk adjustment has to be "budget neutral."  It's totally senseless to compel CMS to explain something that was obvious to the agency and to every stakeholder in the process.[10]  As I see it, the judge's decision typifies the kind of mistake that

---

[9]When Professor Bagley calls the Court's analysis in its MOO "weak," he underscores what is wrong with much of legal scholarship, and, indeed, scholarship in general in modern law schools and universities.  The academic world should offer something more than an editorial in the newspaper.  Scholarship is useful, and to be given respect and deference, when it does the hard work of statistical research or analysis the courts or parties may not be able to do, such as James Q. Wilson used to do.  See, e.g., George L. Kelling & James Q. Wilson, Broken Windows: The Police and Neighborhood Safety, ATLANTIC (March 1982), https://www.theatlantic.com/ magazine/archive/1982/03/broken-windows/304465/?single_ age=true.

[10]Professor Bagley makes one observation with which the Court agrees and finds helpful. Professor Bagley argues that HHS should not have had to discuss the need of budget neutrality, because that need is so patently obvious.  He does not argue that HHS explained the rationale for its budget neutral rule.  The Court draws some comfort from his reading of the record, because the Court agrees that HHS did not explain its rationale of its rule.

The Court disagrees with Professor Bagley, however, in that budget neutrality is so obvious that HHS did not have to address it.  First, HHS itself does not make the argument that "risk adjustment has to be 'budget neutral'" because of its goal "to adjust risk among insurers,"

generalist judges make in reviewing complex rules that they only dimly understand.[11]

Bagley, <u>supra</u>. Professor Bagley notes the possibility "that the New Mexico court meant to impose a nationwide injunction, even though it never said so," but counters that "the Justice

---

Bagley, <u>supra</u>; rather, HHS argues the statute "designed" the program to be budget neutral and that budget neutrality was mandated by the lack of congressional appropriations, Motion at 12. Second, HHS therefore does not argue that the need for operating the risk adjustment program in a budget-neutral manner was so obvious that it did not need to explain its decision to do so -- HHS' argument is that it did not need to explain this decision because no commenter raised this issue. <u>See</u> Motion at 9-10. Third, even if the need for budget neutrality were obvious, HHS would still need to explain this decision for there is no obviousness exception to an agency's explanation of a rule. <u>See</u> 5 U.S.C. § 553(c) ("[T]he agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."); <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.</u>, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting <u>Burlington Truck Lines v. United States</u>, 371 U.S. at 168)). While courts have upheld rules that failed to include a statement of basis and purpose as required under 5 U.S.C. § 553(c) "where the agency's aims are obvious and unmistakable," this requires the reviewing court to be able to discern the basis and purpose from "the surrounding regulatory context." <u>United States v. Exxon Corp.</u>, 561 F. Supp 816, 828 (D.D.C. 1983)(Flannery, J.). There is no such ability for the Court to determine HHS' basis and purpose from the regulatory context; the Court can only speculate as to what HHS' basis and purpose could be. Finally, it is clear that operating the program in a budget-neutral manner was not an obvious choice, because commenters noted that it "leads to inadequate compensation for enrollees' risk." 2018 Final Rule, 81 Fed. Reg. 94,101 (A.R.009638).

[11]While Professor Bagley criticizes the rulings of generalists such as federal trial judges, he does not offer any alternatives. He does not suggest whether law professors, a specialist court, or a district judge in another part of the country would be better able to review and understand complex rules. The history of specialist courts, such as the United States Court of Appeals for the Federal Circuit, has not been uniformly good in this country, and the specialty courts have been criticized. <u>See</u>, <u>e.g.</u>, Laura G. Pedraza-Fariña, <u>Understanding the Federal Circuit: An Expert Community Approach</u>, 30 Berkeley Tech. L.J. 89, 92-93 (2015); Tamar M. Meekins, <u>"Specialized Justice": The Over-Emergence of Specialty Courts and the Threat of a New Criminal Defense System</u>, 40 Suffolk U. L. Rev. 1, 4 (2006). Moreover, it is unclear what the specialty court here would be -- just one on the ACA or something broader. If some believe that federal judges in the District of Columbia or the Southern District of New York should be the only ones to decide certain issues, that is terribly elitist. For better or worse, the Congress and the nation entrusts these issues to federal trial judges throughout the country, and, absent some other alternative, the Court cannot be fearful of exercising jurisdiction, where no one disputes it.

Department believes that district courts lack the power to enter that kind of nationwide injunction." Bagley, supra. With these considerations in mind, Bagley writes that he is shocked that HHS suspended the program and considers this an act of "sabotage." Bagley, supra.

**13.    The 2017 Risk Adjustment Summary Report.**

Besides noting the suspension of the risk adjustment program for the 2017 benefit year, the 2017 Risk Adjustment Summary Report describes the program as "working as intended by more evenly spreading the financial risk borne by issuers that enrolled higher-risk individuals, thereby protecting issuers against adverse selection within a market within a state and supporting them in offering products that serve all type of consumers." 2017 Risk Adjustment Summary Report at 2. It notes that the "absolute value of risk adjustment transfers as a percent of premiums decreased to 10 percent of premiums in the individual non-catastrophic risk pool and decreased to 5 percent of premiums in the small group risk pool." 2017 Risk Adjustment Summary Report at 2. CMS states that the program's transfers total about $10.4 billion: $5.2 billion in risk adjustment charges and $5.2 billion in risk adjustment payments. See 2017 Risk Adjustment Summary Report at 8. In addition to that total, the report "set[s] forth the 2017 benefit year risk adjustment transfer amounts by issuer." 2017 Risk Adjustment Summary Report at 11. See 2017 Risk Adjustment Summary Report at 11-28 (listing issuer-specific information). In New Mexico, for example, Blue Cross' Licensee Health Care Service Corporation[12] is due a payment of about $7.7 million in the small group risk pool, whereas

---

[12]Health Care Service Corporation runs Blue Cross' insurance plans in New Mexico as its licensee. See Company Information, BLUECROSS BLUESHIELD OF NEW MEXICO, https://www.bcbsnm.com/company-info (last visited Oct. 9, 2018)("Blue Cross and Blue Shield of New Mexico, a division of Health Care Service Corporation, a Mutual Legal Reserve Company, an independent licensee of the Blue Cross and Blue Shield Association."); Who We Are: Overview, HEALTH CARE SERVICE CORPORATION, http://www.hcsc.com/who-we-are (last

Health Connections is assessed a charge of roughly $4.7 million in the same pool.  See 2017 Risk Adjustment Summary Report at 20.  In the individual non-catastrophic risk pool, Blue Cross' Health Care Service Corporation is due about $3.7 million and Molina Healthcare is due about $5.1 million, whereas Health Connections is charged $724,274.47 and not-for-profit CHRISTUS Health[13] is charged about $7.4 million.  See 2017 Risk Adjustment Summary Report at 20.  Presbyterian Healthcare Services, another large insurance provider in New Mexico, is assessed charges: $738,102.52 in the individual non-catastrophic risk pool, and about $4.4 million in the small group risk pool.  See 2017 Risk Adjustment Summary Report at 20.

14.     **The First HHS Notice.**

On July 19, 2018, HHS notified the Court that it "has begun the process of promulgating a new Interim Final Rule."  Notice at 1, filed July 19, 2018 (Doc. 78)("First HHS Notice").  HHS states that it is "unable to provide further information at this time about the content of this rule as inter-agency review is still ongoing."  HHS Notice at 1.  HHS adds that it "will promptly advise the Court about further developments with respect to the rule and what effect, if any, the final rule will have on the pending motion for reconsideration," but the agency is "unable to provide an estimated timeframe for these events at present."  HHS Notice at 1-2.

---

visited Oct. 9, 2018)("Health Care Service Corporation, a Mutual Legal Reserve Company (HCSC), and an Independent Licensee of the Blue Cross and Blue Shield Association, is the largest customer-owned health insurer in the United States and fourth largest overall, operating through our Blue Cross and Blue Shield® Plans in Illinois, Montana, New Mexico, Oklahoma, and Texas.").

[13]CHRISTUS Health is relatively small, New Mexico, Texas, Arkansas, and Louisiana in the United States.  See About Us, CHRISTUS HEALTH, https://www.christushealth.org/about (last visited Oct. 9, 2018).  It is a "not-for-profit system made up of more than 600 centers, including long-term care facilities, community hospitals, walk-in clinics and health ministries." About Us, supra.

15.    **The Motion for Leave.**

On July 19, 2018 -- four weeks after the Court asked why there were no amici curiae statements after HHS suggested that vacatur would disrupt risk adjustment collections and payments, and about a week and a half after HHS' suspension of the payments and collections -- two health insurance industry groups, AHIP and Blue Cross, sought leave to file a statement as amici curiae.  See Motion for Leave at 1.  AHIP is "the national trade association representing health plans," and Blue Cross is "the national association of Blue Cross Blue Shield health plans."  Amici Motion at 1.  AHIP and Blue Cross argue that the Court should permit them to file an amici statement, because "their perspective will provide the Court with a deeper and more comprehensive understanding of the issues involved in -- and the urgency of an immediate resolution of -- the pending" Motion.  Amici Motion at 1.  AHIP and Blue Cross add that they both "represent health plans that both pay and receive risk adjustment transfers."  Amici Motion at 1-2.

AHIP and Blue Cross attach to the Motion for Leave the statement that they want the Court to consider.  See Statement of *Amici Curiae* America's Health Insurance Plans and Blue Cross Blue Shield Association on New Developments in Support of Rule 59(e) Motion at 1, filed July 19, 2018 (Doc. 80-1)("Amici Statement").  The Amici Statement point to CMS "surpris[ing] all carriers by" halting collections and payments under the risk adjustment program, calling for a "new urgency to resolution -- and grant (at least as to remedy) -- of" the Motion.   Amici Statement at 1.  AHIP and Blue Cross assert that this decision "has serious and time-sensitive ramifications for the functioning of the market for individual and small group health plans," because the "decision deprives many AHIP and BCBSA members of substantial risk adjustment payments that the Affordable Care Act guarantees and that they have relied on in making critical

plan offering and pricing decisions." Amici Statement at 2. They assert that the decision also harms those issuers who pay the risk adjustment transfers, because the decision "jeopardizes the future market participation of plans that receive risk adjustment payments, and the resulting change in risk-profile adversely affects the plans that remain and the calculation of their rates." Amici Statement at 2. Further, AHIP and Blue Cross argue that "the freeze creates profound uncertainty for future health plan pricing," which "could result in increased premiums for many health plans and reduced coverage options." Amici Statement at 2.

AHIP and Blue Cross also note that the nature of the risk adjustment program means that issuers must consider transfers under the program when setting their premiums and that deadlines for issuers -- such as those for changing their individual market submissions or electing to participate in the individual market Exchanges -- are fast approaching. See Amici Statement at 2-3. Finally, AHIP and Blue Cross state:

> [I]t is unclear how health plans are to treat risk adjustment payments or transfers in the calculation of their medical loss ratio (MLR) . . . . Accurate and complete calculation of MLRs is essential in determining whether a plan has met certain legally mandated requirements and if the plan has any corresponding financial obligations (e.g., whether or not direct rebates must be paid to consumers).

Amici Statement at 3-4. AHIP and Blue Cross thus "respectively urge the Court to resolve Defendants' Motion -- and grant the relief requested -- as soon as possible." Amici Statement at 4.

### 16.    **The Second HHS Notice**.

On July 25, 2018, HHS notified the Court that it "issued a new Final Rule concerning the risk adjustment methodology for the 2017 benefit year, which will be effective upon its publication in the Federal Register." Notice at 1, filed July 25, 2018 (Doc. 81)("Second HHS Notice")(citing Centers for Medicare & Medicaid Services, CMS-9920-F, Adoption of the

Methodology for the HHS-operated Permanent Risk Adjustment Program under the Patient Protection and Affordable Care Act for the 2017 Benefit Year, available at https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/CMS -9920-F-7-24-18-final.pdf, filed July 25, 2018 (Doc. 81-1)("New 2017 Rule")).  HHS states that the New 2017 Rule "adopts the risk adjustment methodology previously promulgated by the agency for the 2017 benefit year," but responds to the MOO "by providing additional explanation of the agency's use of statewide average premium in the risk adjustment payment transfer formula, as well as the risk adjustment program's budget neutral design."  Second HHS Notice at 1 (citing New 2017 Rule at 6-12).

With the New 2017 Rule, HHS "will now proceed with carrying out the risk adjustment program for the 2017 year, including collecting charges and making payments for the 2017 benefit year."  Second HHS Notice at 2.  HHS asserts the New 2017 Rule "further demonstrate[s] that the earlier 2017 benefit year rule at issue in this litigation was not arbitrary and capricious," and urges the Court to grant its Motion.  Second HHS Notice at 2.  Finally, HHS notes that it "intend[s] to issue a Notice of Proposed Rulemaking to propose and solicit comment on the risk adjustment methodology that will apply to the 2018 benefit year," and will provide more information "when appropriate."  Second HHS Notice at 2 (citation omitted).

### 17.    **The Motion for Leave Opposition.**

On August 1, 2018, Health Connections responded to the Motion for Leave, arguing why the Court should not grant AHIP and Blue Cross leave to file their Amici Statement.  See New Mexico Health Connections' Opposition to America's Health Insurance Plans and Blue Cross Blue Shield Association's Motion for Leave to File Statement as Amici Curiae at 1, filed August 1, 2018 (Doc. 82)("Motion for Leave Opposition").  Health Connections notes that appearance as

amici curiae is "a matter of privilege, not of right," so "the Court has broad discretion to deny" the Motion for Leave. Motion for Leave Opposition at 2 (citing Lopez v. Santa Fe Police Dep't, No. CIV 09-1214 JH/LFG, 2010 BL 17160, at *1 (D.N.M. Jan. 25, 2010)(Garcia, M.J.); WildEarth Guardians v. Lane, No. CIV 12-118 LFG/KBM, 2012 U.S. LEXIS 189661, at *4 (D.N.M. June 20, 2012)(Garcia, M.J.)). This discretion is especially true in district courts, Health Connections asserts, in which "*amicus* requests are subject to greater scrutiny." Motion for Leave Opposition at 3.

Health Connections argues that the Motion for Leave is untimely, because it is filed in support of the Motion over three months after the Motion was filed, and the Federal Rules of Appellate Procedure require amicus briefs be filed within seven days of the filing of the principal brief it is supporting. See Motion for Leave Opposition at 4 (citing Fed. R. App. P. 29(a)(6)). Health Connections also asserts that the proposed Amici Statement provides no useful information that will help the Court, because "the entire premise of the *amicus* statement was to apprise the Court of the now-ended Risk Adjustment Suspension." Motion for Leave Opposition at 5. Health Connections further argues against the granting of the Motion for Leave, because "there is no indication that the parties to the law suit . . . will not adequately present all relevant legal arguments, [so] there is no persuasive reason to grant" the Motion for Leave. Motion for Leave Opposition at 5 (internal quotation marks omitted)(quoting Am. Coll. of Obstetricians & Gynecologists, PA Section v. Thornburgh, 699 F.2d 644, 645 (3rd Cir. 1983)). Finally, Health Connections argues that the Amici Statement "is just another attempt to preserve [Blue Cross'] market dominance and to protect the risk adjustment program that has been so effective in thwarting their competitors' efforts to establish a foothold in the market and provide options to consumers." Motion for Leave Opposition at 7-8. Health Connections asserts that the ACA

created the individual and small group markets "to foster competition, [but] HHS's risk adjustment program is doing the opposite. Rather than supporting new entrants and providing consumers with more options, the risk adjustment program as implemented has been preserving the dominance of Blue Cross Blue Shield plans." Motion for Leave Opposition at 6-7.

18.     **The Second HHS Notice Response.**

Health Connections responded to the Second HHS Notice on August 1, 2018, to note that the New 2017 Rule moots the Motion as to the "reconsideration of the Court's findings on the 2017 rule." Plaintiff New Mexico Health Connections' Response to HHS's Notice at 1, filed August 1, 2018 (Doc. 83)("Second HHS Notice Response"). Health Connections also asserts that HHS' "cry of disruption was a purely self-inflicted wound," because it is clearly able to promulgate new rules. Second HHS Notice Response at 2. Finally, Health Connections argues the New 2017 Rule is improper under the APA, because HHS "delay[ed] taking action for months and then used an alleged timing emergency of its own creation to avoid going through notice and comment," and that the New 2017 Rule "underscores just how specious HHS's pending Rule 59 motion is." Second HHS Notice Response at 2.

19.     **The Third HHS Notice.**

On August 8, 2018, HHS notified the Court that it "issued a new Notice of Proposed Rulemaking ('NPRM') concerning the risk adjustment methodology for the 2018 benefit year." Notice at 1, filed August 8, 2018 (Doc. 84)("Third HHS Notice")(citing Adoption of the Methodology for the HHS-Operated Permanent Risk Adjustment Program for the 2018 Benefit Year Proposed Rule, 83 Fed. Reg. 39,644, 39,644 (dated August 10, 2018)("2018 NPRM")). HHS notes that the 2018 NPRM "responds to the Court's prior decision by providing additional explanation of the agency's use of statewide average premium in the risk adjustment payment

transfer formula, as well as the risk adjustment program's budget neutral design, and seeks comment on these issues." Third HHS Notice at 1-2 (citing 2018 NPRM, 83 Fed. Reg. at 39,645-48). HHS also notifies the Court that the New 2017 Rule has "been published in the Federal Register" and requests that the Court grant its Motion "in full," because issuance of the New 2017 Rule and the 2018 NPRM "does not moot the motion with respect to the 2014-2016 rules." Third HHS Notice at 2 (citing Adoption of the Methodology for the HHS-Operated Permanent Risk Adjustment Program Under the Patient Protection and Affordable Care Act for the 2017 Benefit Year, 83 Fed. Reg. 36,456, 36,456 (dated July 30, 2018)).

### 20. The Third HHS Notice Response.

Health Connections responded to the Third HHS Notice on August 13, 2018. See Plaintiff New Mexico Health Connections' Response to HHS's Notice at 1, filed August 13, 2018 (Doc. 85)("Third HHS Notice Response"). Health Connections asserts that, with the 2018 NPRM and New 2017 Rule, HHS' Motion "is now entirely moot as to 2017 and 2018." Third HHS Notice Response at 1. Health Connections further asserts that "[t]he issuance of both new regulations also betrays the hollowness of HHS's cry that this Court's remedy of vacatur will inevitably cause market disruption." Third HHS Notice Response at 2.

### 21. The Second Notice of Supplemental Authority.

Health Connections brings another case to the Court's attention: Mont. Health Co-op v. United States, No. 18-143C, 2018 U.S. Claims LEXIS 1066 (Fed. Cl. Sept. 4, 2018)(Kaplan, J.)("Montana Health"). See Notice of Supplemental Authority at 1, filed November 6, 2018 (Doc. 88)("Second Notice"). Health Connections notes that, as in Moda, the United States Court of Federal Claims in Montana Health "expressly rejected the appropriations-based arguments HHS advances in its pending" Motion. Second Notice at 1. Health Connections states: "In

*Montana Health*, the Government argued that the lack of a specific appropriation discharged its obligation to make cost-sharing reduction payments to the Plaintiff, a health insurer. The Court rejected this theory, explaining that 'Congress's failure to appropriate funds to make those payments did not vitiate [the Government's statutory] obligation.'" Second Notice at 1 (alteration in original)(quoting Montana Health, 2018 U.S. Claims LEXIS 1066, at *1). Health Connections further notes that the Court of Federal Claims "pointed to the United States Supreme Court's clear precedent that 'a bare failure to appropriate funds to meet a statutory obligation could not vitiate that obligation.'" Second Notice at 2 (quoting Montana Health, 2018 U.S. Claims LEXIS 1066, at *19-20). Finally, Health Connections says Montana Health "rejected the Government's argument (which mirrors that made in this case) that the structure of the Medicare Part D statute supported its claims." Second Notice at 2 (quoting Montana Health, 2018 U.S. Claims LEXIS 1066, at *14-15).

### 22.     The Second Notice Response.

HHS responded to the Second Notice. See Defendants' Response to Plaintiff's Notice of Supplemental Authority at 1, filed November 13, 2018 (Doc. 89)("Second Notice Response"). HHS argues that Montana Health is "a decision largely irrelevant to the appropriations law arguments advanced in" the Motion. Second Notice Response at 1. HHS notes that Health Connections quotes parts of the decision that "are clear that the court's reasoning relied on the existence of a *statutory* obligation to make payments." Second Notice Response at 1-2 (emphasis in original)(citing Second Notice at 1-2). HHS asserts that this "reasoning has no bearing on this case because there is no dispute that the statute creating the risk adjustment program does not dictate a formula for mandatory payments." Second Notice Response at 2 (citing 42 U.S.C. § 18063(b)). Thus, HHS argues, Montana Health does not discuss "whether

*agency officials* can make or authorize a legally-enforceable obligation in the absence of an appropriation."  Second Notice Response at 2 (emphasis in original).

### LAW REGARDING MOTIONS TO RECONSIDER

Except where the Federal Rules of Civil Procedure specify, motions to reconsider in civil cases fall into three categories.  First, there are motions to reconsider "filed within [twenty-eight][14] days of the entry of judgment," which are "treated as a motion to alter or amend the judgment under rule 59(e)."  Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.).  Second, there are motions to reconsider "filed more than [twenty-eight] days after judgment," which are "considered a motion for relief from judgment under rule 60(b)."  Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. at 462.  Finally, there are motions to reconsider "any order that is not final," which are treated as "a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion."  Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. at 462.  See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005); Computerized Thermal Imaging, Inc. v. Bloomberg, L.P., 312 F.3d 1292, 1296 n.3 (10th Cir. 2002).

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant

---

[14]Former rule 59 provided for a ten-day period after entry of judgment to file motions to reconsider.  In 2009, the rule was amended, extending the filing period to twenty-eight days:

> Experience has proved that in many cases it is not possible to prepare a satisfactory post-judgment motion in 10 days, even under the former rule that excluded intermediate Saturdays, Sundays, and legal holidays.  These time periods are particularly sensitive because Appellate Rule 4 integrates the time to appeal with a timely motion under these rules.  Rather than introduce the prospect of uncertainty in appeal time by amending Rule 6(b) to permit additional time, the former 10-day periods are expanded to 28 days.

Federal Rules of Civil Procedure, Rule 59, Legal Information Institute, https://www.law.cornell.edu/rules/frcp/rule_59 (Committee Notes on Rules -- 2009 Amendment).

files within twenty-eight days of a court's entry of judgment. See Price v. Philpot, 420 F.3d at 1167 n.9. If the movant files outside that time period, courts should treat the motion as seeking relief from judgment under rule 60(b). See Price v. Philpot, 420 F.3d at 1167 n.9. "[A] motion for reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones the notice of appeal's effect until the motion is resolved." Jones v. United States, 355 F. App'x 117, 122 (10th Cir. 2009)(unpublished).[15] The time limit in rule 59(e) is now twenty-eight days from the entry of a judgment. See Fed. R. Civ. P. 59(e).

A court cannot enlarge the time for filing a rule 59(e) motion. See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 348 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. 11-0103, 2012 WL 869000, at *2 (D.N.M. March 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e) . . . ."). "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment." 12 James Wm. Moore et al., Moore's Federal Practice § 59.11[4][b], at 59-32 (Matthew Bender 3d ed.)(citations omitted). Nevertheless, a court will not generally treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a decision on the merits'

---

[15]Jones v. United States is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that Jones v. United States, Village of Logan v. United States Department of Interior, and Hospice of New Mexico, LLC v. Sebelius have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

contemplated by Rule 59(e)." Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005)(quoting

Osterneck v. Ernst & Whinney, 489 U.S. 169, 174 (1989)).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule

60 is not only a question of timing, but also "depends on the reasons expressed by the movant."

Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194,

1200 (10th Cir. 2011). Where the motion "involves 'reconsideration of matters properly

encompassed in a decision on the merits,'" a court considers the motion under rule 59(e). Phelps

v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d

751, 753 (10th Cir. 1989)). In other words, if the reconsideration motion seeks to alter the

district court's substantive ruling, then it should be considered a rule 59 motion and be subject to

rule 59's constraints. See Phelps v. Hamilton, 122 F.3d at 1324. In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal
> representatives from a final judgment, order, or proceeding for the following
> reasons:
>
>> (1)     mistake, inadvertence, surprise, or excusable neglect;
>>
>> (2)     newly discovered evidence that, with reasonable diligence,
>> could not have been discovered in time to move for a new trial
>> under Rule 59(b);
>>
>> (3)     fraud (whether previously called intrinsic or extrinsic),
>> misrepresentation, or misconduct by an opposing party;
>>
>> (4)     the judgment is void;
>>
>> (5)     the judgment has been satisfied, released or discharged; it is
>> based on an earlier judgment that has been reversed or vacated; or
>> applying it prospectively is no longer equitable; or
>>
>> (6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b). Neither a rule 59 nor a rule 60 motion for reconsideration is an appropriate

vehicle

to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion. . . . Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000).[16]  "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." Servants of the Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

The United States Court of Appeals for the Tenth Circuit reviews a district court's ruling on a motion to alter or amend "under an abuse of discretion standard." Phelps v. Hamilton, 122

---

[16]A loose conflation in terminology in Servants of the Paraclete v. Does, which refers to rule 59(e) motions -- "motion[s] to alter or amend a judgment," Fed. R. Civ. P. 59(e) (emphasis added) -- as "motion[s] to reconsider," 204 F.3d at 1012, has created some confusion as to the proper standard for a district court to apply when reconsidering an "interlocutory or interim" order, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment.  The Honorable Paul J. Kelly, Jr., now-Senior United States Circuit Judge for the Tenth Circuit, who authored Servants of the Paraclete v. Does, refers to rule 59(e) motions as "motion[s] to reconsider" several times throughout the opinion.  204 F.3d at 1012.  He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within 28 days of the entry of judgment, which the Servants of the Paraclete v. Does standard governs; and (iii) motions to reconsider a judgment made more than 28 days after the entry of judgment, which rule 60(b) governs.  There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category).  These are the terms that the Federal Rules of Civil Procedure -- and other Courts of Appeals -- use to describe (ii) and (iii).  The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

F.3d at 1324.  Under that standard, "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."  122 F.3d at 1324.  "The purpose [of a rule 59(e)] motion is to correct manifest errors of law or to present newly discovered evidence."  Monge v. RG Petro-Mach. (Group) Co., 701 F.3d 598, 611 (10th Cir. 2012)(alteration in original)(internal citations omitted)(quoting Webber v. Mefford, 43 F.3d 1340, 1345 (10th Cir. 1994)).  "Where the motion requests a substantive change in the district court's judgment or otherwise questions its substantive correctness, the motion is a Rule 59 motion, regardless of its label."  Yost v. Stout, 607 F.3d 1239, 1243 (10th Cir. 2010).

The Court has recently written on the issue of parties filing rule 59(e) motions which repeats arguments that they already made:

> Under rule 59(e)'s framework, the Court is not restricted to rule 50(b)'s remedies and may alter the judgment when there is: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice."  Servants of Paraclete v. Does, 204 F.3d at 1012.  The Tenth Circuit has noted that motions to alter, amend, or reconsider should not rehash old arguments, or advance new arguments or facts that could have been raised earlier.  See United States v. Amado, 841 F.3d [867, 871 (10th Cir. 2016)]("A proper motion to reconsider does not simply state facts previously available or make arguments previously made."); Servants of Paraclete v. Does, 204 F.3d at 1012 ("Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law.  It is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing.").  As the Court has already noted, the Defendants' Motion raises the same arguments that the Defendants previously argued during their Motion to Alter.  The Court, however, also concludes that Servants of Paraclete v. Does, does not force the Court to deny a motion to amend or alter, simply because it raises identical issues; rather, it affords the Court the option to deny that motion for reasons of judicial efficiency.  A court need not review a motion to alter or amend with the same rigor if the motion raises issues already considered, because it would waste time by forcing a judge to rewrite an opinion already rendered.  If, on the other hand, a party raises an identical issue on a motion to alter, and, upon the district judge's reflection, perhaps after passions have cooled, he or she concludes that he or she erred

> previously, <u>Servants of Paraclete v. Does</u> does not chain that district judge to an erroneous legal conclusion. There is no sound reason for a district judge to be unable to change a ruling he or she has made if he or she has become concerned that he or she is wrong.

<u>Nelson v. City of Albuquerque</u>, 283 F. Supp. 3d 1048, 1099 (D.N.M. 2017)(Browning, J.). In

<u>Nelson v. City of Albuquerque</u>, the Court looked to the <u>Servants of Paraclete v. Does</u> factors and

decided to grant the motion to alter the previous judgment based on "clear error," despite the

other two factors not favoring granting the motion. 283 F. Supp. 3d at 1099 & n.35. <u>Cf. Lopez</u>

<u>v. Delta Int'l Machinery Corp.</u>, 312 F. Supp. 3d 1115, 1153-62 (D.N.M. 2018)(Browning,

J.)(denying a rule 59(e) motion because the plaintiff did not show the Court erred in its

judgment); <u>United States v. 2002 Pontiac Bonneville SE</u>, No. CIV 12-0580 JB/LFG, 2015 WL

8331144, at *6 (D.N.M. Dec. 7, 2015)(Browning, J.)(denying a rule 59(e) motion because the

plaintiff did not make a showing of: "(i) a change in the controlling law; (ii) new evidence;

(iii) clear legal error; [or] (iv) manifest injustice." (citations omitted)).

## LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTION

Under the APA,

> [a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702 (emphasis in original).  The APA states that district courts can:

(1)      compel agency action unlawfully withheld or unreasonably delayed; and

(2)      hold unlawful and set aside agency action, findings, and conclusions found to be --

> (A)      arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B)      contrary to constitutional right, power, privilege, or immunity;
>
> (C)      in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D)      without observance of procedure required by law;
>
> (E)      unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F)      unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

Under Olenhouse v. Commodity Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed *as appeals*.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."  42 F.3d 1560, 1580 (10th Cir. 1994)(emphasis in original).  See WildEarth Guardians v. U.S. Forest Serv., 668 F. Supp. 2d 1314, 1323 (D.N.M. 2009)(Browning, J.).  "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use, which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant."  N. New Mexicans Protecting Land & Water Rights v. United States, No. CIV 15-0559, 2015 WL 8329509, at *9 (D.N.M. 2015)(Browning, J.).

1.      <u>**Reviewing Agency Factual Determinations.**</u>

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E). The APA's two linguistic formulations amount to a single substantive standard of review. <u>Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve Sys.</u>, 745 F.2d 677, 683-84 (D.C. Cir. 1984)(Scalia, J.)(explaining that, as to factual findings, "there is no *substantive* difference between what [the arbitrary or capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense" (emphasis in original)); <u>See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve Sys.</u>, 745 F.2d at 684 ("[T]his does not consign paragraph (E) of the APA's judicial review section to pointlessness. The distinctive function of paragraph (E) -- what it achieves that paragraph (A) does not -- is to require substantial evidence to be found *within the record of closed-record proceedings* to which it exclusively applies." (emphasis in original)). <u>See also Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.</u>, 140 F. Supp. 3d at 1167-68 (discussing this fact).

In reviewing agency action under the arbitrary-or-capricious standard, a court considers the administrative record -- or at least those portions of the record that the parties provide -- and not materials outside of the record. <u>See</u> 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party . . . ."); Fed. R. App. P. 16(a) ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the

pleadings, evidence, and other parts of the proceedings before the agency."); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted . . . ."). See also Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here Congress has provided for judicial review without setting forth . . . procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most instances, no de novo proceedings may be had." (footnote omitted)). Tenth Circuit precedent indicates, however, that the ordinary evidentiary rules regarding judicial notice apply when a court reviews agency action. See New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d at 702 n.21 (10th Cir. 2009)("We take judicial notice of this document, which is included in the record before us in [another case]." (citing Fed. R. Evid. 201(b))); New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d at 702 n.22 ("We conclude that the occurrence of Falcon releases is not subject to reasonable factual dispute and is capable of determination using sources whose accuracy cannot reasonably be questioned, and we take judicial notice thereof."). In contrast, the United States Courts of Appeals for the Ninth and Eleventh Circuits have held that taking judicial notice is inappropriate in APA reviews absent extraordinary circumstances or inadvertent omission from the administrative record. See Compassion Over Killing v. U.S. Food & Drug Admin., 849 F.3d 849, 852 n.1 (9th Cir. 2017); Nat'l Mining Ass'n v. Sec'y U.S. Dep't of Labor, 812 F.3d 843, 875 (11th Cir. 2016).

To fulfill its function under the APA, a reviewing court should engage in a "thorough, probing, in-depth review" of the record before it when determining whether an agency's decision survives arbitrary-or-capricious review. Wyoming v. United States, 279 F.3d 1214, 1238 (10th

Cir. 2002)(citation and internal quotation marks omitted).  The Tenth Circuit explains:

> "[I]n determining whether the agency acted in an 'arbitrary and capricious manner,' we must ensure that the agency 'decision was based on a consideration of the relevant factors' and examine 'whether there has been a clear error of judgment.'"  We consider an agency decision arbitrary and capricious if "the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999)(quoting Friends of the Bow v. Thompson, 124 F.3d 1210, 1215 (10th Cir. 1997)).  Arbitrary-or-capricious review requires a district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions," Olenhouse, 42 F.3d at 1580, but it is not to assess the wisdom or merits of the agency's decision, see Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1172.  The agency must articulate the same rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings.  See SEC v. Chenery Corp., 318 U.S. 80, 92-95 (1943).  While the court may not supply a reasoned basis for the agency's action that the agency does not give itself, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(citation omitted).

### 2.      Reviewing Agency Legal Interpretations.

In promulgating and enforcing regulations, agencies must interpret federal statutes, their own regulations, and the Constitution of the United States of America, and Courts reviewing those interpretations apply three different deference standards, depending on the kind of law at issue.  First, the federal judiciary accords considerable deference to an agency's interpretation of

a statute that Congress has tasked it with enforcing. See United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994). This is known as Chevron deference, named after the supposedly seminal case, Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron").[17] Chevron deference is a two-step process[18] that first asks whether the statutory provision in question is clear and, if it is not, then asks whether the agency's interpretation of the unclear statute is reasonable. As the Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative agency interpretations of their organic statutes laid down by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 . . . (1984). Those directives require that we first determine whether Congress has directly spoken to the precise question at issue. If the congressional intent is clear, we must give effect to that intent. If the statute is silent or ambiguous on that specific issue, we must determine whether the agency's answer is based on a permissible construction of the statute.

---

[17]The case itself is unremarkable, uninstructive, does not explicitly outline the now-familiar two-step process of applying Chevron deference, and does not appear to have been intended to become a "big name" case at all. Its author, the Honorable John Paul Stevens, former Associate Justice of the Supreme Court, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of Chevron deference's greatest detractors in subsequent years. See generally Charles Evans Hughes, Justice Stevens and the Chevron Puzzle, 106 Nw. U. L. Rev. 551 (2012).

[18]There is, additionally, a threshold step -- the so-called step zero -- which asks whether Chevron deference applies to the agency decision at all. See Cass R. Sunstein, Chrevron Step Zero, 92 Va. L. Rev. 187 (2006). Step zero asks: (i) whether the agency is Chevron-qualified, meaning whether the agency involved is the agency charged with administering the statute -- for example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded the deference -- interpretation of contracts, the Constitution, and the agency's own regulations are not afforded Chevron deference, see, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference."); and (iii) whether Congress intended the agency to "speak with the force of law" in making the decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001) -- opinion letters by the agency, for example, do not speak with the force of law and are thus not entitled to Chevron deference, see Christensen v. Harris Cty., 529 U.S. 576 (2000). An affirmative answer to all three inquiries results in the agency's decision passing step zero.

United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d at 238 (citing Chevron, 467 U.S. at 842-43).

Chevron's second step is all but toothless, because if the agency's decision makes it to step two, it is upheld almost without exception. See Ronald M. Levin, The Anatomy of Chevron: Step Two Reconsidered, 72 Chi.-Kent L. Rev. 1253, 1261 (1997)("[T]he Court has never once struck down an agency's interpretation by relying squarely on the second Chevron step."); Jason J. Czarnezki, An Empirical Investigation of Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental Law, 79 U. Colo. L. Rev. 767, 775 (2008)("Due to the difficulty in defining step two, courts rarely strike down agency action under step two, and the Supreme Court has done so arguably only twice."). Courts essentially never conclude that an agency's interpretation of an unclear statute is unreasonable.

Chevron's first step, in contrast, has bite, but there is substantial disagreement about what it means. In an earlier case, the Court noted the varying approaches that different Supreme Court Justices have taken in applying Chevron deference:

> The Court notices a parallel between the doctrine of constitutional avoidance and the Chevron doctrine. Those Justices, such as Justice Scalia, who are most loyal to the doctrines and the most likely to apply them, are also the most likely to keep the "steps" of the doctrines separate: first, determining whether the statute is ambiguous; and, only then, assessing the merits of various permissible interpretations from the first step. These Justices are also the most likely to find that the statute is unambiguous, thus obviating the need to apply the second step of each doctrine. Those Justices more likely to find ambiguity in statutes are more likely to eschew applying the doctrines in the first place, out of their distaste for their second steps -- showing heavy deference to agencies for Chevron doctrine, and upholding facially overbroad statutes, for constitutional avoidance.

Griffin v. Bryant, 30 F. Supp. 3d 1139, 1192 n.23 (D.N.M. 2014)(Browning, J.). A number of policy considerations animate Chevron deference, among them: (i) statutory interpretation, i.e., that Congress, by passing extremely open-ended and vague organic statutes, grants discretionary

power to the agencies to fill in the statutory gaps; (ii) institutional competency, i.e., that agencies are more competent than the courts at filling out the substantive law in their field; (iii) political accountability, i.e., that agencies, as executive bodies ultimately headed by the President of the United States of America, can be held politically accountable for their interpretations; and (iv) efficiency, i.e., that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory state -- found in the Code of Federal Regulations and other places -- than a unified but Circuit-fragmented federal judiciary can.

Second, when agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party was in compliance with them -- courts accord agencies what is known as Auer or Seminole Rock deference.  See Auer v. Robbins, 519 U.S. 452 (1997)("Auer"); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945)("Seminole Rock").  This deference is applied in the same manner as Chevron deference and is substantively identical.  There would be little reason to have a separate name for this doctrine, except that its logical underpinnings are much shakier, and its future is, accordingly, more uncertain.  Justice Scalia, after years of applying the doctrine followed by years of questioning its soundness, finally denounced Auer deference in 2013 in his dissent in Decker v. Northwest Environmental Defense Center, 568 U.S. 597 (2013).  The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice himself:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations."  This is generally called *Seminole Rock* or *Auer* deference.
>
> . . . .

The canonical formulation of *Auer* deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation." But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation. Obviously, that is not enough, or there would be nothing for *Auer* to do. In practice, *Auer* deference is *Chevron* deference applied to regulations rather than statutes. The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.

Our cases have not put forward a persuasive justification for *Auer* deference. The first case to apply it, *Seminole Rock,* offered no justification whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Our later cases provide two principal explanations, neither of which has much to be said for it. First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it. The implied premise of this argument -- that what we are looking for is the agency's *intent* in adopting the rule -- is false. There is true of regulations what is true of statutes. As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means." Whether governing rules are made by the national legislature or an administrative agency, we are bound *by what they say*, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'" That is true enough, and it leads to the conclusion that agencies and not courts should make regulations. But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective. Making regulatory programs effective is the purpose of *rulemaking*, in which the agency uses its "special expertise" to formulate the best rule. But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is." Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience. Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation *will be given effect* if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors. If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for *Auer* deference, though not one that

is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that *Congress* enacted, as we do per *Chevron*, it is *a fortiori* reasonable to defer to them regarding the meaning of *regulations that they themselves crafted*.  To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all.  The theory of *Chevron* (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute.  While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations.  For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands.  "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner."  Congress cannot enlarge its *own* power through *Chevron* -- whatever it leaves vague in the statute will be worked out *by someone else*.  *Chevron* represents a presumption about who, as between the Executive and the Judiciary, that someone else will be.  (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.)  So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else.  Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect.  "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power."  Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it."  And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation.  *Auer* deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures."  *Auer* is not a logical corollary to *Chevron* but a dangerous permission slip for the arrogation of power.

It is true enough that *Auer* deference has the same beneficial pragmatic effect as *Chevron* deference: The country need not endure the uncertainty

produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court. The agency's view can be relied upon, unless it is, so to speak, beyond the pale. But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute. For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear. The circumstances of this case demonstrate the point. While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing. It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here. And there is another respect in which a lack of *Chevron*-type deference has less severe pragmatic consequences for rules than for statutes. In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute. That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from *Auer* deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 568 U.S. at 616-21 (Scalia, J., dissenting)(alterations and emphasis in original)(citations omitted). Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.

Last, courts afford agencies no deference in interpreting the Constitution. See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference. . . . [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))). Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to

interpret -- the Constitution's content. The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation. See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

### 3. **Waiving Sovereign Immunity.**

The APA waives sovereign immunity with respect to non-monetary claims. See 5 U.S.C. § 702. The statute provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States . . . .

5 U.S.C. § 702. Claims for money damages seek monetary relief "to *substitute* for a suffered loss." Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d 1290, 1298 (10th Cir. 2009)(emphasis in original). Claims that do not seek monetary relief or that seek "specific remedies that have the effect of compelling monetary relief" are not claims for monetary damages. Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1298. To determine whether a claim seeks monetary relief, a court must "look beyond the face of the complaint" and assess the plaintiff's prime objective or essential purpose; "[a] plaintiff's prime objective or essential purpose is monetary unless the non-monetary relief sought

has significant prospective effect or considerable value apart from the claim for monetary relief."

Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (internal

quotation marks omitted)(quoting Burkins v. United States, 112 F.3d 444, 449 (10th Cir. 1997)).

The APA's sovereign immunity waiver for claims "seeking relief other than money

damages" does not apply, however, "if any other statute that grants consent to suit expressly or

impliedly forbids the relief which is sought."  5 U.S.C. § 702.  The Tucker Act, 28 U.S.C.

§§ 1346, 1491, permits district courts to hear some claims against the United States, but it also

states that "district courts shall not have jurisdiction of any civil action or claim against the

United States founded upon any express or implied contract with the United States."  28 U.S.C.

§ 1346(a)(2).  It follows that the APA does not waive the United States' sovereign immunity as

to contract claims even when those claims seek relief other than money damages, such as

declaratory or injunctive relief.  See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban

Dev., 554 F.3d at 1295.  Consequently, two questions determine whether the APA waives the

United States' sovereign immunity as to a particular claim: "First, does [the] claim seek 'relief

other than money damages,' such that the APA's general waiver of sovereign immunity is even

implicated?  Second, does the Tucker Act expressly or impliedly forbid the relief that [the

plaintiff] seeks, such that the APA's waiver does not apply?"  Normandy Apartments, Ltd. v.

U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting 5 U.S.C. § 702).

## LAW REGARDING ISSUE EXHAUSTION

As a general matter, parties need "to raise their issues before the agency during the

administrative process in order to preserve those issues for judicial review."  Advocates for

Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1148 (D.C. Cir.

2005).  There are, essentially, two lines of cases articulating this issue exhaustion requirement.

The first line of cases applies when courts review administrative adjudications, and the second applies when courts review administrative rulemaking.

1. **Administrative Adjudication.**

Vis-à-vis administrative adjudication, "requirements of administrative issue exhaustion are largely creatures of statute" or regulations, but courts "have imposed an issue-exhaustion requirement even in the absence of a statute or regulation." Sims v. Apfel, 530 U.S. 103, 107-08 (2000)(citing Marine Mammal Conservancy, Inc. v. Dep't of Agric., 134 F.3d 409, 412 (D.C. Cir. 1998)). "The basis for a judicially imposed issue-exhaustion requirement is an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." Sims v. Apfel, 530 U.S. at 108-09. The Supreme Court explained why fairness to administrative-adjudication litigants requires such an analogy:

> Ordinarily an appellate court does not give consideration to issues not raised below. For our procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact. This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence. And the basic reasons which support this general principle applicable to trial courts make it equally desirable that parties should have an opportunity to offer evidence on the general issues involved in the less formal proceedings before administrative agencies entrusted with the responsibility of fact finding. Recognition of this general principle has caused this Court to say on a number of occasions that the reviewing court should pass by, without decision, questions which were not urged before the Board of Tax Appeals.

Hormel v. Helvering, 312 U.S. 552, 556 (1941). In a different case, the Supreme Court explained why fairness to the agency itself -- as well as fairness to litigants -- justifies an issue exhaustion requirement:

> We have recognized in more than a few decisions . . . that orderly procedure and good administration require that objections to the proceedings of an

administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts. . . . Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.

United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 36-37 (1952)(footnote omitted).

The Supreme Court has recognized, however, that the relationship between administrative tribunals and federal courts is not perfectly analogous to the relationship between trial courts and appellate courts. See Sims v. Apfel, 530 U.S. at 109-10. If an administrative adjudication is not similar to a traditional trial, then the reasons for requiring litigants to initially raise issues at trial do not necessarily apply to that adjudication. See Sims v. Apfel, 530 U.S. at 109 ("[T]he desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding.").

Where the parties are expected to develop the issues in an adversarial administrative proceeding, it seems to us that the rationale for requiring issue exhaustion is at its greatest. . . . Where, by contrast, an administrative proceeding is not adversarial, we think the reasons for a court to require issue exhaustion are much weaker.

Sims v. Apfel, 530 U.S. at 110. Cf. Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1191 (D.N.M. 2010)(Browning, J.)(discussing the Supreme Court's recognized exceptions to the exhaustion requirement). Sims v. Apfel's broad language, which refers to administrative proceedings generally, would, if taken literally, expel issue exhaustion from cases where courts review administrative rulemaking, because agency rulemaking is nothing like adversarial litigation. See 5 U.S.C. § 553 (setting out notice-and-comment procedures for agency rulemaking). Courts have not applied that language literally, however, and the distinct line of

cases outlining issue exhaustion vis-à-vis administrative rulemaking remains good law. See Dep't of Transp. v. Public Citizen, 541 U.S. 752, 764 (2004)(applying -- years after Sims v. Apfel -- a judge-made issue exhaustion requirement while reviewing whether an agency's decisionmaking process in a National Environmental Policy Act, 42 U.S.C. §§ 4321 to 4370m-12 ("NEPA"), case); Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin., 429 F.3d 1136, 1148 (D.C. Cir. 2005) (rejecting an argument that, under Sims v. Apfel, "it is inappropriate to apply the general principles of issue waiver to administrative rulemaking"). See also Jeffrey S. Lubbers, Fail to Comment at Your Own Risk: Does Issue Exhaustion Have a Place in Judicial Review of Rules?, 70 Admin. L. Rev. 109, 142-49 (2018) (collecting post-Sims v. Apfel cases, from United States Courts of Appeals, applying issue exhaustion).

### 2. **Administrative Rulemaking.**

On the flip side, issue exhaustion vis-à-vis rulemaking through the comment process is largely a judicial, not statutory, imposition. See Lubbers, supra, at 124 (stating he has found only two statutes explicitly requiring issue exhaustion in the rulemaking context -- the Clean Air Act, 42 U.S.C. § 7606(d)(7)(B), and the Securities Act of 1934, 15 U.S.C. § 78y(c)(1) -- yet courts are requiring issue exhaustion in unrelated cases). In Department of Transportation v. Public Citizen, the Supreme Court wrote that "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." 541 U.S. at 764 (second alteration in original)(quoting Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, 435 U.S. 519, 553 (1978)). It then stated that the challengers "forfeited any objection to the [Environmental Assessment ("EA")] on the ground that it failed adequately to discuss potential alternatives to the proposed action," because the

challengers had not raised "these particular objections to the EA" in their comments.  Dep't of Transp. v. Public Citizen, 541 U.S. at 764-65.  Further, in deciding a challenge to reimbursement rates under Medicare, the United States Court of Appeals for the Ninth Circuit stuck to its precedent that "a party's failure to make an argument before the administrative agency in comments on a proposed rule barred it from raising that argument on judicial review."  Universal Health Servs. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004)(citing Exxon Mobil Corp. v. EPA, 217 F.3d 1246, 1249 (9th Cir. 2000)).  It also distinguished Sims v. Apfel for "turn[ing] on the unique nature of Social Security benefit proceedings and offer[ing] no guidance relevant to rulemaking."  363 F.3d at 1020.

The Tenth Circuit has also discussed issue exhaustion in the rulemaking context.  Where nobody has made their dissatisfaction with a particular issue known through the comment process, "such issue has been waived."  N.M. Envtl. Improvement Div. v. Thomas, 789 F.2d 825, 835 (10th Cir. 1986).  Courts' "refusal to consider issues not presented to the agency" is sound policy, because courts "may not substitute [their] judgment for that of the agency on matters where the agency has not had an opportunity to make a factual record or apply its expertise."  N.M. Envtl. Improvement Div. v. Thomas, 789 F.2d at 835.  Thus, it is a "well-settled rule" in this circuit that,

> [u]nless the issue with the proposed action is "so obvious that there is no need for a commentator to point [it] out," or some other extraordinary extenuating circumstance exists, failing to raise an issue during the administrative proceedings precludes a plaintiff from later raising that objection for the first time in court.

Village of Logan v. U.S. Dep't of Interior, 557 F. App'x 760, 769 (10th Cir. 2014)(unpublished)(quoting Dep't of Transp. v. Public Citizen, 541 U.S. at 764-65).

The United States Court of Appeals for the Second Circuit has recognized:

> Two kinds of exhaustion doctrine are currently applied by the courts, and the distinction between them is pivotal. Statutory exhaustion requirements are mandatory, and courts are not free to dispense with them. Common law (or "judicial") exhaustion doctrine, in contrast, recognizes judicial discretion to employ a broad array of exceptions that allow a plaintiff to bring his case in district court despite his abandonment of the administrative review process.

Bastek v. Federal Crop Ins., 145 F.3d 90, 94 (2d Cir. 1998). See also Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d 1123, 1165 (D.N.M. 2015)(Browning, J.). The courts have thus created some exceptions to waiver. For example, because it is the agency's responsibility to ensure compliance with its enabling statute, when the agency produces and relies on a report with obvious flaws, "there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." Dep't of Transp. v. Public Citizen, 541 U.S. at 765. Other courts have recognized a number of limits on the issue exhaustion doctrine in the rulemaking context, such as the "key assumption" rule and where an agency has shown an awareness of the issue. Lubbers, supra, at 149-55.

## ANALYSIS

While the Court is not convinced that HHS' Motion satisfies rule 59(e) standards in asking the Court to reconsider its MOO, the Court has reconsidered its ruling. There are a number of problems with HHS' prior position and its current position regarding the risk adjustment program. HHS has flip-flopped between stating that Congress designed the program to be budget neutral and that the program must be budget neutral because of a lack of funding authority. Many of HHS' problems with the Court's MOO start with this change in position. Now that HHS has abandoned its view that the statute compelled budget neutrality, it must come to grips with the reality that it -- not Congress -- made the decision to embrace budget neutrality. Once HHS grips that reality, it must decide what to do following the Court's conclusion that this

decision was arbitrary and capricious. The Court stands by both its initial determination that

HHS' risk adjustment formula is arbitrary and capricious and that vacating the formula and

remanding to HHS for further consideration is the appropriate remedy. Accordingly, the Court

denies the Motion.

I.      **HHS' DECISION TO USE THE STATEWIDE AVERAGE PREMIUM IN ITS
        RISK ADJUSTMENT FORMULA -- INSTEAD OF EACH INSURER'S OWN
        <u>AVERAGE PREMIUM -- WAS ARBITRARY AND CAPRICIOUS.</u>**

HHS began to consider how to structure risk adjustment -- and whether to use state

average premiums or insurer average premiums when determining risk adjustment transfers -- on

July 15, 2011:

> We believe the payments and charges methodology should mitigate the financial
> impact of adverse selection on risk adjustment covered plans, while limiting
> overall issuer uncertainty. We have identified two methods that may achieve
> those goals -- multiplying plan average actuarial risk by the State average
> normalized premiums and multiplying plan average actuarial risk by the specific
> premiums collected for each plan. To determine the precise value of payments
> and charges using State average normalized premiums, plan average premiums
> are first normalized to the actuarial value of their benefits by dividing each plan's
> premiums by the plan's actuarial value. . . . .
>
> Next, States would use these normalized average premiums as the basis
> for the State normalized average premiums, weighted by enrollee months, for all
> plans in a specific risk pool. . . . Next, the amount by which a plan's average
> actuarial risk deviates from the state average actuarial risk is calculated. . . .
>
> The alternative methodology uses plan-specific premiums as the basis for
> calculating the gross plan charges and gross plan payments, assuming that health
> plan premiums reflect State average actuarial risk and the expectation that risk
> adjustment accounts for favorable or adverse selection. Under this methodology,
> the deviation in actuarial risk is multiplied by the aggregated plan premiums to
> determine the gross plan charges and total plan payments that should be collected
> from or disbursed to health plans through risk adjustment.

Standard Related to Reinsurance, Risk Corridors and Risk Adjustment, 76 Fed. Reg. 41,930,

41,939 (dated July 15, 2011)(A.R.000011)("Standards"). Two months later, HHS published a

more detailed analysis regarding the two alternatives that the Standards set out, <u>i.e.</u>, using state

average premiums and using each insurer's average premium. See Risk Adjustment Implementation Issues at 14 (dated September 12, 2011)(A.R.004380)("White Paper")("The [Standards] identified two basic approaches to establish the baseline premium; this section expands discussion."). HHS relied on that analysis when it published its proposed risk adjustment methodology. See HHS Notice of Benefit and Payment Parameters for 2014, 77 Fed. Reg. 73,118, 73,139 (A.R.000134)("2014 Proposed Rule")("In the Risk Adjustment White Paper, we presented several approaches for calculating risk adjustment transfers using the State average premium and plans' own premiums."). The proposed rule used state average premiums in its risk adjustment formula. See 2014 Proposed Rule, 77 Fed. Reg. at 73,139 (A.R.000134). In March 2013, HHS finalized its "proposal to base the payment transfer formula on the State average premium." 2014 Final Rule, 78 Fed. Reg. at 15,432 (A.R.000249).

In the MOO, the Court identified an unexplained gap in HHS' reasoning. Throughout its decision-making process, HHS acted as if risk adjustment charges must equal risk adjustment payments. See 2014 Final Rule, 78 Fed. Reg. at 15,441 (A.R.000258)("The Affordable Care Act risk adjustment program is designed to be a budget-neutral revenue redistribution among issuers."); 2014 Proposed Rule, 77 Fed. Reg. at 73,139 (A.R.000134)("The approaches that used plans' own premiums resulted in unbalanced payment transfers, requiring a balancing adjustment to yield transfers that net to zero."); White Paper at 15 (A.R.000661)("Since payment and charge transfers will be budget neutral, a method is needed to balance them if payments are greater than charges or vice versa."). HHS never articulated why it acted as if budget neutrality were a risk adjustment requirement, but the Court inferred that HHS believed that the ACA requires budget neutrality from the agency's statement that, "[t]he Affordable Care Act risk adjustment program is designed to be a budget-neutral revenue distribution among issuers." 2014 Final Rule, 78 Fed.

Reg. at 15,441 (A.R.000258). The Court determined, however, that the ACA imposes no such requirement.[19] The Court also considered the possibility that HHS decided to impose a budget-neutrality requirement for public policy reasons, but the Court could find no indication that HHS actually made such a decision. Consequently, the Court concluded that HHS did not adequately explain its decision to employ state average premiums in its risk adjustment formula instead of using each insurer's own premium.

HHS now launches a three-pronged attack on the Court's conclusion. First, HHS argues that, "under black-letter principles of administrative law, HHS was not required to explain -- and NMHC was largely foreclosed from challenging -- HHS's budget-neutral approach to the risk adjustment program, because at no point during the 2014-2017 rulemakings did NMHC or any other commenter challenge or question that approach." Motion at 2. Second, HHS contends that "Congress's failure to appropriate additional funds for risk-adjustment payments" means risk adjustment charges were the only funds available for risk adjustment payments, so "HHS's budget-neutral approach was not a discretionary policy choice." Motion at 2-3. Third, HHS avers that, "even if HHS had possessed the requisite budget authority to implement the program in a manner that was not budget neutral . . . any decision about whether to exercise that authority would not have been subject to judicial review." Motion at 3. Each of those prongs fails, however.

---

[19]HHS does not challenge the Court's determination that the ACA neither requires nor forbids risk adjustment to be operated budget neutrally, see MOO at 60, 312 F. Supp. 3d at 1206; in fact, HHS' litigation position is that it "has never contended that the text of section 1342 [codified at 42 U.S.C. § 18063] requires the program to be budget neutral," just that it was "designed" that way, Motion at 12.

## A. THE WAIVER RULE DOES NOT FORECLOSE HEALTH CONNECTIONS' CHALLENGE TO HHS' DECISION.

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125 (2016). Administrative agencies "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins., 463 U.S. 29, 43 (1983)(quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies . . . .

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins., 463 U.S. at 43. "[A] reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins., 463 U.S. at 42.

The scope of an agency's obligation to explain -- vis-à-vis informal rulemaking -- depends, in part, on the notice and comment process. The agency must publish its proposed rule in the Federal Register, see 5 U.S.C. § 553(b), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). The agency must then "consider[] the relevant matter presented" and "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). While "a reviewing court may not set aside an agency rule that is rational,

based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute," <u>Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto Ins.</u>, 463 U.S. at 42, "[a]n agency's failure to respond to relevant and significant public comments generally 'demonstrates that the agency's decision was not based on a consideration of the relevant factors,'" <u>Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin</u>, 741 F.3d 1309, 1312 (D.C. Cir. 2014). Thus, agencies act arbitrarily and capriciously when they fail to respond to a comment raising a significant problem with a proposed rule.

If no commenter raises a potential problem, however, then the agency has no duty to address that problem or to "respond" to a non-existent comment. <u>See</u> <u>Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.</u>, 429 F.3d 1136, 1150 (D.C. Cir. 2005)("[A] party will normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration."). <u>See also</u> <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.</u>, 463 U.S. at 51 ("Nor do we broadly require an agency to consider all policy alternatives in reaching decision."). The Tenth Circuit has applied this rule:

> The EPA solicited comments on the very issue that [the plaintiff, EID,] now protests. Neither EID nor anyone else advanced any dissatisfaction to the EPA through comments and documents in the record. Under these circumstances, we hold that such issue has been waived. If EID wished that the EPA consider a different formula which required EPA to study other information, it had a responsibility to place such information in the record.
>
> EID was obligated to make its record before the agency. It failed to do so. Thus, we decline to consider any inferences which EID urges upon us for the first time on appeal.

<u>N.M. Envtl. Improvement Div. v. Thomas</u>, 789 F.2d at 835. Judicial restraint is one rationale for this waiver rule, <u>i.e.</u>, "the courts are not authorized to second-guess agency rulemaking

decisions; rather, the role of the court is to determine whether the agency's decision is arbitrary and capricious for want of reasoned decisionmaking." Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d at 1150.  Another rationale is that it would be unfair to overturn an administrative decision unless the agency had a chance to consider the issue, i.e., unless the agency "has erred against objection made at the appropriate time under its practice." Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d at 1150 (internal quotation marks omitted)(quoting United States v. L.A. Tucker Trucker Lines, 344 U.S. at 37).  The Court refers to this rule as an issue exhaustion requirement.  See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 61 F. Supp. 3d 1013, 1064 (D.N.M. 2014)(Browning, J.)("[T]he Court finds that the Plaintiffs did not satisfy the issue-exhaustion requirement in the proceedings before the Forest Service, because they did not specifically raise their First Amendment retaliation issue in a way that the Forest Service could be expected to understand and respond to it.").

The waiver rule does not apply, however, when an agency, for whatever reason, considers a potential issue.  See Garcia-Carbajal v. Holder, 625 F.3d 1233, 1238 (10th Cir. 2010)(Gorsuch, J.)("If the BIA decides an argument is worth *sua sponte* taking up and issuing a final agency decision on, thereby exhausting all available agency processes to hear and resolve that argument, we will not stand in its way."); NRDC v. EPA, 824 F.2d 1146, 1151 (D.C. Cir. 1987)(en banc)("This court has excused the exhaustion requirements for a particular issue when the agency has in fact considered the issue.").  If an agency addresses an issue -- even if the agency does so on its own initiative -- then an administrative record exists for a court to review; likewise, when an agency addresses an issue sua sponte, then the agency had a fair opportunity to consider the issue.  For example, the en banc United States Court of Appeals for the District of

Columbia Circuit permitted the Natural Resource Defense Council ("NRDC"), which "did not participate in the rulemaking proceedings," to challenge an EPA rule, because the EPA's notice of proposed rulemaking made it "clear that the EPA actually did consider the issue raised by the NRDC." NRDC v. EPA, 824 F.2d at 1250-51.

HHS considered whether to use each insurer's average premium instead of state average premiums when calculating risk adjustment transfers. See Standards, 76 Fed. Reg. at 41,939 (A.R.000011). HHS sets out its reasoning in the 2014 Proposed Rule:

> In the Risk Adjustment White Paper, we presented several approaches for calculating risk adjustment transfers using the State average premium and plans' own premiums. The approaches that used plans' own premiums resulted in unbalanced payment transfers, requiring a balancing adjustment to yield transfers that net to zero. These examples also demonstrated that the balancing adjustments could introduce differences in premiums across plans that were not consistent with features of the plan . . . . A balancing adjustment would likely vary from year to year, and could add uncertainty to the rate development process . . . .

> Therefore, we propose a payment transfer formula that is based on the State average premium for the applicable market, as described in section III.B.3.a. of this proposed rule. The State average premium provides a straightforward and predictable benchmark for estimating transfers. As shown in the examples in the Risk Adjustment White Paper, transfers net to zero when the State average premium is used as the basis for calculating transfers.

2014 Proposed Rule, 77 Fed. Reg. at 73,139 (A.R.000134). It was, accordingly, appropriate for the Court, in its MOO, to review whether HHS' reasoning underlying that decision passes muster under the APA. See Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d at 1150 ("[T]he courts are not authorized to second-guess agency rulemaking decisions; rather, the role of the court is to determine whether the agency's decision is arbitrary and capricious for want of reasoned decisionmaking.").

HHS argues, on the contrary, that "the Court's holding is based on a claim . . . that HHS's budget-neutral approach was independently arbitrary and capricious for lack of a satisfactory explanation for the basis of that approach." Motion at 11. That characterization of the MOO is not accurate, because the Court considered budget neutrality only insofar as HHS implicitly used budget neutrality to justify its decision to base its risk adjustment formula on statewide average premiums. See MOO at 67, 312 F. Supp. 3d at 1209 ("That HHS erroneously reads the ACA's risk adjustment provisions to require risk adjustment payments equal risk adjustment charges infects its analysis of the relative merits of using a state's average premium when calculating risk adjustment transfers instead of using a plan's own premium."). Specifically, HHS justified its decision to structure its risk adjustment formula using statewide average premiums by identifying problems that an alternative formula using each insurer's average premium would produce. See 2014 Proposed Rule, 77 Fed. Reg. at 73,139 (A.R.000134)("[A]pproaches that used plans' own premiums resulted in unbalanced payment transfers, requiring a balancing adjustment to yield transfers that net to zero."); 2014 Proposed Rule, 77 Fed. Reg. at 73,139 (identifying problems that a balancing adjustment would produce). The Court recognized that those problems arise only if risk adjustment payments must equal risk adjustment transfers, so HHS' reasoning implicitly assumes that risk adjustment must be budget neutral. See MOO at 67, 312 F. Supp. 3d at 1209 (recognizing that, if risk adjustment does not need to be budget neutral, then "HHS' risk adjustment methodology could use a plan's own premium instead of a state's average premium without imposing a balancing adjustment," in which case, "the problems that HHS identifies with imposing a balancing adjustment . . . do not justify HHS' aversion to using a plan's own premium to calculate risk adjustment transfers").

In an effort to discern HHS' analytical path, the Court considered the possibility that HHS' budget-neutrality assumption reflects a conscious decision on the agency's part to structure risk adjustment in a budget neutral way.  See MOO at 66-68, 312 F. Supp. 3d at 1209. See also Encino Motorcars, LLC v. Navarro, 136 S. Ct. at 2125 (stating that an agency's obligation to explain its decisions "is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'"  (quoting Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974))); In re FCC 11-161, 753 F.3d 1015, 1115 (10th Cir. 2014)(permitting courts to rely on an agency's implicitly adopted rationales when reviewing agency action, if they reflect a "fair and considered judgment"  (internal quotation marks omitted)(quoting S. Utah Wilderness All. v. Office of Surface Mining Reclamation & Enf't, 620 F.3d 1227, 1236 (10th Cir. 2010))).   The Court ruled out that possibility, because the administrative record indicates that HHS did not actually make such a decision.  See MOO at 69, 312 F. Supp. 3d at 1210 ("That HHS, in designing its risk adjustment methodology, never considered whether budget neutrality was sound public policy means that HHS cannot now appeal to budget neutrality's public policy benefits to justify its decision.").  See also Encino Motorcars, LLC v. Navarro, 136 S. Ct. at 2127 ("It is not the role of the courts to speculate on reasons that might have supported an agency's decision.").  The administrative record indicates instead that HHS believed that the ACA requires risk adjustment and that "HHS' only decision" -- vis-à-vis budget neutrality -- was "to comply with a supposed statutory requirement."  MOO at 68, 312 F. Supp. 3d at 1210.  See 2014 Final Rule, 78 Fed. Reg. at 15,441 (A.R.000258)("The Affordable Care Act risk adjustment program is designed to be a budget-neutral revenue redistribution among issuers.").  Because the ACA is unambiguous insofar as it imposes no such requirement, see MOO at 62-63, 312 F. Supp. 3d at 1207, the Court concluded that HHS did not

sufficiently explain its reasons for using statewide average premiums in its risk adjustment formula by articulating a rational connection between the facts it found and the choice the agency made, see MOO at 70-71, 312 F. Supp. 3d at 1211-21.

### B. HHS WAS FREE TO ADOPT A RISK ADJUSTMENT FORMULA THAT DID NOT, AS A MATTER OF MATHEMATICS, GUARANTEE BUDGET NEUTRALITY.

HHS argues that "binding principles of constitutional and appropriations law . . . mandated budget neutrality in light of Congress's failure to appropriate additional funds." Motion at 13. It follows, according to HHS, that the agency's assumption that risk adjustment payments must equal risk adjustment charges was valid, so the agency's decision to base its risk adjustment formula on state average premiums -- which relied on that assumption -- was not arbitrary and capricious.[20] The keystone of HHS' appropriations argument is the agency's

---

[20]HHS cannot use an appeal to appropriations law to justify the structure of its risk adjustment formula vis-à-vis the 2014-2017 benefits years, because the administrative record contains no indication that HHS actually employed this line of reasoning when adopting the risk adjustment formula for those years. See Burlington Truck Lines, Inc. v. United States, 371 U.S. at 168-69 ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; [SEC v. Chenery Corp., 332 U.S. 194 (1947)] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself . . . ."). See also Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213 (1988)("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); Inv. Co. Inst. v. Camp, 401 U.S. 617, 628 (1971)("Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.").

Nevertheless, the Court must grapple with the substance of HHS' appropriations argument for two reasons. First, the 2018 Final Rule contains an oblique reference to HHS' appropriations constraints, which the Court reads as a terse presentation of the Motion's appropriations argument:

A few commenters noted that the budget neutrality of the risk adjustment program leads to inadequate compensation for enrollees' risk and recommended a non-budget neutral risk adjustment program as with Medicare Advantage. . . .

Response: In the absence of additional funding for the HHS-operated risk

assertion that -- because HHS cannot compel the states to subsidize risk adjustment, and no congressional appropriation for risk adjustment exists -- risk adjustment charges are the only available funding source for risk adjustment payments. <u>See</u> Motion at 15 ("HHS could not -- absent another source of appropriations -- have designed the risk adjustment program in a way that required payments in excess of collections consistent with binding appropriations law.").

That keystone assertion is false. The ACA contemplates risk adjustment as a state-run program, <u>see</u> 42 U.S.C. § 18063(a) (directing states to "assess" risk adjustment charges and to "provide" risk adjustment payments), so the ACA does not appropriate any federal funds for that state-run program. The ACA assigns risk adjustment responsibilities to HHS only if a state fails to establish an Exchange or does not take the actions the HHS Secretary determines necessary to implement risk adjustment. <u>See</u> 42 U.S.C. § 18041(c). When HHS implements risk adjustment, the ACA authorizes it to "take such actions as are necessary" for that purpose, 42 U.S.C.

---

adjustment program, we continue to calculate risk adjustment transfers in a budget neutral manner and note that Medicare Part D risk adjustment transfers are also calculated in a budget neutral manner.

2018 Final Rule, 81 Fed. Reg. at 94,101 (A.R.009638). <u>See</u> <u>Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.</u>, 419 U.S. at 286 (requiring courts to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). Second, even though the administrative record contains no indication that HHS considered appropriations law when crafting its risk adjustment formula for 2014-2017, the agency argues that, "given the constitutional and budgetary constraints limiting HHS's discretion, the agency's failure to explain its approach . . . was harmless." Motion at 18 n.8. <u>See</u> 5 U.S.C. § 706(2) (admonishing courts reviewing administrative decisions that "due account shall be taken of the rule of prejudicial error"). According to HHS, Congress' failure to appropriate money for risk adjustment prevented the agency from adopting a non-budget-neutral risk adjustment formula, so failing to consider such formulae could not have affected the outcome, <u>i.e.</u>, it was harmless error. <u>See</u> Motion at 18 n.8; Tr. at 34:7-10 (Powers)("I think that our main point is that if that was an error, the failure to consider those alternatives, or discuss those issues, that was an error that's harmless."). <u>See</u> also <u>PDK Labs. Inc. v. U.S. Drug Enf't Admin.</u>, 362 F.3d 786, 799 (D.C. Cir. 2004)("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule . . . . If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

§ 18041(c)(1), but that authorization is not an appropriation, so it does not permit HHS to spend any federal money -- including the risk adjustment charges that HHS collects -- on risk adjustment payments, see U.S. Const. art. I, § 9, cl. 7 ("No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."); 31 U.S.C. § 1301(d) ("A law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made . . . ."). See also Government Accountability Office, Principles of Federal Appropriations Law 2-23 (4th ed. 2016)("GAO Redbook")("Though the making of an appropriation must be expressly stated, a statute need not use the word 'appropriation.' If the statute contains a specific direction to pay and a designation of the funds to be used . . . then this amounts to an appropriation.").[21]

Instead, HHS must rely on the CMS program management appropriation to fund risk adjustment payments when HHS implements risk adjustment on behalf of the states.[22] That

---

[21]The GAO publishes the GAO Redbook, which is a treatise on federal fiscal law. The GAO advises other agencies, such as HHS, on federal appropriations law. See Appropriations Law, GAO: U.S. Gov't Accountability Off., https://www.gao.gov/legal/appropriations-law-decisions (last visited Oct. 10, 2018).

[22]HHS is correct that, even though it operates risk adjustment on behalf of the states, anti-commandeering principles prevent the agency from requiring the states to subsidize risk adjustment. See Hodel v. Va. Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 288 (1981)(concluding that a regulatory scheme that permitted -- but did not require -- states to implement federal standards was permissible, because "the States are not compelled to enforce the . . . standards, to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever"). Because HHS cannot pry open the coffers of state governments, HHS must operate risk adjustment with federal funds exclusively.

It is not true, however, that HHS' inability to force states to spend money on risk adjustment requires HHS' risk adjustment methodology to be budget neutral. See Reply at 9 (asserting that a non-budget neutral risk adjustment methodology would be unconstitutional, because HHS cannot require states to fund risk adjustment and the ACA tasks HHS with crafting a risk adjustment methodology "that could be used by states to administer their own risk adjustment programs"). The ACA directs HHS to establish "criteria and methods" for risk adjustment, 42 U.S.C. § 18063(b), "which a State may either implement itself or yield to a

appropriation provides a fixed dollar amount, i.e., a $3,669,744,000 lump sum, to CMS "[f]or carrying out" enumerated statutory provisions as well as CMS' "other responsibilities," and it supplements that fixed dollar amount with "such sums as may be collected from authorized user fees." Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2477-78 (2014)(appropriating money for fiscal year 2015)("Program Management Appropriation").[23] Because HHS delegated to CMS its responsibility, under 42 U.S.C. § 18041(c)(1), to implement risk adjustment programs on behalf of states that fail to do so for themselves -- which is to say, all of them, see supra at 5-6 -- making risk adjustment payments is one of CMS' responsibilities. See Delegation of Authorities, 76 Fed. Reg. 53,903, 53,903-04 (dated Aug. 30, 2011). CMS can, thus, spend its program management funds -- including both CMS' lump sum and the user fees it collects, e.g., risk adjustment charges -- to make risk

_____

federally administered program," Hodel v. Va. Mining & Reclamation Ass'n, Inc., 452 U.S. at 289. See 42 U.S.C. § 18041(c) (directing HHS to implement risk adjustment for states that elect not to do so for themselves). Because states can choose not to implement risk adjustment, in which case "the full regulatory burden will be borne by the Federal Government," non-budget neutral risk adjustment regulations would not compel states to spend their own funds on risk adjustment. Hodel v. Va. Mining & Reclamation Ass'n, Inc., 452 U.S. at 288. Risk adjustment is, thus, "a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." Hodel v. Va. Mining & Reclamation Ass'n, Inc., 452 U.S. at 289.

[23]Public Law 113-235 contains CMS' program management appropriation for the 2015 fiscal year -- during which HHS collected risk adjustment charges and made risk adjustment payments for the 2014 benefits year -- but Congress made program management appropriations for the 2016-2018 fiscal years that are identical in all relevant respects, including the funding amount. See Consolidated Appropriations Act, Pub. L. No. 115-141, 132 Stat. 348, 726-27 (2018)(appropriating money for fiscal year 2018); Consolidated Appropriations Act, Pub. L. No. 115-31, 131 Stat. 135, 530 (2017)(appropriating money for fiscal year 2017); Consolidated Appropriations Act, Pub. L. No. 114-113, 129 Stat. 2242, 2611 (2015)(appropriating money for fiscal year 2016).

adjustment payments.  See 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.").

No federal agency or court has addressed whether the $3,669,744,000 lump sum portion of CMS' program management appropriation can fund risk adjustment, but authorities analyzing whether that appropriation can fund an analogous premium stabilization program -- the risk corridors program -- confirm the Court's conclusion regarding risk adjustment.  The ACA directs HHS to "establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016."  42 U.S.C. § 18062(a).  As part of that risk corridors program, HHS collects money from insurers with low costs and makes payments to insurers with high costs.  See 42 U.S.C. § 18062(b).

On February 7, 2014, then-Senator Jeff Sessions requested an opinion from the GAO "regarding the availability of appropriations to make payments to qualified health plans pursuant to . . . 42 U.S.C. § 18062," i.e., risk corridors payments.  Dep't of Health & Human Servs.-Risk Corridors Program, B-325630, 2014 WL 4825237, at *1 (Comp. Gen. Sept. 30, 2014)("GAO Report").  The GAO Report provides that opinion, and it concludes: (i) making risk corridors payments is one of CMS' "other responsibilities"; (ii) CMS can use the lump sum portion of its program management appropriation on risk corridors payments; and (iii) CMS can use risk corridors charges to fund risk corridors payments, because those charges are "sums as may be collected from authorized user fees."  GAO Report, 2014 WL 4825237, at *3 (internal quotation marks omitted)(quoting Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5, 374 (2014)).  Thus, the GAO Report implicitly rejects HHS' argument that its "underlying budget requests reflect [that] the Program Management lump sum is for *program management expenses*, such as administrative costs . . . not for program payments themselves."  Motion at 16

(emphasis in original).[24]  The GAO Report, as an opinion letter, does not receive <u>Chevron</u>

deference, <u>see</u> <u>Christensen v. Harris Cty.</u>, 529 U.S. 576, 587 (2000), but it is still entitled to

respect as "a body of experience and informed judgment to which courts and litigants may

properly resort for guidance," <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944).  <u>See</u> <u>Moda</u>,

892 F.3d at 1326 (considering the GAO report and concluding that "GAO's opinion was

correct").

The Federal Circuit's decision in <u>Moda</u> also supports the Court's conclusion that the

Program Management Appropriation is available for risk adjustment payments.  According to the

Federal Circuit, the GAO Report accurately identifies the two possible funding sources for risk

corridors payment -- the user fees that CMS collects, <u>e.g.</u>, risk corridors charges, and the

_____

[24]Additionally, the GAO Redbook explicitly rejects the notion that HHS' underlying budget requests restrict the Program Management Appropriation's permissible uses:

> How much flexibility does an agency have in spending a lump-sum appropriation?  Is it legally bound by its original budget estimate or by expressions of intent in legislative history?  How is the agency's legitimate need for administrative flexibility balanced against the constitutional role of the Congress as controller of the public purse?
>
> . . . .
>
> The answer to these questions is one of the most important principles of appropriations law.  The rule, simply stated, is this: Restrictions on a lump-sum appropriation contained in the agency's budget request or in legislative history are not legally binding on the department or agency unless they are carried into (specified in) the appropriation act itself, or unless some other statute restricts the agency's spending flexibility.  This is an application of the fundamental principle of statutory construction that legislative history is not law and carries no legal significance unless "anchored in the text of the statute." *Shannon v. United States*, 512 U.S. 573, 583 (1994).  Of course, the agency cannot exceed the total amount of the lump-sum appropriation, and its spending must not violate other applicable statutory restrictions.  The rule applies equally whether the legislative history is mere acquiescence in the agency's budget request or an affirmative expression of intent.

GAO Redbook at 6-6 to 6-7 (3d ed. 2006)(footnotes omitted).

$3,669,744,000 lump sum portion of the Program Management Appropriation, see Moda, 892 F.3d at 1326, but subsequently adopted appropriations riders to prevent the lump sum from funding risk corridors payments, see Moda, 892 F.3d at 1319. The Federal Circuit concludes that those riders evince a congressional intent to cap the United States' liability for risk corridors payments so that those payments would never exceed the risk corridors charges that the United States collects, i.e., the appropriations riders impose a de facto budget neutrality requirement. See Moda, 892 F.3d at 1325-26. Those riders refer to risk corridors payments only, Moda, 892 F.3d at 1319, so they do not apply to risk adjustment payments; it follows that the lump sum portion of the Program Management Appropriation can fund those payments and no de facto budget neutrality requirement applies to them.

HHS tries to distinguish Moda by observing that the Anti-Deficiency Act restrains the agency's ability to design its risk adjustment formula in a way that is not budget neutral, whereas Congress faced no such restriction when it enacted the risk corridors formula. See Notice Response at 1-2. Whether the Anti-Deficiency Act applies, however, is irrelevant to whether the lump sum portion of the Program Management Appropriation is available for risk adjustment payments. The Anti-Deficiency Act prevents "[a]n officer or employee of the United States Government" from incurring obligations "exceeding an amount available in an appropriation" or "before an appropriation is made"; it says nothing about whether particular funds are available for a particular purpose. 31 U.S.C. § 1341(a)(1). Thus, while HHS' observation is accurate -- Congress is not an officer or employee of the United States -- it does not successfully distinguish Moda; the Anti-Deficiency Act restricts agency action absent an available appropriation, but it is silent on whether a particular appropriation is available for a particular purpose. Consequently, the Federal Circuit's and the GAO's analysis concluding that the lump sum portion of the

Program Management Appropriation is available for risk corridors payments applies equally to risk adjustment payments. That this lump sum is available for risk adjustment payments means that HHS could have adopted a risk adjustment formula where risk adjustment payments might exceed risk adjustment charges.

### C. WHETHER TO USE STATEWIDE AVERAGE PREMIUMS IN ITS RISK ADJUSTMENT FORMULA IS NOT A DECISION COMMITTED SOLELY TO HHS' DISCRETION.

HHS argues that, even if it "had the authority to design the risk adjustment program in a non-budget neutral matter, its decision not to exercise that authority would be committed to agency discretion as a matter of law and thus exempted from judicial review." Motion at 19. HHS is correct that courts cannot substantively review an agency's choices regarding how to spend lump sum appropriations. See Lincoln v. Vigil, 508 U.S. 182, 192 (1993)("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."); Lincoln v. Vigil, 508 U.S. at 193 ("[A]s long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude."). "[E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985). That a court cannot evaluate the substance of an agency decision does not mean, however, that courts cannot evaluate whether the agency followed appropriate procedures in reaching that decision. See Lincoln v. Vigil, 508 U.S. at 190, 195 (analyzing "whether it was error for the Court of Appeals to hold the substance of the Service's decision to terminate the Program reviewable under the APA" separately from whether "the

Court of Appeals's holding, . . . that before terminating the Program the Service was required to abide by the familiar notice-and-comment rulemaking provisions of the APA," was erroneous).

The Court does not agree with HHS' argument, for two distinct reasons. First, in its MOO, the Court reviews HHS' decision to use statewide average premiums rather than each insurer's own average premium in the agency's risk adjustment formula, and not a decision to spend the lump sum portion of the Program Management Appropriation on other priorities. See MOO at 67, 312 F. Supp. 3d at 1209 (reviewing HHS' "analysis of the relative merits of using a state's average premium when calculating risk adjustment transfers instead of using a plan's own premium"). Far from reviewing an agency decision regarding budget priorities, the Court concluded that HHS made no such decision when crafting its risk adjustment formula. See MOO at 68, 312 F. Supp. 3d at 1210 ("HHS never articulates any public policy decision to operate risk adjustment in a budget neutral way; HHS' only decision is to comply with a supposed statutory requirement."). Second, the Court does not, in its MOO, take issue with the substance of HHS' decision; instead, it concludes that HHS fails to satisfactorily explain its decision's rationale. See MOO at 70, 312 F. Supp. 3d at 1211 ("HHS offers, in its briefing, sound policy reasons for using the statewide average premium instead of the issuer's own premium . . . the agency does not, however articulate those reasons in the [administrative] record."). Hence, the Court does not -- in concluding that HHS acted arbitrarily and capriciously -- violate the APA by reviewing an action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

II.     **VACATUR IS THE APPROPRIATE REMEDY.**

According to the Tenth Circuit, when a Court concludes that an agency action is arbitrary and capricious, "[v]acatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts."     WildEarth Guardians v. U.S. Bureau of Land

Mgmt., 870 F.3d at 1239.  WildEarth Guardians v. United States Bureau of Land Management

does not cite any authority for that proposition.  See 840 F.3d at 1239.  The Tenth Circuit's

assertion that vacatur is a form of injunctive relief implies that the traditional standard for

injunctive relief applies to vacatur under the APA:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

The Tenth Circuit has not, however, performed the traditional four-factor inquiry when

vacating agency action -- or ordering a district court to vacate agency action on remand -- under

the APA, which suggests that the Tenth Circuit does not fully treat vacatur as injunctive relief.

See, e.g., Utah Envtl. Cong. v. Bosworth, 439 F.3d 1184, 1195 (10th Cir. 2006)(concluding that

the United States Forestry Service acted arbitrarily and capriciously for failing to comply with

the Endangered Species Act, 16 U.S.C. §§ 1531-44, and vacating the agency's action without

any further analysis).  See also WildEarth Guardians v. U.S. Bureau of Land Mgmt., 870 F.3d at

1239-40 (treating Utah Envtl. Cong. v. Bosworth and similar cases as good law).  Further, the

APA's text indicates that vacatur is the mandatory remedy for arbitrary and capricious agency

action, which is at odds with the Tenth Circuit's statement that vacatur is a form of injunctive

relief.  See 5 U.S.C. § 706 ("The reviewing court shall . . . hold unlawful and set aside agency

action, findings, and conclusion found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law . . . .").[25]  See also Murphy v. Smith, 138 S. Ct. 784, 787

(2018)(Gorsuch, J.)("[T]he word 'shall' usually creates a mandate, not a liberty, so the verb

phrase 'shall be applied' tells us that the district court has some nondiscretionary duty to

perform."  (quoting 42 U.S.C. § 1997e(d)(2))); Lexecon Inc. v. Milberg Weiss Bershad Hynes &

Lerach, 523 U.S. 26, 35 (1998)("The Panel's instruction comes in terms of the mandatory 'shall,'

which normally creates an obligation impervious to judicial discretion.").  Likewise, Supreme

Court precedent indicates that vacatur and injunctions are distinct types of relief:

> An injunction is a drastic and extraordinary remedy, which should not be granted
> as a matter of course.  If a less drastic remedy (such as partial or complete vacatur
> of [the agency's] deregulation decision) was sufficient to redress respondents'
> injury, no recourse to the additional and extraordinary relief of an injunction was
> warranted.

Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165-66 (2010).  Consequently, the Court

concludes that WildEarth Guardians v. United States Bureau of Land Management indicates that

---

[25]On a clean slate, the Court would rely on the plain language, and not consider remand without vacatur.  See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985)("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").  Wandering into the equities of vacatur is not what the APA has directed the courts to consider or what Congress dictated.  See 5 U.S.C. § 706(2)(A); Diné Citizens Against Ruining Our Env't v. Jewell, 312 F. Supp. 3d 1031, 1110 (D.N.M. 2018)(Browning, J.)(discussing how "the presumption is in favor of vacatur instead of remand without vacatur" and that the "statute's mandatory language supports that proposition"); Brian S. Prestes, Remanding Without Vacating Agency Action, 32 Seton Hall L. Rev. 108, 129-50 (2001)(discussing the legal arguments for and against remand without vacatur, and concluding the strongest argument is that against remand without vacatur as a remedy under the APA).  See also, e.g., Kristin E. Hickman & Mark Thomson, Open Minds and Harmless Errors: Judicial Review of Postpromulgation Notice and Comment, 101 Cornell L. Rev. 261, 304-05 (2016)(discussing some issues with remand without vacatur as a remedy); Daniel B. Rodriguez, Of Gift Horses and Great Expectations: Remand Without Vacatur in Administrative Law, 36 Ariz. St. L.J. 599, 601 (2004)(discussing how remand without vacatur is used "to temper the draconian impact of hard look review," but that it "should be disfavored precisely because it facilitates the use of more aggressive judicial scrutiny of agencies' reasoning process").  Given that the Tenth Circuit has endorsed the idea of remand without vacatur, the Court will consider fully HHS' request.

vacatur under the APA is a form of discretionary relief akin to an injunction even though vacatur is not, strictly speaking, a form of injunctive relief. Vacatur is a form of "equitable relief," however, and so, upon a "balance [of] the equities," vacatur may not be appropriate in all cases. Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1290 (11th Cir. 2015). See Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1139 (10th Cir. 2010)("Vacatur is an equitable remedy, indeed an 'extraordinary' one, and the decision whether to grant vacatur is entrusted to the district court's discretion." (citing U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 26 (1994)); Diné Citizens Against Ruining Our Env't v. U.S. Office of Surface Mining Reclamation & Enf't, No. 12-cv-01275-JLK, 2015 WL 1593995, at *1 (D. Colo. April 6, 2016)(Kane, J.)("[C]ourts retain equitable discretion to fashion an appropriate remedy, and in some cases equitable principles counsel in favor of remand without vacatur." (citation omitted)(citing 5 U.S.C. § 702; Pac. Rivers Council v. U.S. Forest Serv., 942 F. Supp. 2d 1014, 1021 (E.D. Cal. 2013)(England, Jr., C.J.))).

Instead of applying the traditional test for injunctive relief, the United States Court of Appeals for the District of Columbia Circuit has developed a test to determine when a court should remand without vacatur of the agency's action. "The decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" Allied-Signal, Inc. v. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993)(quoting Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 967 (1990)). Courts primarily use this test where the agency's failure is a lack of explanation or reasoned decisionmaking. See, e.g., Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d at 1290 (applying the test "[i]n circumstances . . . where it is not

at all clear that the agency's error incurably tainted the agency's decisionmaking process" and not deciding "whether remand without vacatur is permissible when the agency has erred to such an extent as to indicate that its ultimate decision was unlawful"); Allied-Signal, Inc. v. Nuclear Regulatory Comm'n, 988 F.2d at 150 (providing the test after stating that "[a]n inadequately supported rule . . . need not necessarily be vacated); Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d at 966 (providing the test after stating the court "commonly remand[s] without vacating an agency's rule or order where the failure lay in lack of reasoned decisionmaking but also where the order was otherwise arbitrary and capricious" (citations omitted)). The Tenth Circuit has not endorsed the District of Columbia Circuit's test or otherwise "specifically addressed the factors to be considered in determining whether vacatur is an appropriate remedy." Diné Citizens Against Ruining Our Env't v. U.S. Office of Surface Mining Reclamation & Enf't, 2015 WL 1593995, at * 2.

The Court set aside HHS' 2014-2018 rules for its failure to explain its budget-neutral approach to the program, which infected its decisionmaking with respect to its choice to use the statewide average premium in its formula. See supra at 82. Accordingly, with no Tenth Circuit guidance on the issue of appropriate remedy here, the Court finds the District of Columbia Circuit's test persuasive and will use it to evaluate the appropriate remedy for HHS' error. On balance, however, the Court still concludes that vacatur is the appropriate remedy. Further, there are no grounds to limit this vacatur to the state of New Mexico.

### A. THE DEFICIENCIES IN HHS' 2014-2018 RISK ADJUSTMENT RULES OUTWEIGH ANY DISRUPTIVE CONSEQUENCES THAT VACATUR MAY IMPOSE.

Where "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand" and "the consequences of vacating may be quite disruptive," the equities

point to remanding to the agency without vacatur. Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d at 151. Remand without vacatur may also be appropriate "where it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process" or where the agency's error "may turn out to be inconsequential." Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d at 1290. On the other hand, remand with vacatur is appropriate where "such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." Pollinator Stewardship Council v. EPA, 806 F.3d 520, 532 (9th Cir. 2015). Vacatur has also been found appropriate where an agency promulgated an administrative rule "without the notice-and-comment procedures mandated by the APA," and provided no explanation for not using those procedures. Alabama v. Centers for Medicare & Medicaid Servs., 674 F.3d 1241, 1244 (11th Cir. 2012). Another serious deficiency counseling vacatur is where the agency's reasoning behind a rule is "flimsy, and [the agency's] half-hearted attempt to defend its decision in this court is but another indication that [the rule] is a hopeless cause." Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1053 (D.C. Cir. 2002).

The Court is cognizant that HHS started this rulemaking process with the belief that the states would be running their own risk adjustment programs, as the statute contemplates. See 42 U.S.C. § 18063; Motion at 4. Congress always charged, however, HHS with "establish[ing] criteria and methods to be used in carrying out the risk adjustment activities," so the methodology used in implementing the programs was always HHS' responsibility. 42 U.S.C. § 18063(b). That HHS ended up having to operate the programs for all fifty states as well does not excuse its deficiency in establishing the methodology -- the erroneous assumption the program must be budget neutral. Further, it is incongruous for HHS to now say that it never made this assumption, see Motion at 12 ("HHS has never contended that the text of section 1343

alone requires the program to be budget neutral . . . ."), because it continues to state Congress'

statute "designed" the program to be budget neutral -- which is really no different from saying

that the statute requires budget neutrality, <u>see</u> Motion at 12 (reiterating that HHS has contended

only "that the program was '*designed* to be a budget-neutral revenue distribution among

issuers'" (emphasis is original)); Tr. at 31:11-15 (Powers)("The agency's position has always

been that the Risk Adjustment Program is designed to be budget neutral, as a matter of the ACA

and the broader lack of appropriations, or budget authority conferred by Congress."); Tr. at 32:6-

12 (Powers)("I think that [budget neutrality] was mandated by the absence of the authority or

appropriations . . . [s]o rather than it having been commanded by Congress, it was that there was

an absence of any authority to do it, to operate the program in any other way.").   HHS also,

however, attempts to justify budget neutrality as good policy.  <u>See</u> 2018 Final Rule, 81 Fed. Reg.

at 94,101 (A.R.009638)("In the absence of additional funding for the HHS-operated risk

adjustment program, we continue to calculate risk adjustment transfers in a budget neutral

manner . . . ."); Wu Decl. ¶ 9, at 3 ("Due to the absence of additional funding for the risk

adjustment program, risk adjustment must balance payments and charges across plans."); Cross

MSJ at 22 & n.4 (stating the program must be budget neutral, because the statute contemplates

states administering the program, and does not require states or HHS to use general

appropriations to administer payments).   These two arguments do not mesh and, rather,

contradict each other.   This flip-flopping makes it more difficult to review HHS' decision-

making process in choosing to use the statewide average premium in its formula, and underlines

the Court's conclusion that this "decision" was arbitrary and capricious.  HHS' attempt to change

its position also implies that it is attempting to provide post hoc rationalization for a decision it

was not aware it made, which cannot withstand APA review.  <u>See</u>, <u>e.g.</u>, <u>Christopher v.</u>

SmithKline Beecham Corp., 567 U.S. 142, 155 (stating deference is unwarranted "when it appears that the interpretation is nothing more than a 'convenient litigating position' or a '*post hoc* rationalization[n]' advanced by an agency seeking to defend past agency action against attack.'" (quoting Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213 (1988); Auer, 519 U.S. at 462)); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins., 463 U.S. at 50 ("[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action.").

While it is conceivable that HHS may provide sound reasons for operating the program in a budget-neutral fashion, especially because it purports to have done so for 2019, see HHS Notice of Benefit and Payment Parameters for 2019, 83 Fed. Reg. 16,930, 16,954 (April 17, 2018), the Court does not appreciate HHS attempting to rationalize budget neutrality only now when it should have provided a conscious explanation when it proposed the formula in the first instance. The Court, therefore, concludes that HHS' deficiencies in promulgating the 2014-2018 rules to be great, and not merely, as HHS construes its deficiency, a "failure to provide a sufficient explanation to permit judicial review." Motion at 22. All the cases that HHS cites to justify its proposition that remand without vacatur is appropriate are thus distinguishable, for they remanded to obtain sufficient information on which to base their review. See, e.g., Camp v. Pitts, 411 U.S. 138, 142-43 (1973)(per curiam)("If . . . there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was not to hold a de novo hearing but, . . . to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary."); Dist. Hosp. Partners, L.P. v. Burwell, 786 F.3d 46, 60 (D.C. Cir. 2015)("Having decided that the Secretary's explanation is insufficient, . . . [we] remand to the Secretary for additional explanation."); Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d at 1289

("The bottom line is we cannot now say that the Corps' ultimate conclusion . . . was unlawful. We, therefore, believe that the proper course is to remand the matter to the district court with instructions to remand to the Corps . . . ."). The APA will not allow the Court to accept HHS' lack of consideration here. See, e.g., Burlington Truck Lines, Inc. v. United States, 371 U.S. at 167 ("There are no findings and no analysis here to justify the choice made . . . . [T]he Administrative Procedure Act will not permit us to accept such . . . practice . . . ." (footnote omitted)).

The 2014-2018 rules are deficient in that HHS promulgated them with the erroneous belief that the ACA required the risk adjustment program be budget neutral. See MOO at 67-68, 312 F. Supp. 3d at 1209-10. This error, then, is much more than just the agency's failure to provide an explanation for its budget neutrality decision; this flaw is the agency making all its subsequent decisions assuming budget neutrality is a given and not making any decision on budget neutrality itself. There is no attempt to justify budget neutrality until 2016, in the 2018 Final Rule, when commenters noted that budget neutrality may not be furthering the risk adjustment program's goals. 2018 Final Rule, 81 Fed. Reg. at 94,101 (A.R.009638). Here, HHS provides an explanation which the Court finds inadequate to support the budget-neutrality decision -- "the absence of additional funding" -- but again this explanation contradicts HHS' position that Congress designed the statute to be budget neutral. 2018 Final Rule, 81 Fed. Reg. at 94,101 (A.R.009638). See supra at 84-91. While the Court is mindful that operating the program in a budget-neutral manner and using the statewide average premium to promote that goal may be the correct choice, that choice is one the agency must actually make instead of taking for granted. Building a rule on an erroneous assumption -- not even a conscious decision -- is at the heart of an arbitrary and capricious action, especially where the assumption may not

promote the authorizing statute's goals. See WildEarth Guardians v. U.S. Bureau of Land Mgmt., 870 F.3d at 1237. Thus, the 2014-2018 rules' deficiencies are not minor, and this fact supports vacatur.

Further, it is hard for the Court to determine the consequences of vacating the 2014-2018 rules, because HHS has not enlightened the Court on this front. To attempt to determine what will likely happen if it vacates the rule, and properly weigh the equities, the Court concludes it is proper to consider all the information it can as to better make an informed decision. It will thus consider the Wu Decl. and the Amici Statement to gain a sense of vacatur's consequences. These sources, however, are also unhelpful in enlightening the Court's understanding of the consequences.

The Wu Decl. first states that vacatur will prevent CMS from "invoic[ing] issuers, collect[ing] charges, or mak[ing] billions of dollars of disbursements in risk adjustment payments" for 2017 and 2018. Wu Decl. ¶ 13, at 4. Wu, Associate Deputy Director for Policy Coordination at the Center for Consumer Information and Insurance Oversight, makes this statement under oath. While CMS did initially state it would suspend payments in July, two and a half weeks later CMS expressly decided not to suspend payments. Once again, HHS told the Court something that, like every time HHS speaks to the Court, reveals its new position. The Court's experience with HHS' changing positions has not been good. HHS' hyperbole does not appear to be an equity that weighs against vacatur.

Second, Wu states that, for 2015-2016, "vacatur raises questions about the legal status of these already-administered payments and charges." Wu Decl. ¶ 14, at 4. Vacatur does not, itself, raise questions about the legal status of prior payments and charges; the merits of the decision of the MOO -- not just the remedies analysis -- has already done that. It is likely that

payees like Health Connections will seek this money back, regardless of what the Court chooses on the remedy.

Third, HHS then tries to frighten the Court by saying its decision will cause the sky to fall.  Wu states that both consequences he has claimed may "create strong financial incentives for insurance companies to raise their rates, avoid sick enrollees, or otherwise attempt to insulate themselves against the financial uncertainty of riskier enrollees."  Wu Decl. ¶ 15, at 4. Wu states that vacatur of the risk adjustment methodology will also impact the risk corridors program, forcing revisions of "billions of dollars of risk corridors calculations," disrupting expectations, and burdening health insurance companies.  Wu Decl. ¶ 19, at 5.  According to Wu, both the risk adjustment and risk corridors revisions will impact companies' medical loss ratio reporting as well.  See Wu Decl. ¶ 21, at 5.

The statements in the Wu Decl. do not persuade the Court.  The problem with Wu's predictions is that the Court issued its decision on February 28, 2018, and none of what Wu has predicted has come true.  He has proven to be a poor prognosticator.  First, insurance premiums are predicted to rise less in 2019 than they have in the past, and may go down for a few states.  See Alison Kodjak, Analysts Predict Health Care Marketplace Premiums Will Stabilize for 2019 Coverage, NPR (Sept. 3, 2018, 5:06 AM), https://www.npr.org/sections/health-shots/2018/09/03/643457582/analysts-predict-health-care-marketplace-premiums-will-stabilize-in-2019.  Second, insurance companies cannot avoid sick enrollees, because the ACA still requires them to cover people with pre-existing health connections and prevents them from charging these enrollees higher premiums.

Third, the Court notes that HHS has not been prevented in collecting payments under the risk adjustment program for 2017 and 2018, because it promulgated a new rule for 2017, and is

in the process of doing so for 2018. <u>See</u> Second HHS Notice at 1-2; Third HHS Notice at 1.

Thus, although HHS temporarily suspended taking payments under the risk adjustment program

-- for seventeen days -- it is now collecting and dispersing money owed. <u>See</u> Second HHS

Notice at 2. The Court does agree that there is uncertainty as to the legality of payments

collected and made during 2014-2016, but without knowing more about this issue it is difficult

for the Court to consider this in equity.[26] Nonetheless, the Court concludes that the effect on

prior payments weighs slightly against vacatur. The effect on the risk corridors program does

not, however, weigh against vacatur, because, as Health Connections notes, "HHS has defaulted

on its risk corridors obligations," so that program already faces havoc. Response at 20. The

Court also does not believe that vacating the rules for 2014-2018 will create uncertainty for

insurance companies as to rate-setting or cause them to raise premiums, as the administrative

record shows that insurance companies are already unclear as to how the risk adjustment

program affects them. <u>See</u> Daniel J. Perlman & David M. Liner, Milliman, <u>Financial Analysis of</u>

<u>ACA Health Plan Issuers</u> at 3 (February 2016)(NMHC001007)("Over half of ACA health plan

issuers recorded $0 in risk adjustment transfers . . . [which] could represent an acknowledgement

that it was not possible to determine whether a receipt or payment was the more likely outcome .

---

[26]The Wu Decl. makes it seem as though the charges and payments administered for 2014-2016 will stand unless, after undergoing the new rulemaking process, HHS decides to change the rules for those years. <u>See</u> Wu Decl. at ¶ 14, at 4 ("[V]acatur raises questions about the legal status of these already-administered payments and charges while CMS engages in the additional rulemaking necessitated by the Court's decision."). It is thus unclear whether HHS would have to refund all the charges collected and "would be unable to recover those fees under a later-enacted rule," <u>Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n</u>, 988 F.2d at 151, or whether issuers will have to go to the Court of Federal Claims to recoup the money they paid. Further, because HHS does not raise the issue of retroactive rulemaking, the Court can only speculate as to how much of a concern this prediction is, if even a concern at all, so it is difficult to evaluate how this factor weighs in equity. According to Health Connections, it is one of only four CO-OPs left, so there not be many, if any, claims.

. . ."); CHOICES, <u>Improving Risk Adjustment to Improve the Market Today</u> (March 29, 2016)(NMHC000190)("Transfer payments for Risk Adjustment have been difficult to predict, highly variable, and in some cases vary large in relation to insurers' premium amounts."). First, deciding whether one will be a payee or payor is so uncertain that insurers do not even make a receipt on financial statements; predictability is that poor. <u>See</u> Perlman & Liner, <u>supra</u> at 3 (NMHC001007). Second, there is at least a two-year gap between when premiums are set and when risk adjustment calculations are made, meaning the risk adjustment calculation may be impacted in ways insurers cannot predict when setting their rates. <u>See</u> Victoria Boyarsky & Rong Yi, Milliman, <u>EHB, MLR and Risk Adjustment: Stakeholder Considerations on the 2019 Proposed Notice of Benefit and Payment Parameters</u> at 6 (January 2018). So risk adjustment is a non-factor in setting premiums. Further, the record shows the program itself has harmed insurers and the insured, with exorbitant charges forcing some insurers to close their doors, decreasing market competition, and increasing premiums. <u>See</u> <u>supra</u> at 9-11. It is unclear how vacatur will impact medical loss ratio reporting, as HHS has not provided further information besides saying it will be impacted. On balance, then, these equities weigh slightly in favor of vacatur.

Finally, the Amici Statement discusses only AHIP and Blue Cross' surprise with HHS' suspension of the risk adjustment program and how the suspension affects the market. <u>See</u> Amici Statement at 1-2. It notes that the suspension "jeopardizes the future market participation of plans" and "creates profound uncertainty for future health plan pricing." Amici Statement at 2. The Amici Statement states that the suspension also brings uncertainty into insurers' "calculation of their medical loss ratio." Amici Statement at 3. While the Court appreciates that AHIP and Blue Cross filed this Statement, the concerns are mooted now, because the risk adjustment program is no longer suspended. Accordingly, none of these concerns add anything

to the Court's equitable considerations. The Court notes, however, that, because the Amici Statement came only after HHS suspended the program and does not discuss any harms to insurance companies resulting from vacatur of the prior years, it appears that insurance companies -- at least AHIP and Blue Cross -- do not seem to be concerned by this issue of remedies. The insurance companies did not file the Amici Statement after the Court issued its MOO on February 28, 2018, but only after HHS suspended payments.

In sum, it is difficult for the Court to determine how disruptive vacatur will be. So far -- nearly eight months after the MOO -- vacatur has not been very disruptive. Although HHS could arguably justify budget neutrality and the resulting decision to use the statewide average premium if the Court remanded without vacating the rules, the Court concludes this remedy would be contrary to the APA's mandate. HHS operated with the conclusion that the program had to be budget neutral, and all its reasoned decisionmaking stemmed from this erroneous assumption -- until commenters noted that budget neutrality may not promote the program's goals. This combined with HHS' later justification that it did not have money to operate the program any differently -- which again, was erroneous -- counsels that the Court should vacate the 2014-2018 rules. This situation is not a case where the Court did not have sufficient information to decide whether HHS had acted arbitrarily and capriciously. There is a sufficient record here to conclude HHS acted arbitrarily and capriciously. HHS merely providing additional justification for budget neutrality and the use of the statewide average premium would not fix its error in assuming that the ACA required the risk adjustment program to be budget

neutral.  HHS must consciously make the decision to conduct the program in a budget-neutral manner and provide sufficient justification for this decision. [27]

Finally, the Court cannot, in an intellectually honest manner, limit vacatur of the rules to the state of New Mexico.  The Court does not know how a court vacates a rule only as to one state, one district, or one party.  The main Department of Justice lawyer advised that he was not sure if the department had ever asked for relief to be limited to one state before doing so in this case and did not know of anyone else in the United States asking for such relief.  See Tr. at 91:14-92:7 (Court, Powers).  The rules do not apply only to New Mexico; they apply nationwide and, thus, have nationwide harms.  Further, the deficiencies with the rules are not specific to New Mexico but, again, rather inherent in the rules themselves.  The Court vacates only the 2014-2018 rules as to the statewide average premium rules,[28] so this is a limited and tailored vacatur as to the deficiencies in the rules; the remaining provisions stand.[29]

---

[27]"[F]orcing an agency to supply better reasons for doing what it's already done is unlikely to mollify those who brought the initial challenge or to inspire agencies to craft higher-quality rules in the first place."  Nicholas Bagley, Remedial Restraint in Administrative Law, 117 Colum. L. Rev. 253, 309 (2017).

[28]This vacatur is not a grant of a nationwide injunction, so the cases HHS cites to support its request for limiting vacatur to New Mexico are inapplicable.  See L.A. Haven Hospice, Inc. v. Sebelius, 638 F.3d 644, 664-65 (9th Cir. 2011)(stating "that nationwide injunctive relief may be inappropriate where a regulatory challenge involves important or difficult questions of law"); Hospice of N.M., LLC v. Sebelius, 691 F. Supp. 2d 1275, 1294 (D.N.M. 2010)(Brack, J.) (discussing the plaintiff's request "that the Court impose a nationwide injunction"), aff'd, 435 F. App'x 749 (10th Cir. 2011)(unpublished).  As described by Samuel L. Bray, professor at UCLA School of Law, a national injunction is where, "in non-class actions, federal courts are issuing injunctions that are universal in scope -- injunctions that prohibit the enforcement of a federal statute, regulation, or order not only against the plaintiff, but also against anyone."  Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 419 (2017)(emphasis in original).  The Court did not in its MOO, and is not now, issuing a nationwide injunction prohibiting enforcement of the rule; it is, instead, "set[ting] aside and vacat[ing] the agency action as to the statewide average premium rules" and remanding to HHS. MOO at 71, 312 F. Supp. 3d 1211-12.  Congress expressly allows a district court to enter a

vacatur order. See 5 U.S.C. § 706 ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."). It is not ordering HHS to take some action or to refrain from taking some action. While the effects of vacatur and an injunction may be the same, they are separate forms of relief. See Monsanto Co. v. Geertson Seed Farms, 561 U.S. at 565-66.

[29] Professor Bagley also states that "it's possible that the New Mexico court meant to impose a nationwide injunction," and suggests that the DOJ policy is against nationwide injunctions. Bagley, supra. While Professor Bagley's position is not entirely clear, he seems to suggest that the Court issued a nationwide injunction, or, more likely, that HHS read the Court's MOO and used it to justify suspending risk adjustment payments, which suspension acts like a national injunction and that is inconsistent with DOJ's policy on national injunctions. Professor Bagley does not, however, state whether he is for or against national injunctions.

As an initial matter, the Court has already discussed that it did not issue a national injunction. See infra note 28. Second, even if it can be likened to an injunction order, Congress has expressly granted the power to district courts to vacate agency rules that are arbitrary and capricious, or unlawful. Third, Professor Bagley's questions seem more with what HHS did with the Court's MOO that what the Court did. Fourth, there seems to be some tension between the DOJ's position against nationwide injunctions and its hospitality to Chevron deference. See Assistant Attorney General John C. Cruden Delivers Remarks on the Enduring Nature of the Chevron Doctrine at the D.C. Bar's Administrative Law and Agency Practice Committee's Harold Leventhal Lecture (Nov. 10, 2015), available at https://www.justice.gov/opa/speech/assistant-attorney-general-john-c-cruden-delivers-remarks-enduring-nature-chevron.

Recently, there has been an influx of Professors, Justices, Congresspeople, and academia discussing the propriety of federal district court judges issuing "national injunctions," i.e., "injunctions that apply across the nation, controlling the defendant's behavior with respect to nonparties." Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 418 (2017). The criticism seems to be mostly due to the fact that there have been twenty-nine preliminary injunctions entered against the current administration. The critics see these courts as blocking the democratic process. A few years ago, a more liberal administration criticized judges for blocking its executive orders and its laws, including the ACA. What seems clear is that the rule on national injunctions should not depend on whether the injunction blocks legislation the critics like. In the end, the discussion should be governed by more rational principles than whether the critics or proponents like or dislike the legislation.

Whether the nation will allow or not national injunctions is less of a legal issue and more of a policy issue. The critics have not really said that current law -- Congress or some statute -- precludes national injunctions; rather, critics mostly argue that prudential concerns counsel against national injunctions. Congress or the Supreme Court will have to make that call. It would be easy to be aggressive. As a conservative, cautious judge, the Court is inclined not to go any further than the case requires and leave nonparties' law for another day. It is not always clear whether a national injunction has been entered. For example, in this case, there is no national injunction, but vacatur may affect non-parties to this case. On the other hand, even

when an injunction limited to the parties, it may effectively impact nonparties. Finally, the national injunctions that seem to draw criticism the most are those against the federal government and not other entities, so it is unclear whether critics are concerned, for example, with national injunctions against corporations in some or all instances.

Critics of federal district court judges issuing national injunctions argue that this practice "encourages forum shopping and that it arrests the development of the law in the federal system." Bray, supra at 419. The grant of an injunction in one circuit, for example, may discourage plaintiffs from bringing similar challenges in different circuits, thus preventing other circuits from developing their views on the issue. See Bray, supra at 461. This reality means that, when the issue reaches the Supreme Court, it is "more likely to hear a case without the benefit of disagreement from the courts of appeals," and its "resolution may be accelerated and relatively fact-free," leading to a bad development of law. Bray, supra at 461-62. Criticism also stems from the fact that, in the multiple-judge federal system, a number of judges may be deciding the same issue in different courts, so conflicting injunction orders may issue. See Bray, supra at 420. According to critics, these conflicting orders creates absurdity in that, to carry out its policies, the United must win every case brought against it seeking to halt a policy, yet a plaintiff need win only once for the policy to be invalidated. See Suzanne Monyak, New House Bill Seeks to Bar Nationwide Injunctions, Law360 (Sept. 10, 2018, 6:09 PM), https://www.law360.com/articles/ 1081108/new-house-bill-seeks-to-bar-nationwide-injunctions . Accordingly, the House Judiciary Committee has recently introduced a new bill -- the Injunctive Authority Clarification Act of 2018 -- which, as it is currently written, provides that "[n]o court of the United States . . . shall issue an order that purports to restrain the enforcement against a non-party of any statute, regulation, order, or similar authority, unless the non-party is represented by a party acting in a representative capacity pursuant to the Federal Rules of Civil Procedure." Injunctive Authority Clarification Act of 2018, H.R. 6730, 115th Cong. (2018), available at https://www.congress.gov/bill/115th-congress/house-bill/6730/text.

While the Court agrees that national injunctions often are anti-democratic and messy, the Court also is inclined to think that national injunctions have their place in a federal court's arsenal of equitable relief. There is nothing inherently wrong in a federal court issuing a national injunction. The criticisms against the national injunction do not completely move the Court from this stance. First, the Court notes that, as to the issue of forum shopping, prohibiting national injunctions will not solve this issue, and the Court is not convinced that forum shopping is a strong issue here. See Suzette M. Malveaux, Class Actions, Civil Rights, and the National Injunction, 131 Harv. L. Rev. F. 56, 57 (2017)("Forum shopping is hardly new and, in fact, the American legal system tacitly encourages with its charge that lawyers zealously represent their clients within the bounds of the law." (footnote omitted)). Zealous litigators are inclined to head to the Ninth Circuit as compared to the Tenth, regardless whether a national injunction is available or not. Second, the national injunction does not create bad development of law. Courts do not issue injunctions lightly. The standard to receive an injunction is high, and litigants have every incentive to zealously argue for their position. There must be some facts presented for a court to determine whether a plaintiff is likely to succeed on the merits of the case. While deciding an issue on such a bare record is not ideal, this is the standard for receiving a preliminary injunction. See Winter v. NDRC, 555 U.S. 7, 20 (2008)("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to

suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). The protections that Congress has put in place balance this uncertainty: (i) the requirement for a hearing, see Fed. R. Civ. P. 65(a); (ii) the requirement for "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," unless the party seeking the injunction in the United States government, Fed. R. Civ. P. 65(c); (iii) the requirement that an order granting an injunction state the reasons for and the terms of the injunction, see Fed. R. Civ. P. 65(d)(1); (iv) the ability to stay an injunction during an appeal, see Fed. R. App. P. 8(a)(1)(c); and (v) the right to immediately appeal an injunction order, see 28 U.S.C. § 1292. Restraining the conduct of another is a serious remedy, but, as discussed, there are many safeguards in place to ensure this remedy is provided in a reasoned manner. That the Supreme Court may have to decide whether to overturn a preliminary injunction on a bare record is not ideal, but mnay6 times these cases involve a key legal issue and thus ultimately rarely create bad law. Again, the standard is based on the likelihood of success on the merits; there is not a ruling on the merits. Further, a preliminary injunction is just that -- preliminary. It is not meant to, and cannot, last forever. The decision to grant a permanent injunction is done with a full factual record once the merits have been decided, allowing for a full review at the Supreme Court when the law will be decided on the merits.

Critics of the national injunction also note the apparent lack of legal authority for federal courts to issue national injunctions. The argument is that, because equitable remedies must be grounded in traditional equity as it existed in the Court of Chancery in 1789 and because traditional equity had nothing similar to a national injunction, federal courts today lack the ability to issue national injunctions. See Bray, supra at 425. In traditional equity, the Court of Chancery, as it originated from the Crown, would not enjoin the Crown and would normally issue decrees affecting only the parties before it. See Bray, supra at 425-27. Broader relief could be obtained, however, where it resolved the "common claims of cohesive group," which allowed "a successful plaintiff to obtain an injunction protecting all similarly situated persons" and, thus, affecting nonparties. Bray, supra at 427.

The Court also has issues with this ground for prohibiting national injunctions. The federal government is one of checks and balances, and all three branches must work together to promote an organized society. "The legislative department has been committed the duty of making laws, to the executive the duty of executing them, and to the judiciary the duty of interpreting and applying them in cases brought before the courts." Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 488 (1923). The constitutional requirement of standing thus requires a plaintiff to show some concrete injury resulting from the law's enforcement, for a federal court to properly enjoin enforcement without stepping on the toes of the other two branches. See, e.g., Commonwealth of Massachusetts v. Mellon, 262 U.S. at 488. Where the complaint asserts merely "that officials of the executive department of the government are executing and will execute an act of Congress asserted to be unconstitutional," the court may not enjoin, because "[t]o do so would be, not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and coequal department," which courts do not have the power to do. Commonwealth of Massachusetts v. Mellon, 262 U.S. at 488-89. An unconstitutional statute or action, however, cannot be law; rather, it is "as inoperative as though it has never been passed." Norton v. Shelby Cty., 118 U.S. 425, 442

(1886).  It is the federal judiciary's role to "say what the law is" and, thus, determine whether Congress' action violates the Federal Constitution.  Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177-78 (1803).  Federal courts may not give weight to unconstitutional laws, for doing so "would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits."  Marbury v. Madison, 5 U.S. (1 Cranch) at 178.  Deciding the law of a case to uphold the Constitution as Marbury v. Madison counsels and enjoining the enforcement of an unconstitutional statute as to the plaintiff bringing the case certainly restricts the Legislature to a degree.  This narrow relief is not enough for due justice in all situations.   If there is a conviction is that "an act of the legislature, repugnant to the constitution, is void," Marbury v. Madison, 5 U.S. (1 Cranch) at 177, then it is not enough to enjoin enforcement only as to one person.  This narrow relief provides no justice for those who, for some reason, cannot bring a case to prevent the executive from applying this void law to them.

Limiting the injunction also does nothing to prevent the broader effects of the void law. In effect, then, while the law is void as to the deciding case, it still stands as to everyone else who has not challenged it.  This result means that the law, which should be void for conflicting with the Supreme Law of the land, is still influencing conduct.  Thus, the Legislature still has "a practical and real omnipotence," and is still able to "do what is expressly forbidden."  Marbury v. Madison, 5 U.S. (1 Cranch) at 178).  Where a plaintiff has standing to challenge the law -- therefore showing an actual, concrete injury -- and shows that the law is unconstitutional, then to fully provide justice a federal court should have the power to void the statute and uphold the sanctity of the Constitution by striking the statute down, i.e., enjoining its enforcement broadly.

Critics also note a number of doctrinal inconsistencies that the issuance of national injunctions creates.  These inconsistencies include: (i) national injunctions render meaningless the legal principle that nonmutual, offensive issue preclusion cannot be used against the federal government; (ii) the use of rule 23(b)(2) class actions are unnecessary if a national injunction provides the same relief to an individual plaintiff; (iii) the inability of nonparties to enforce an injunction order; and (iv) the ability of federal district court judges to "recognize and determine the law" for nonparties through a national injunction, when their decisions cannot and should not bind other district courts or create precedent or clearly established law.  Bray, supra at 464-65. Again, these criticisms do not sway the Court's belief that national injunctions have their place in promoting a just society, but they counsel extreme caution in using them.

An injunction has been issued as to a party -- the defendant -- who had a full and fair chance to litigate.  Enjoining that defendant's enforcement of an unconstitutional law means that law cannot stand.  Should that defendant then attempt to enforce the law against a nonparty, that person would not be able to sue for contempt under the injunction, but would rather have to relitigate the issue.  The point of the injunction is to attempt to prevent the defendant from enforcing the law at all, which a federal court could do because the defendant is a party in front of it.   Finally, a national does not create binding precedent, and does not create clearly established law for qualified immunity purposes.   A national injunction, as with any other injunction, is enforceable via contempt of court only by the court that issued the injunction.  It is true that the national injunction is an "imperfect and crude form[] of justice," but the Court is inclined to believe that, without it, there are situations in which justice cannot be served. Malveaux, supra at 56.

**IT IS ORDERED** that: (i) the Defendants' Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59(e), filed March 28, 2018 (Doc. 57), is denied; (ii) the Plaintiff's Motion to Strike the Declaration of Jeffrey Wu or in the Alternative Grant Plaintiff Leave to Take Discovery, filed April 23, 2018 (Doc. 61), is denied; and (iii) the Motion of America's Health Insurance Plans and Blue Cross Blue Shield Association for Leave to File Statement on New Developments in Support of Rule 59(e) Motion as Amici Curiae, filed July 19, 2018 (Doc. 80), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Nancy Ruth Long
Long Komer & Associates, P.A.
Santa Fe, New Mexico

-- and --

Barak A. Bassman
Leah Greenberg Katz
Marc D. Machlin
Sara Richman
Pepper Hamilton, LLP

---

In the end, there are sound policy reasons for and against national injunctions. Congress and/or the Supreme Court will decide the issue. On balance, the Court agrees with the criticism that they should be used sparingly and carefully, but that there is some room in the nation's democratic society for them. Cases have to get started somehow, and most get started in the district court, which either gets the issues right or wrong in the first instance.

Finally, if Congress or the Supreme Court limits national injunctions, it should not do so in a way that displays some form of elitism. The critics seem uncomfortable with national injunctions in Hawaii, California, or New Mexico, but less so if they come out of S.D.N.Y. or the District of Columbia. Again, that limitation would not be a national principle, but only would reflect a distaste for everyone and everything that is not on the East Coast.

Philadelphia, Pennsylvania

*Attorneys for the Plaintiff*

Chad A. Readler
    Acting Assistant Attorney General
Joel McElvain
    Assistant Branch Director
Arjun Garg
Serena Orloff
James R. Powers
    Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Washington, D.C.

*Attorneys for the Defendants*